1                IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3   AMERICAN SOCIETY FOR        .   Case No. 24-CV-1895
    TESTING AND MATERIALS,      .
4   DOING BUSINESS AS           .
    ASTM INTERNATIONAL,         .
5                               .          **REDACTED**
            Plaintiff,          .
6                               .
            v.                  .
7                               .
    UPCODES, INC., *et al.,*     .
8                               .
            Defendants.         .   Monday, August 26, 2024
9   . . . . . . . . . . . . . . .   10:21 A.M.

10

11

12               TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE ANITA S. BRODY
13         UNITED STATES SENIOR DISTRICT COURT JUDGE

14

15
    APPEARANCES ON NEXT PAGE.
16

17

18  Deputy Clerk:            Joseph B. Walton
                             James A. Byrne U.S. Courthouse
19                           601 Market Street
                             Philadelphia, Pennsylvania 19106
20

21  Transcription Service:   Liberty Transcripts
                             9107 Topridge Drive
22                           Austin, Texas 78750
                             (847) 848-4907
23                           DBPATEL1180@GMAIL.COM
                             www.libertytranscripts.com
24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.


                        **LIBERTY TRANSCRIPTS**
                          **(847) 848-4907**

```
 1
     APPEARANCES:
 2
     For the Plaintiff:        DLA Piper LLP (US)
 3                             BY: J. KEVIN FEE, ESQUIRE
                               500 Eighth Street, NW
 4                             Washington, D.C. 20004
                               (202) 799-4441
 5                             kevin.fee@us.dlapiper.com

 6                             DLA Piper LLP (US)
                               BY: JANE W. WISE, ESQUIRE
 7                             500 Eighth Street, NW
                               Washington, D.C. 20004
 8                             (202) 799-4149
                               jane.wise@us.dlapiper.com
 9
                               DLA Piper LLP
10                             BY: GABRIELLE VELKES, ESQUIRE
                               1251 Avenue of the Americas
11                             New York, New York 10020
                               (212) 335-4812
12                             gabrielle.velkes@us.dlapiper.com

13   For the Defendants:       Morrison & Foerster LLP
                               BY: JOSEPH C. GRATZ, ESQUIRE
14                             425 Market Street
                               San Francisco, California 94105
15                             (415) 268-7000
                               JGratz@mofo.com
16
                               Hangley Aronchick Segal Pudlin &
17                                 Schiller
                               BY: BONNIE M. HOFFMAN, ESQUIRE
18                             One Logan Square 27th Floor
                               Philadelphia, Pennsylvania 19103
19                             (215) 496-7062
                               bhoffman@hangley.com
20
                                   *  *  *  *  *
21

22

23

24

25
```

1       (Whereupon, at 10:21 a.m., the proceeding was commenced.)

2           THE COURT:  Do you have the names of the people?

3           Oh, okay, thanks.

4           All right, I recognize you kind of from before.

5           Okay.  would you like to begin?

6           MR. FEE:  Sure, Your Honor.

7           THE COURT:  Okay.  You don't have any witnesses, is

8  that right?

9           MR. FEE:  No.

10          THE COURT:  There are going to be no witnesses?

11          MR. FEE:  Neither party is bringing witnesses, Your

12 Honor, because we had --

13          THE COURT:  Oh, really?

14          MR. FEE:  -- a chance to do depositions and

15 submitted the deposition testimony to Your Honor.

16          THE COURT:  Oh, okay.  I thought that you were going

17 to submit witnesses.  Okay. that's fine.

18          MR. FEE:  Okay.  That's good.

19          THE COURT:  That's submitted.  But I want to

20 understand that you've submitted the depositions.

21          MR. FEE:  Yes.

22          THE COURT:  Okay.

23          MR. FEE:  The other thing, a couple things before we

24 get started on the substance, Your Honor.

25          First of all, I want to make sure you're aware.

1  Over the weekend, we filed a copy of a decision that was

2  issued late on Friday from the court in the NFPA v. Upcodes

3  case, where the court granted summary judgment in favor of

4  NFPA on the issues of copyrightability and copyright

5  ownership, as well as copying itself or infringement, and

6  denied Upcodes' motion for summary judgment of fair use.

7  We'll be referring to some portions of that throughout this

8  proceeding.

9           THE COURT:  Is that a Third Circuit case?

10          MR. FEE:  No, no.  I think it's the Central District

11  of California case that was issued on Friday.

12          THE COURT:  Oh, it's a district court case.

13          MR. FEE:  Yes.

14          THE COURT:  I have not read it.

15          MR. FEE:  Okay.

16          THE COURT:  My law clerk told me it was -- so if

17  you'd like to hand one up, that would be lovely.

18          MR. FEE:  We do have that, Your Honor.

19          May I approach, Your Honor?

20          THE COURT:  Yeah, sure, of course.  You don't have

21  to ask me questions like that.  Okay.

22          MR. FEE:  One thing I want to flag for Your Honor,

23  too, about this decision is it was filed under seal with this

24  Court because it was sealed by the Central District of

25  California.  The only way we got access to it is both NFPA

1 and Upcodes agreed that we could have access to it for

2 outside counsel only, for ASTM, and to submit it to the Court

3 under seal.

4           THE COURT:  Okay, no problem about that.

5           MR. FEE:  Okay.  So there will be references to both

6 that decision, which is sealed, and some of the other

7 materials that have been designated as "Outside

8 Counsel/Attorneys' Eyes Only.  So I don't know how Your Honor

9 would like to handle those issues with respect to the

10 transcript or if anybody enters the courtroom.

11           THE COURT:  Well, if Defense has no objection, I'll

12 just keep that under seal.  I have no problem with that.

13           MR. FEE:  Okay.

14           THE COURT:  Do you?

15           MR. GRATZ:  No objection, Your Honor.

16           THE COURT:  All right, good.

17           MR. FEE:  Great.  So we've --

18           THE COURT:  All right, Joe?  Okay.

19           MR. FEE:  With all that behind us, Your Honor, first

20 of all, let me introduce myself again.  My name is Kevin Fee.

21 I'm at DLA Piper, and I represent American Society for

22 Testing of Materials, a plaintiff in this case.  And I'm

23 joined here by Jane Wise and Gabby Velkes, also from DLA

24 Piper.

25           THE COURT:  Okay.

1          MR. FEE:  Your Honor, we do have a presentation

2    today that I'd refer to here from time to time.

3          THE COURT:  One second, let me --

4          MR. FEE:  Do you have that up, Your Honor?

5          THE COURT:  Oh, I have it on my big screen.  Okay.

6          MR. FEE:  Great, terrific.

7          First of all, I thought it would just make sense to

8    make sure we're all on the same page with some of the basic

9    facts at issue in this case.  I thought it would make sense

10   to start with who is ASTM, the Plaintiff in this case.

11         ASTM is a standards development organization that

12   was first founded in 1898, currently located in West

13   Conshohocken, Pennsylvania.  And it has developed over 13,000

14   standards during the course of its existence.  So as I

15   mentioned, ASTM has developed 13,000 standards over the last

16   century or so, but what it doesn't do is develop model codes.

17         So what are model codes?  Well, the court in the

18   Fifth Circuit just recently told us that model codes serve no

19   other purpose than to become the law.  That's consistent with

20   its previous finding in the Veeck case where it described

21   model codes.  And model codes are typically very large

22   documents.  I've got some of them right here.  This is the

23   Canadian Standards Association's Electrical Code that was at

24   issue in the Fifth Circuit case that was issued last month.

25         They cover a wide variety of topics.  For example,

1   if we turn to the next slide, the Canadian Standards

2   Association's publication that was issued in that case dealt

3   with things as diverse as electrical requirements for patient

4   care areas, fire alarms, elevators, amusement parks, pools,

5   and electrical vehicle charging systems that I contrast with

6   standards, like what are written by ASTM.

7           Standards, CSA tells us, are works that are written

8   that have other non-governmental uses and are not written

9   just for the purpose of becoming the law, as is the case with

10  standards in this case.  They often focus on much more narrow

11  subject matters as opposed to a broad area of topic.  For

12  example, we have here ASTM A36, which deals with

13  specifications for carbon steel.  ASTM A36, for example, is

14  three pages, not hundreds or nearly 1,000 pages, like the CSA

15  publication.

16          Now, one other thing that helps distinguish

17  standards from model codes, and the CSA court, again,

18  referred to this in its recent opinion, is that model codes

19  make it abundantly clear that they're intended to become the

20  law.  They frequently say that they're intended to be adopted

21  by jurisdictions.  And if you look here on this slide, for

22  example, we show a sample ordinance to adopt the code that

23  was at issue in the Veeck case.  This is the SBCCI Building

24  Code from 1994, which has express language for adopting the

25  word pursuant to law.

1        Now, unlike those model building codes, again, if

2   you look at any of the ASTM standards, there's nothing

3   remotely close to this suggesting how any organization or

4   governmental authority should go about adopting those works.

5        Here's just to give you some example of how specific

6   these standards are.  This, again, is an excerpt from ASTM

7   A36, and it provides for a tension test for carbon steel that

8   would be used in many circumstances.  As you see in the table

9   here, it provides specific measurements for the required

10  tension requirements for carbon steel, depending on the shape

11  and use of the steel at issue.

12       Now if you turn to the next page, this is here just

13  to make the point that nobody who's governed by the building

14  codes, such as the Pennsylvania Building Code, is going to do

15  this tensile strength requirement test.  It requires very

16  expensive machinery.  This example here was $16,000.

17  Nobody's going to go out if they're building a home or even

18  if they're a construction company and buy this $16,000 piece

19  of machinery to test whether or not the carbon steel that

20  they're using complies with this ASTM standard.

21       But what this one does, if you turn to the next

22  page, basically it just pulls the carbon steel as hard as it

23  can until it starts to deform, and that's how you figure out

24  whether or not it complies with an ASTM standard.  So you may

25  then wonder, well, what is somebody supposed to do if they're

1  trying to build a building in Pennsylvania? What they do is
2  they look for steel that has been certified to comply with
3  ASTM A36.  They don't go out and buy a $16,000 piece of
4  equipment and then try to figure out whether or not it meets
5  the requirements as set forth in ASTM A36.
6        So with that factual background, I thought it would
7  make sense then to talk a little bit about incorporation by
8  reference.  Now, as Your Honor, I think already understands,
9  incorporation by reference occurs when a governmental entity
10  adopts or references a privately authored model code instead
11  of replicating all that language and directing its own
12  language, in many cases, into the statute or regulation at
13  issue.
14        And governmental authorities do that for many
15  reasons.  First of all, governmental authorities frequently
16  don't have the expertise to determine what is the best or
17  most appropriate requirements for buildings such as those
18  governed by the International Building Code.  And it also
19  helps ensure some sort of measure of uniformity between many
20  jurisdictions.  You know, Pennsylvania also incorporates the
21  same building code that's been adopted in New Jersey, it
22  makes standardization much easier for all the participants in
23  that marketplace.
24        But many times, the government organizations do
25  incorporate these by reference rather than repeating the

1  language in the statute to respect the copyrights of the

2  standards development organizations that create these model

3  codes and standards.  So I bring this up because it's

4  important to note that many of the cases we talk about today

5  do relate to incorporation by reference.  But it's also

6  important to note that none of the works that are at issue in

7  this case have been incorporated by reference by any

8  governmental authority.

9          Let's talk about what happened to these works.  All

10  the ASTM works that are referenced or at issue in this case

11  were only referenced in a draft or in a model building code

12  written by the International Building Code or International

13  Code Council.  So the International Code Council is

14  incorporated by reference by jurisdictions such as

15  Pennsylvania.  The International Building Code that's

16  incorporated by states such as Pennsylvania refers to

17  literally thousands of privately authored works, ten of which

18  are the works that are at issue in this case.

19          THE COURT:  That's ICC.

20          MR. FEE:  Yeah, ICC writes a model building code

21  that's incorporated by reference by states like Pennsylvania.

22  ICC's Model Building Code refers to thousands of other

23  privately authored works, including the ten works here.

24          THE COURT:  Out of curiosity, how did it get from

25  the Plaintiff to ICC?  I mean, did they buy -- what are they

1  doing?  Is it licensed?  Is it a --

2         MR. FEE:  No, they do not license the standards.

3  And the reason they don't have to license the standards is

4  they don't reproduce the language of any of those thousands

5  of standards in the book itself.  This thing is 900 pages,

6  not because it's reproducing thousands of other parties'

7  publications.  It's literally, that's all developed by just

8  the one organization.

9         So, but the persons who are involved in developing

10 model building codes are frequently involved in the industry

11 and they're familiar with lots of the other standards that

12 they're often using.  And they oftentimes decide that it

13 makes sense rather than create some new test for tensile

14 requirements for carbon steel to incorporate pre-existing

15 standards that are already in use in industry, such as those

16 you know, an issue in this case.

17        Does that make sense, Your Honor?

18        THE COURT:  Yeah.

19        MR. FEE:  Okay.  And in addition --

20        THE COURT:  I don't know what sense you want me to

21 know whether it makes sense, but I understand what you're

22 saying.

23        MR. FEE:  Okay.  And I think it's also important to

24 note that, you know, the International Building Code, it gets

25 incorporated by reference in Pennsylvania, for example.  It

1  refers to thousands of privately authored works, including

2  the ten works at issue here.  But then those thousands of

3  incorporated or reference works in the International Building

4  Code, like the ASTM standards here --

5          THE COURT:  You're speaking a little quickly.

6          MR. FEE:  Sorry.

7          THE COURT:  Yeah.  I'm the only one allowed to speak

8  a little quickly in the courtroom.

9          MR. FEE:  Okay, I'll slow down.

10          But for example, the ASTM standard A36, that's

11  identified on this slide here, is incorporated by reference

12  by the International Building Code.  But that standard also

13  refers to 22 additional ASTM standards and 7 third-party

14  standards.  And then each of those standards refers to

15  standards of other private organizations.

16          So you see here on this slide, we have a little

17  nesting doll here.  The idea is that there's one

18  International Building Code that refers to thousands of

19  privately authored standards.  And each of those standards

20  refers to other standards, which then refer to other

21  standards and then refer to other standards.

22          So what's at issue here is not just whether or not

23  works that are incorporated by reference that refer to

24  privately authored standards, like the ASTM standard, lose

25  their copyright.  But the position of Upcodes is anything

1   that ever gets referenced in any work that's incorporated by

2   reference, directly or indirectly, loses its copyright

3   protection.  And if that's the case, not only do the

4   thousands of works that are referenced in the International

5   Building Code lose their copyright protection, but every

6   other privately authored work that's referenced in one of

7   those thousands of standards would also lose its copyright

8   protection.

9        So with that background, just a little bit about

10  what Upcodes is.  You know, Upcodes is a Silicon Valley

11  venture fund, for-profit company that sells and licenses the

12  right to access many model building codes that are

13  incorporated by reference by various jurisdictions.  It also

14  makes them available for free so that they could be copied

15  and redistributed however the user deems fit.

16       Now Upcodes, like ASTM, targets the architecture,

17  engineering, and construction industries as their customers.

18  That's sometimes also referred to as the AEC community.  Now

19  initially, Upcodes was just posting codes and standards that

20  were directly incorporated by reference by a governmental

21  authority.  But recently, it started going down the path of

22  reproducing works that were just third-party references on

23  its website as well.  And that's where ASTM comes in in this

24  case.

25       THE COURT:  So now what they copied was on the ICC?

1          MR. FEE:  Yeah, they --

2          THE COURT:  In other words, there's a middle person.

3          MR. FEE:  Yeah.

4          THE COURT:  And this is, as far as I could find,

5    this is the only case that involves a middle person.  Is that

6    correct?

7          MR. FEE:  That's correct, Your Honor.

8          THE COURT:  I mean, the legal significance of that

9    I've made -- I haven't concluded, but that's -- I want to

10   make sure I understand it.

11         MR. FEE:  That's correct, Your Honor.

12         THE COURT:  Okay.

13         MR. FEE:  All of the other cases that either of the

14   parties have cited have addressed the issue of whether or not

15   works that were directly incorporated by reference by a

16   governmental authority lose their protection.

17         THE COURT:  And that's your main argument, primary

18   argument.  Is that correct?

19         MR. FEE:  That's certainly one of the main arguments

20   we're making is that those cases -- well, first of all,

21   they're not consistent with the Supreme Court's decision in

22   Georgia, but even if they were, those cases deal with

23   standards that were incorporated by -- or model codes that

24   were incorporated by reference.

25         THE COURT:  All right.  You're going to have to tell

1   me why you care that -- why you're contending that the

2   outcome should be different.

3          MR. FEE:  Sure, I'd be happy to do that, Your Honor.

4          So now, Upcodes, as you can see on this slide,

5   they've posted ten ASTM standards.  Those are the ones that

6   are in the darker text right now, but they have plans to post

7   additional ASTM standards, and that's what these grayed out

8   ones are.  That's sort of the start of what they're going to

9   post.  But the evidence we've submitted to Your Honor also

10  indicates that they've already purchased, I think, at least

11  60 additional ASTM standards that they're obviously intending

12  to post at some time in the future if they're not enjoined

13  from doing so.

14         THE COURT:  All right.

15         MR. FEE:  So one of the other things that makes --

16         THE COURT:  Okay, do you want me?

17     (Whereupon, Court confers briefly with courtroom staff.)

18         MR. FEE:  So I think it's also worth noting that

19  Upcodes doesn't make the ASTM standards that are on its

20  website accessible for anybody on the internet. You have to

21  create an account, and they have a password-protected area of

22  their website where the ASTM standards are located.  And

23  that's different from what they did when they were posting

24  the model building codes that were directly incorporated by

25  reference.

1          Here's an example of the National Fire Protection

2   Association's Cde being reproduced on their website that did

3   not require any password protection.

4          THE COURT:  You're, again, speaking too quickly.  I

5   think I understand the case, but you have to speak a little

6   more slowly.

7          MR. FEE:  I'm sorry.  Okay.

8          THE COURT:  Okay.

9          MR. FEE:  So unlike the other cases that involved

10  Upcodes, this case does not involve an instance where the

11  standards at issue or codes at issue are freely accessible.

12  You have to create an account, and it's behind a

13  password-protected paywall.  Paywall's the wrong word, but

14  password-protected wall.

15         So we asked Upcodes, why are you password-protecting

16  ASTM standards?  And what they told us is they didn't want AI

17  tools to get access to our standards, which we thought was

18  pretty ironic because their supposed mission is to make these

19  standards freely available and easily accessible as possible

20  but, yet they're shielding AI tools from accessing ASTM's

21  copyrighted works on their website.

22         So, finally, with that factual background, Your

23  Honor, I think it makes sense to dig into the legal issues

24  here.  The first one is our copyright infringement claim, and

25  copyright infringement claim has two elements.  The first one

1  is ownership of a valid copyright, and the second one is

2  unauthorized copying of original elements of the work.

3          So with respect to the first element, ASTM is

4  entitled to a presumption that it owns a valid copyright as a

5  result of it having timely registrations for each of its

6  copyrights.  That's pursuant to 17 U.S.C. 410(c).

7          In addition, and this will become important when we

8  talk about the <u>Georgia</u> case, ASTM is entitled to a

9  presumption that it is the author of each of these works

10  because that, in fact, is stated on the copyright

11  registration itself.

12          Talking to the second element, the copying, there's

13  really no dispute again that Upcodes has copied the ASTM text

14  on its website.  Here's just one example of comparing two

15  separate sections of ASTM A36 as it appears both on Upcodes

16  website and on the standard itself.

17          One other thing that just coincidentally happened

18  when we were making this slide is we noticed that there was a

19  mistake in Upcodes copy.  If you look at Footnote 2 on the

20  right-hand side, you see at the end of that section, it

21  refers to in Section 2 of that code.  But if you look at

22  Upcodes Footnote 2 on the left-hand side, it just refers to

23  section of that code.  So it's missing the number two.  That

24  will become more important when we get around to the

25  trademark issues in this case.

1          So as I already alluded to, the really important

2   issue here with respect to the government-edicts doctrine is

3   the Supreme Court's holding in Georgia v Public.Resource.Org.

4   In that case, the Supreme Court made clear that the

5   government-edicts doctrine only applies to works that are

6   authored by officials who are empowered to speak with the

7   force of law and who are acting within the scope of that

8   authority.  And just in case there was any confusion about

9   that point, the Supreme Court emphasized that the government-

10  edicts doctrine does not apply to works that were created by

11  private parties who lack the authority to make or interpret

12  the law.

13         Also, I think it's important to note, if you could

14  just go back one more second, the third column over there

15  with the quote from the Georgia case, the Supreme Court made

16  clear that the government-edicts doctrine does not care

17  whether or not the text quote carries the force of law.  The

18  Court only asked whether or not the author of the work is a

19  judge or legislator.

20         So I know Your Honor said that you hadn't had a

21  chance to review the summary judgment decision that was

22  issued on Friday from the court in the NFPA v. Upcodes case,

23  but I think it did a very good job of analyzing this

24  government-edicts issue there.

25         The court on Friday in the NFPA case rejected the

1   exact arguments that Upcodes is making here today. Now,

2   Upcodes would have you believe that even though the court

3   said that the government-edicts doctrine focused on the

4   identity of the author, that there was also what they call a

5   prophylactic rule that nobody can own the law that comes out

6   of the Georgia case.

7          Well, the court in the NFPA decision rejected that

8   argument.  It said that Georgia tried to make the argument in

9   the Supreme Court that whether or not the language had the

10  force of law should be the relevant test for assessing

11  whether or not the works in that issue were entitled to

12  copyright protection.  And the dissent actually agreed with

13  that position.

14         But the majority rejected that position and said

15  that the question is whether or not the work has been

16  authored by a governmental authority who has the ability to

17  speak the law and that whether or not the language has the

18  force of law is not the relevant inquiry for purposes of the

19  government-edicts doctrine.

20         Now, this gets back to, I think, the question you

21  raised originally, Your Honor, about why does it matter if

22  something's a model code or a standard.  Even if Veeck and

23  the Canadian Standards case, survive the decision in the

24  Georgia case, which held that the relevant inquiry focuses on

25  the identity of the author, which is not what Veeck or CSA

1  focused on, even under those cases' analysis, there's a

2  distinction between model codes and standards.

3      The Veeck court and CSA both made clear that while

4  model codes that are written for no other purpose than to

5  become the law can lose their copyright protection if they

6  are incorporated by reference, the courts both made a

7  distinction between model codes, which lose their copyright

8  protection, and standards, which don't.  In fact, in the

9  Veeck case, the court said, "Case law that derives from the

10 official incorporation of extrinsic standards is

11 distinguishable in reasoning and result."  And that's one of

12 the reasons why, even if Veeck survived the Georgia decision,

13 it does not help Upcodes in this case.

14      As I already alluded to, these ASTM works are

15 standards and not model codes.  There's no language in those

16 standards that suggests that they're intended to be

17 incorporated by reference by governmental authorities.

18 They're focused on very narrow subject areas, unlike the

19 900-plus page model codes that you see on my table here.

20 And, you know, as a result, even if Veeck and CSA were still

21 valid, those cases suggest -- in fact, confirm -- that

22 extrinsic standards, like ASTM standards here, maintain their

23 copyright protection.

24      And I also think it's worth noting now that those

25 cases all did deal with a governmental authority

1  incorporating the works by reference, and that's not what

2  happened here.  All the ten works that issue in this case

3  have never been incorporated by reference.  They were never

4  incorporated by reference by any governmental authority.  So

5  there's literally no case that has ever held that a

6  third-party reference to a standard or a model code loses its

7  copyright protection as a result of that third-party

8  reference.

9       In addition to the government edict's defense,

10 Upcodes also raises the defense of merger.  Now, the Third

11 Circuit has told us that merger is a rare occurrence, and

12 it's only appropriate when there are no or few other ways of

13 expressing a particular idea.  This is really, I think, the

14 most important part of the merger analysis, Your Honor.

15      Merger is assessed at the time that the work is

16 created.  The question is whether or not, at the time ASTM

17 was running these ten works, could they have written them in

18 a different way?  And even Upcodes admits that if that is the

19 relevant analysis, that there are other options for ways to

20 write these standards.

21      And the vast majority of the case law confirms that

22 merger is assessed at the time of creation and not at the

23 time -- any time after creation.  We have here the Third

24 Circuit's case in Apple, in which the defendant argued that

25 merger was appropriate because it wanted to be compatible

1  with other Apple software.  And the court rejected that

2  argument and said that that's not relevant to the merger

3  inquiry.

4      The Oracle v. Google case says it very simply up

5  there on that slide.  Whether or not an idea, an expression,

6  merge must be evaluated at the time of creation, not at the

7  time of infringement.  We cite down there, as well, the

8  Solicitor General's Office has chimed in on this issue, as

9  well, with briefs at the Supreme Court confirming that merger

10  should be assessed at the time of creation and not based on

11  facts that arise thereafter.

12      Again, the recent decision from the NFPA v. Upcodes

13  case is, I think, very helpful on this issue.  There, like

14  here, Upcodes argued that the merger defense applied because

15  those works had been incorporated by reference into law, and

16  there was only one way to express the law.  And the court in

17  the NFPA v. Upcodes case correctly rejected that argument.

18      It recognized that there were multiple ways that

19  these works could have been written at the time that they

20  were created, and the fact that they were later incorporated

21  by reference did not result in merger that would terminate

22  the copyright protection of those standards.

23      Let's skip the next one.

24      UNIDENTIFIED SPEAKER:  Sorry.

25      MR. FEE:  No, I think we can skip that one, too.

1        So that's really, I think, the gist of the matter

2   with respect to merger, Your Honor.  I think that one's

3   pretty straightforward.  The vast majority of the authority

4   suggests that merger doesn't apply based on facts that arise

5   after the creation of the work.

6        They rely basically exclusively on the Veeck

7   decision and its progeny to argue that once things become the

8   law, there's only one way to express them and, therefore,

9   merger applies.  But even the Veeck case doesn't explain why

10  it was considering facts that arose after the creation of

11  those works.  The dissent actually calls the majority out in

12  Veeck for saying that that's an appropriate analysis.

13       Aside from Veeck, there's really no support for

14  creating or applying the merger doctrine based on facts that

15  are post-creation of the work.

16       The third and final defense that they raise is fair

17  use.  Now, Upcodes, as a Defendant, raising fair use has the

18  burden of proof with respect to fair use because fair use is

19  an affirmative defense.  And fair use, as the statute even

20  makes clear, and as does this quote from the Third Circuit,

21  is usually made for purposes of criticism, comment, news

22  reporting, teaching, scholarship, or research.  And none of

23  those examples of types of fair use are applicable here.

24       As we showed on the last slide, as your Honor

25  probably realizes by now, there's a four-prong test for fair

1   use.  The first one addresses the purpose and character of

2   the use, including whether or not the use was commercial.

3   There's no real question here that Upcodes use of the ASTM

4   standards is commercial in nature.  As the Southern District

5   of New York made clear in the Hachette case, a use can be

6   commercial even though the user does not charge patrons

7   access to copies, especially when the infringer uses the

8   copies to attract new customers.

9        Even the NFPA case that was decided in connection

10  with the preliminary injunction motion found that Upcodes was

11  a for-profit entity.  Even if it provides free access to the

12  codes, this factor weighed against fair use.  And that's only

13  addressing the free use of ASTM standards.  But I think it's

14  also very important to recognize that ASTM standards are also

15  used in connection with Upcodes' paid services.

16       They're literally selling the right to use their

17  tools on ASTM standards that are at issue in this case for

18  $39 a month in some instances.  And as the record shows,

19  sometimes they're charging larger organizations $50,000 or

20  more to do so.  Just so I'm clear, that's to use their tools

21  on everything.  I don't want to make it sound like they're

22  just charging $50,000 for these ten works.

23       But Upcodes has built quite a business based on

24  these standards.  I think the NFPA's decision that just came

25  out on Friday indicated that Upcodes has plans to get a

1    billion-dollar valuation as a result of doing what they're

2    doing these days.  They've got 900,000-plus users on their

3    website allegedly.  And they're using this access to ASTM

4    standards, among other standards and codes, to build that

5    business.

6          We've submitted in the briefing numerous examples of

7    customers reaching out to them, asking for whether or not

8    their service provides access to ASTM standards.  And in this

9    one we have highlighted here, they made clear that because

10   one of the organizations asking about this, ███████

11   ██████████, was such a large customer, they were going to

12   focus on getting the standards that they wanted online sooner

13   rather than later.  And some of the standards that they were

14   interested in were ASTM codes, or ASTM standards, sorry.

15         Now again, the NFPA decision that came down on

16   Friday addresses this issue and I think is pretty germane

17   here.  Next slide.

18         What that court found is that Upcodes' unlicensed

19   use of the standards on both its free and paid tiers has one

20   objective purpose, which is making money.  That's I think

21   really undisputable.  And as that court concluded, posting

22   NFPA standards on its free tier to grow the funnel for its

23   paid tier is indisputably commercial.

24         And that's exactly what's happening here.  They lure

25   in lots of visitors to their website, offering free access to

1  our standards, among other standards and codes.  And then the

2  evidence is clear that they use that as a starting base to

3  start a solicit and sell their tiers of paid services to

4  those customers.  Now the first factor of the fair-use test

5  not only addresses whether or not the use is commercial, but

6  it also addresses whether or not the use is transformative.

7          And here, the Supreme Court in the <u>Warhol</u> case

8  provides great guidance on how to assess whether or not a use

9  is transformative.  And as you see in the second quote here,

10  the Supreme Court made clear that the central question is

11  whether the defendant's use supersedes the objects of the

12  original and thus serves as a substitute, which is copyrights

13  bet noir.  Here, there could be no question that Upcodes'

14  copies, verbatim copies of the entirety of ASTM standards,

15  serve as a substitute for getting the ASTM standards from

16  ASTM.

17          We've submitted evidence to Your Honor already that

18  the limited amount of documents we've gotten indicating that

19  organizations were reaching out to Upcodes, expressing

20  interest in their paid services, and then asking whether or

21  not they had ASTM standards online.  And we just saw one of

22  the examples of those correspondence where Upcodes indicated,

23  because the customer is such a big customer, they want to

24  know exactly what ASTM standards and other standards, they

25  want to know so that they could get them online as soon as

1  possible.

2        Next slide.

3        So as I alluded to at the beginning of the

4  discussion of fair use, the types of purposes or uses that

5  fair use contemplates typically are things like criticism or

6  commentary on a work.  None of those examples of

7  transformativeness are governed here.

8        The purpose of Upcodes putting the ASTM works online

9  is simple.  The NFPA court, I think, reached this easy

10 conclusion.  They're trying to provide access to the AEC

11 marketplace to our standards.  That's the exact same reason

12 why ASTM provides access to those standards.  They don't

13 provide any commentary or criticism of the standards.  They

14 don't add any content to the standards.  All they do is

15 reproduce in a slightly different format the exact same

16 language that's authored by ASTM in its entirety.  They do it

17 for commercial purposes, and they do it in order to build

18 what they expect to be a billion-dollar business.

19       Really all they do, and this is sort of alluded to

20 in this bottom quote down here, is scan and reproduce the

21 copyrighted works.  And as the Hachette court found, simply

22 scanning and reproducing copyrighted works without providing

23 criticism, commentary, or information about them is not

24 transformative.  That's exactly what's happening here, and

25 Upcodes' use of the ASTM standards is not transformative.

1          Again, just so Your Honor knows, the NFPA decision

2   that came out on Friday reached the same conclusion.  We

3   bolded here part of that decision where the court found there

4   is no daylight between Upcodes' commercial use of the

5   standards and NFPA's use.  And it also rejected Upcodes

6   argument on the right-hand side here, and saying Upcodes

7   purported intent to publish, quote, the law with socially

8   useful purpose does not make use of NFPA standards

9   transformative.

10         And it reached that conclusion at least in part

11  based on the Supreme Court's decision in Warhol, which made

12  clear that the transformative question is an objective

13  question, and the user's subjective intent is irrelevant to

14  the analysis.  So whether or not Upcodes had the intent to

15  only publish the law is not relevant to this inquiry.

16         So I just want to talk real briefly about factors

17  two and three of the fair-use analysis.  The second factor is

18  the nature of the copyrighted work.  That factor is rarely

19  significant in fair-use analysis, and it's not particularly

20  important here.  It is true, of course, these works are

21  somewhat factual in nature, but there also are creative or

22  expressive elements to what's been written.  It's not simply

23  a compilation of data, for example, which would be copyright

24  protectable, but purely factual in nature.

25         And as a result, Upcodes copies both the factual but

1  also the expressive elements of the ASTM works.  And as a

2  result, that factor, although it's not particularly

3  important, suggests that there's no fair use here.

4          The third factor, also, I think we can deal with

5  relatively quickly.  That is the amount and substantiality of

6  the portion used.  Here, Upcodes uses the entirety of the

7  works.  And this first quote on the right-hand side here, I

8  think it sums up pretty well, when it says, "When a party

9  copies the entirety of a work for no transformative purpose

10 and creates copies that directly compete with the copyright

11 owner, this factor weighs strongly in the copyright owner's

12 favor."

13         That's exactly what we have here.  Upcodes is using

14 the entirety of the ASTM works for the purpose of building

15 its billion-dollar company without making any commentary or

16 anything like that on the works, and that simply is using far

17 more of the works than it would be appropriate to use in this

18 circumstance.  So the third factor, I think, also clearly

19 favors a finding of no fair use.

20         And that takes us to the fourth fair-use factor,

21 which is the effect of the use upon the potential market for,

22 or value of, the copyrighted work.  Now, the Supreme Court

23 has told us that factor four is undoubtedly the most

24 important fair-use factor.  And we've also -- the Supreme

25 Court's also told us that since fair use is an affirmative

1  defense, its proponent would have difficulty carrying the

2  burden of demonstrating fair use without favorable evidence

3  about relevant markets.

4          So the evidence here is clear that Upcodes use and

5  similar uses, if they were permitted by both Upcodes and

6  other potential infringers, which is the appropriate analysis

7  in this circumstance, could have a substantial impact on the

8  market for Upcodes or for ASTM's works.

9          ASTM has already proven through declarations that it

10 has a significant market for the sale and licensing of its

11 standards, including the works, that they have millions of

12 dollars in subscription revenue as a result of making those

13 works available.  And there's also no question that Upcodes

14 is offering an almost perfect substitute, putting aside their

15 typographical errors and other errors -- and they offer that

16 for free, which is a price that nobody else can compete with

17 that they want to try to charge for these works.

18         We already have seen evidence that commercial

19 vendors or commercial customers are inquiring about using

20 Upcodes service to substitute for some of the ASTM licensees

21 that are out there, including a company called MADCAD, who

22 makes their ASTM standards available through their service

23 and pays a royalty to ASTM.  And under these circumstances

24 where somebody is literally giving away the entirety of a

25 work for free, even the ICC court had to acknowledge that in

1  that circumstance, it's fair to say that Upcodes' activities

2  are going to have -- be an effective substitute for ICC's

3  works and have an adverse impact on the marketplace.

4       And I think it's even worth reiterating again here,

5  the works aren't even incorporated by reference in this

6  particular circumstance.  So the market harm is even more

7  difficult, I think, to justify than it would be in a

8  circumstance when they were.

9       And again, the NFPA decision that just came out on

10 Friday against Upcodes, I think addresses this point well.

11 Both in the NFPA case and in the Upcodes case, Upcodes tried

12 to argue that there were two markets that were distinct, a

13 market for the standards and a market for access to what they

14 call the laws.  And the NFPA court rejected that argument.

15 It said both NFPA and Upcodes have provided evidence that if

16 Upcodes can continue with its current practices, or if these

17 practices become widespread, it may be exceptionally

18 difficult for NFPA to compete.

19      So Upcodes relies almost entirely on ASTM v.

20 Public.Resource in connection with its fair-use arguments.

21 But there are some really important distinctions that I think

22 we should be focused on there.  You know, first of all, as

23 I've already alluded to, the ASTM v. Public.Resource case

24 involved works that have been incorporated by reference,

25 which is a scenario not relevant here.  But perhaps even more

1   importantly, they involved a non-profit organization who was

2   not selling any services in connection with the copies that

3   they were making available.

4        There was no evidence in that case that

5   Public.Resource.Org was targeting the AEC market, like

6   Upcodes does in this case, and like ASTM does, as well.

7   Here, Upcodes, of course, is a for-profit entity.  And the

8   ASTM court even alluded to the fact that that was an

9   important factor.  I think it has a footnote where it says,

10  the result may very well be different if the defendant was a

11  for-profit entity who was selling access to the standards or

12  codes at issue in that case.

13       The other thing that I think is important to flag

14  here with respect to comparing this case to the ASTM v.

15  Public.Resource fair-use analysis is that ASTM court focused

16  heavily on the defendant's subjective intent.  You know, that

17  it wanted to make what it called the law available to the

18  public.

19       But as I alluded to already, the Supreme Court

20  rejected the notion that the defendant's subjective intent is

21  relevant to the fair-use analysis.  What matters is the

22  objective facts in that case.  There's nothing in the Upcodes

23  evidence that suggests that consumers would somehow recognize

24  that their subjective intent was to do something other than

25  provide access to ASTM standards.

1        And as a result, the <u>ASTM v. Public.Resource</u>

2    decision is really inapplicable here, both because this case

3    doesn't involve an IVR.  It involves a commercial use by a

4    for-profit entity.  And, of course, we should be taking into

5    account the Supreme Court's guidance on whether or not

6    subjective intent should be considered in the fair-use

7    analysis.

8        So that concludes my argument with respect to the

9    copyright claims.  We do also have a trademark infringement

10    claim, as Your Honor knows.

11        Now on the screen, you can see Upcodes is putting on

12    its website that it's making these standards available.  And

13    they claim that ASTM is the publisher of these electronic

14    copies that they've made available here.  But that's

15    incorrect.  ASTM had nothing to do with these webpages that

16    they posted.  They did not authorize these copies and, as a

17    result, this is misleading to consumers.

18        The primary argument that Upcodes makes here is

19    something called trademark nominative defense, and that

20    defense doesn't apply here.  First of all, what is that

21    defense?  You know, if I'm referring to -- if I wanted to

22    say, you know, compare my service to ICC's service, I could

23    use the word "ICC" because I'm referring to a competitor's

24    work, not my own work.  Here, that doesn't apply because

25    they're saying that the copies that they have on their

1  website are published by ASTM, which they're not.  They're

2  referring to their own works and using ASTM's mark.  And

3  that's improper. And the nominative fair-use analysis does

4  not apply in that circumstance.

5       The other argument they make is that consumers will

6  not be confused about the fact that they claim ASTM is the

7  publisher of these copies that they put on their website.

8  But the Third Circuit, I think, in A&H Sportswear v.

9  Victoria's Secret, made clear that if you're offering a

10 competitive service or product, like is the case here, and

11 you're using the same or virtually the same trademark, that's

12 really the end of the analysis.  If you're offering virtually

13 the same or the same product using the same trademark,

14 consumers are going to be confused.

15       Now, again, Upcodes relies pretty heavily on the

16 ASTM v. Public.Resource case to support its argument that

17 consumers won't be confused.  But what it didn't mention in

18 its brief --

19       THE COURT:  You gobbled the last part.  Say that

20 again.

21       MR. FEE:  Okay.  I think what Upcodes -- Upcodes

22 argues that consumers are not likely to be confused based in

23 large part on the decision in ASTM v. Public.Resource.Org.

24 But what Upcodes doesn't mention in its briefing is that ASTM

25 prevailed on the trademark infringement cases.

1          Initially, the court found that both the use of the

2    letters ASTM and the ASTM logo were trademark infringement.

3    The use of the logo was upheld throughout the entire

4    litigation.  But on remand, Public.Resource did obtain a

5    finding of no likelihood of confusion with respect to just

6    the letters ASTM on its copies.  But it's very important to

7    understand the context in which that happened, and that's

8    what this slide is intended to show.

9          Between the time where the district court found that

10   there was a likelihood of confusion by just using the letters

11   ASTM and its subsequent decision that there was no likelihood

12   of confusion, Upcodes -- or, I'm sorry, Public.Resource.Org

13   dramatically changed the way it presented the standards to

14   the public.  It placed this banner, this entire sheet, our

15   first cover page, on the front of all the standards they've

16   made available that make it abundantly clear, according to

17   the court, that the copies from Public.Resource.Org were not

18   affiliated with ASTM.

19         I mean, in addition to having something that looks

20   dramatically different from the ASTM standards you've seen

21   with this red, white, and blue motif, it has language that

22   says, "This document was posted by Public.Resource.Org, which

23   is not affiliated with nor authorized by the United States

24   government, the state governments, or the American Society

25   for Testing Materials, ASTM."

1          And then it goes on to say, "Note that many of these

2   documents had to be procured on the used marketplace.  Many

3   of the laws in this collection were rekeyed into HTML and

4   diagrams redrawn for increased usability and accessibility.

5   Please note that the process of scanning, OCR, and rekeying

6   might introduce errors.  In addition, standards bodies will

7   frequently issue" -- well, that part's not so relevant.

8          So, the important thing is here, under this

9   circumstance, I think it's understandable why a court might

10  conclude that a viewer of this standard would not think it

11  was affiliated with ASTM.  It expressly says so on its face.

12  And the other important thing is it takes responsibility for

13  the errors it makes.  It says, we may be introducing errors

14  in these things.  That's dramatically different from what

15  Upcodes does.  Upcodes has no disclaimer whatsoever.  It

16  doesn't indicate that it's rekeyed all the ASTM standards and

17  it may be introducing errors.  In fact, we just saw one that

18  we found by accident in creating this presentation earlier

19  today.

20         So, the idea that there's no confusion in the

21  circumstance that was at issue in the ASTM v. Public.Resource

22  case is really of no relevance to the circumstances here.  If

23  they want to place cover sheets like this on top of all their

24  copies, tell everybody that the errors that they may be

25  creating from rekeying and OCR are present, are their

1    responsibility, we might have a different case.  But that's

2    not the circumstances we're dealing with here.

3              So, finally, in light of the foregoing, I think

4    we've established that Upcodes cannot prevail on its fair-use

5    defense.  It cannot prevail on its government-edicts defense.

6    It cannot prevail on its merger defense.  And it's liable for

7    trademark infringement.  So, that leads us to whether or not

8    Your Honor should preliminary enjoin them from future

9    infringement.

10             Now, with respect to the trademark claims, there's a

11   presumption of irreparable harm.  Upcodes has really done

12   nothing to try to rebut that presumption.  In its brief, I

13   think it dedicates seven lines to this subject and doesn't

14   cite any evidence, if my recollection is correct.  But with

15   respect to the copyright-infringement claim, there's ample

16   evidence that ASTM will be irreparably harmed if not only

17   Upcodes is permitted to continue its copying of the ten works

18   issue, but expand it to cover all the other works it intends

19   to reference, which we believe will be all 2,000-plus works

20   that are referenced by the International Building Code at a

21   minimum.  And if others can continue to do it, as well.

22             The first one is, courts recognize that there's a

23   threat of irreparable harm when there's reason to believe

24   that the infringement will continue absent a preliminary

25   injunction.  And they've made it abundantly clear that

1   they're going to continue to keep posting these works if Your

2   Honor doesn't stop them from doing so.  They've agreed

3   temporarily to not do that while Your Honor is deciding this

4   motion for preliminary injunction.  But once it's decided,

5   all bets are off if it goes against us and they're going to

6   start posting more works.

7         And I think another part that makes this case

8   particularly unusual in the copyright context is the fact

9   that all this copying is being posted online.  We cited a few

10  cases in our brief where courts acknowledge that once you put

11  something online that's an infringement copy, it's very

12  impossible to put the genie back in the bottle.  Once

13  somebody gets a copy of it online, they can post it online.

14  Somebody else can copy it, they can post it online.  And

15  that's a threat of irreparable harm, as well.

16        And that's not just a theoretical threat.  The

17  evidence here is that Upcodes actually obtained several of

18  the ASTM works at issue by getting them from an unauthorized

19  infringement on the website, at a website called

20  denationalink.com (phonetic).  So the unauthorized copying on

21  denationalink.com beget Upcodes copying and posting our works

22  online.  So once they start posting these things online,

23  there's sort of no way to put the genie back in the bottle.

24        It's also, I think, hard to understand how Upcodes

25  can credibly claim that giving away these works for free

1  won't undermine our relationships with our customers and

2  licensees who we charge for these works.  As I'm sure your

3  Honor can imagine, many persons who are considering getting

4  access to an ASTM standard when faced with the prospect of

5  either paying a small fee to ASTM, you know, they usually

6  sell from anywhere between like 30 and 100 dollars, or

7  getting them for free from Upcodes, many people are going to

8  take them for free.  And courts recognize that interfering

9  with customer relationships and licensee relationships, like

10 what is inevitable here, is going to result in irreparable

11 harm.

12       And, finally, I think it's also important to note

13 that if standards development organizations like ASTM cannot

14 finance the creation of standards through the sale and

15 licensing of the standards, then it's going to threaten this

16 entire standards development organization ecosystem.  If

17 federal governments and state governments relied on

18 organizations like ASTM for more than a century at this

19 point, they would do so in part because these standards are,

20 you know, consensus standards that allow everybody to

21 participate in the process.

22       You know, industry certainly has a seat at the

23 table, but there's also seats at the table for the

24 public-interest advocates, for educational and academic

25 folks, and any other person who wants to participate in this

1    process.  And that's only possible because ASTM does not

2    charge large membership or participation fees to participate

3    in the standards development process because it's able to

4    fund this process through charging a very small fee to

5    persons who are affected by the standards if they want to

6    have, you know, copies of the standards.

7         If they can't obtain the funding through that

8    process, there's not really another easily accessible way to

9    get that funding.  You know, sometimes people have suggested

10   that maybe the government should pay for this.  You know,

11   getting Congress to agree to anything is tough, and getting

12   them to step up and agree to pay for this process going

13   forward is, to the best of my knowledge, has never even been

14   contemplated by Congress.

15        We could charge a lot more to participate, but then

16   we'll wind up like an industry group who's setting the

17   standards.  And, you know, they'll do what's best for the

18   commercial industry and not really be focused on the public

19   interest.  So that doesn't strike us as a good outcome as

20   well.

21        So this publication of, you know, threatened to

22   publish thousands of ASTM standards poses a real, you know,

23   existential threat to this entire process.  And that, also, I

24   think is a real irreparable harm that may result if Upcodes

25   is allowed to continue to post these ten works and thousands

1  of additional ASTM works for free.

2          The last point I want to make on irreparable harm is

3  Upcodes can't pay a money judgment in this case.  You know,

4  the testimony is that they have, I think, you know, roughly

5  ███████  in that value is the balance sheet that they

6  produced us.  You know, they're going to have to pay to

7  litigate this case.  They're not -- they haven't been

8  profitable in any year so far.  They're going to have to pay

9  a judgment if we win in this case.  They're not going to be

10  able to do that.

11          You know, even if the judgment is, you know, nowhere

12  near the maximum, which would be just for the copyright

13  infringement claim, $1.5 million, plus our attorney's fees,

14  which are recoverable, there's just no prospect for them

15  being able to pay that.  And they haven't really suggested

16  otherwise.  You know, in their brief, they said they can pay,

17  I think, $7,500 in damages if that was what was entered here.

18  But that's not a realistic outcome in this case.  And they

19  haven't suggested that they could pay anything more than

20  that.

21          So, you know, the other preliminary injunction

22  factors I think we've really touched on, but the -- one thing

23  I want to stress though is the harm to Upcodes being enjoined

24  here is minuscule.  They've survived up until earlier this

25  year with never posting any of the ASTM works online.

1  They've only posted ten so far.  They haven't identified any

2  harm that they'll suffer as a result of being enjoined here,

3  other than the fact that they spent a little bit of time

4  putting these works online.

5          You know, if you contrast that with the problems

6  that ASTM is going to deal with, if thousands and thousands

7  of their works are posted online and they'll never be able to

8  get them offline after that, I think the balance of the

9  parties' harms here is pretty clear.

10         And for many of the same reasons that I identified

11 with respect to the threat to the funding system, the public

12 interest is that ASTM be permitted and able to continue to

13 fund the standards development organization or standards

14 development process in a way that allows everybody to

15 participate.  And, you know, courts repeatedly as well have

16 recognized that there's a public interest in enforcing

17 copyright protection because we want to, you know, encourage

18 authors and others to participate in the creation of new

19 works and the advancement of the arts and sciences.

20         So unless Your Honor has any questions, that's all I

21 have.

22         THE COURT:  Why don't we take a ten-minute recess,

23 and then I will hear from the Defense.

24         MR. FEE:  Great, thank you, Your Honor.

25         THE COURT:  And I assume that you'll have a response

1  to them?

2          MR. FEE:  I suspect that that will be the case.

3          THE COURT:  Okay.  So for my planning, today is

4  going to be the -- it will not go past today, will it?

5          MR. FEE:  I think that's certainly what we

6  contemplated.

7          THE COURT:  Is that correct?

8          MR. GRATZ:  That's right, Your Honor.

9          THE COURT:  Okay, all right.

10          Okay, I'll be back in ten minutes.  Don't ever

11  believe a judge if she says ten minutes.

12          MR. FEE:  Thank you, Your Honor.

13          MR. GRATZ:  Thank you, Your Honor.

14          MS. VELKES:  Thank you, Your Honor.

15     (Whereupon, at 11:20 a.m., a brief recess was taken;

16  proceedings reconvened at 11:37 a.m.)

17          THE CLERK:  Are you connected through the HDMI?

18          MR. GRATZ:  I am.

19          THE COURT:  I assume I'm going to get copies of

20  these PowerPoints?  Do you have a PowerPoint, too?

21          MR. GRATZ:  I have an optional PowerPoint that will

22  be great if it works and that does not say anything that I'm

23  not going to be saying.  So if it works, this will be great.

24  And if it does not, it will not change anything about what

25  I'm going to say.

1          THE COURT:  What happened?  Why would it not work?
2  Can you help on that?
3          MR. GRATZ:  We've got it.
4          THE COURT:  Oh, there it is.  Wow.  Fantastic.
5      (Whereupon, there was a brief pause in the proceedings.)
6          MR. GRATZ:  All right.  With that, unless there's
7  anything else, I'm happy to get started.
8          THE COURT:  Oh, good.
9          MR. GRATZ:  Very good.
10         THE COURT:  I was on time, so I'm just admiring
11 myself.  Go on.
12         MR. GRATZ:  Good morning, Your Honor.
13         I'm Joe Gratz representing Upcodes.  With me is
14 Bonnie Hoffman from the Hangley Aronchick firm.
15         THE COURT:  And you are?
16         MR. GRATZ:  Ms. Bonnie Hoffman from the Hangley
17 Aronchick firm.
18         THE COURT:  Oh, okay.
19         MR. GRATZ:  Your Honor, ASTM publishes sets of
20 rules.  Here, they are rules about metal to be used in
21 building buildings.  And the most important difference
22 between the parties' positions here is that they say their
23 rules are not the law because they weren't adopted directly
24 by the government.  And we say their rules are the law.
25         They say because there's a middle person, because

1   ICC is in there, that makes a difference to the outcome.

2   They say, where does this end, right?  How can you tell where

3   the nesting doll is, like, at some point isn't -- under

4   Upcodes theory, isn't everything really the law?  And the

5   answer is no.  We can tell very easily whether or not the

6   rules that ASTM sets forth are the law because when something

7   is the law, it's a rule that you have to follow or else the

8   government will punish you.

9           And these rules that are set forth in ASTM's

10  publications, that we reproduce the rules on our website, are

11  rules that you have to follow or else the government will

12  punish you.  And we know that they are part of the

13  requirements of the law because everybody involved says so.

14          This is the first of my very few slides in what I

15  hope will be a relatively brief presentation of the

16  highlights of our arguments.  The first item on this slide is

17  the Philadelphia Code.  That is straight out of the mouth of

18  the Philadelphia government that, as to referenced codes and

19  standards, the codes and standards referenced in any of the

20  technical codes, that is the ASTM publications referenced in

21  the adopted ICC codes, shall be considered part of the

22  requirements of such code to the prescribed extent of such

23  reference.  And we talk about this on Page 14 of our

24  opposition.

25          The Philadelphia Building Code, the ICC publication

1   that is directly adopted, says the same thing.  It says that

2   those documents provide requirements and are part of this

3   code.  So their argument relies on drawing a distinction

4   between the words that are in ICC's book and the words that

5   are not in ICC's book that are in their publications.  And

6   what ICC's book says about that is their publications, the

7   ASTM works at issue here, are part of this code.  And because

8   they are part of the code that is adopted in the law, they

9   are adopted in the law.  And you can't draw a distinction

10  between those two things for this purpose.

11          ICC's -- excuse me, ASTM's longtime general counsel

12  when we deposed him in this case said, we said, you know,

13  what does it mean when an ICC code references one of your

14  publications?  He says, when the ICC code references an ASTM

15  document, depending on which document, they're saying that

16  you have to meet this standard or you should meet this

17  standard in order to meet our code requirement.  So these are

18  all requirements of the law.

19          One thing that we heard from ASTM's counsel was,

20  well, look, maybe these are technically, in some sense, legal

21  requirements, but does anyone as a practical matter really

22  need to look at these if they're building a building?  Aren't

23  these just for people who are making steel?  And there's an

24  answer for that too in ASTM's document.

25          THE COURT:  Making what?

1      MR. GRATZ:  If they're making steel, right?  We saw

2  --

3      THE COURT:  Steel, okay.  All right.

4      MR. GRATZ:  You know, in Mr. Fee's presentation,

5  these are really publications that you only need if you're

6  running a steel plant, not if you're building a building in

7  Philadelphia.  And we think you need them if you're building

8  a building in Philadelphia to make sure that it's legal to

9  build a building that way.

10      And part of why we think that, and one of the things

11  that we think is probative of the idea that people building

12  buildings in Philadelphia to make sure they're legal have to

13  use the ASTM documents, not just the ICC code, is that ASTM

14  sells a compilation of the standards that are incorporated in

15  the building codes.  And so, you know, we have their catalog

16  in the record, and it says what's here on the slide, that

17  this -- they say, if you buy this book of all of these ASTM

18  standards, including the ten works in suit, this provides the

19  tools to design and construct buildings that satisfy

20  international code requirements as established by the ICC,

21  the International Code Council.

22      So on the idea that you don't need these in order to

23  design and construct buildings that are legal and follow the

24  building code, we think that's inconsistent with what ASTM's

25  catalog suggests, that they're selling copies of these to

1    people who want to do that, because they need these documents

2    to be able to do that.  One of the -- so on the question, are

3    these documents legal requirements that form part of the law,

4    everyone down the line from ASTM to ICC to the government

5    itself says that these are legal requirements.

6          The next argument that ASTM makes is that even if

7    they are legal requirements now, that they are sort of like

8    innocent victims of them being made legal requirements

9    because they weren't created or developed in order to be

10   incorporated into these codes, that they were developed for

11   some other purpose and just sort of incidentally or

12   unexpectedly incorporated into these codes.  And that is an

13   issue on which the record also -- the record of ASTM's

14   documents that we've been able to get during discovery is

15   also, in our view, inconsistent with ASTM taking that

16   position.

17         And if I can just flip the slide, ASTM has a style

18   manual of how to write publications that are getting

19   published as ASTM standards.  And this is in the record, it's

20   Exhibit 4 to my declaration.  And one of the things it says

21   is, if you're writing a document that is being developed for

22   reference in model building codes, if you're developing it

23   for that purpose, you should do this to it, right?  Something

24   you don't otherwise have to do, include this text.

25         And most of the standards at issue here include that

1    text which indicates, according to the style manual, that

2    they were developed for reference in model building codes.

3    And we think that contradicts the suggestion that these are

4    just industry standards that weren't developed for use in a

5    legally binding way.

6         Now, I want to be clear.  We don't think that

7    matters.  We don't think it matters whether they developed it

8    to become the law, or whether the law was thrust upon them,

9    or what, because we think what matters is it's a legally

10   binding rule that the government will punish you for if you

11   break the rule.  But to the extent there's a concern about

12   whether it was developed for use in model building codes, the

13   evidence suggests that it was.

14        The next thing they say about this sort of idea that

15   these things are the law is to talk about the Georgia against

16   Public.Resource case, the Supreme Court case that sort of

17   affects this area.  And what they say is --

18        THE COURT:  Not sort of.

19        MR. GRATZ:  Yeah, no, it is an important case.  And

20   that case says two things.  It resolves a particular question

21   about a particular set of materials before the court, which

22   did not have the force of law and were not binding law.

23        And then it announces a principle that they're

24   applying in doing that.  And what they did is to say that

25   these things were authored by legislators, or effectively

1  authored by legislators, and so these things are going to be

2  considered the law regardless of whether they actually are

3  binding legal rules that the government will punish you if

4  you break.  They said the reason that -- the principle that

5  they are trying to carry out there is the principle that no

6  one can own the law.  And that's so important that even these

7  things that are not legally binding, we're going to consider

8  them enough part of the law because they were written by a

9  legislator that we're going to say that copyright isn't

10 infringed by (indiscernible).

11          Now, what ASTM says that means is this far and no

12 further and that, in fact, if it wasn't written by a

13 legislator, then you just stop.  Then you can have copyright

14 in it, even if it's the law.  That is their view of Georgia.

15 That is not the only reading of Georgia.

16          Our reading of Georgia is that as to materials like

17 the ones that were before the court, that the court addressed

18 there, you look at the author and you apply an author-focused

19 test.  But as to materials that everybody agrees are legally

20 binding rules that everyone has to follow or else the

21 government will punish you, you don't need to look at who the

22 author is.  You don't need to go very far because those

23 things are the law and the principle that we're following

24 here is no one can own the law.

25          So on our reading of Georgia and the analysis in

1  Georgia, our reading is consistent with the principle that

2  the case announces, which is no one can own the law.  Their

3  reading of Georgia is inconsistent with that principle

4  because on their reading, they own the law.  That is not

5  consistent with the principle that no one can own the law.

6         So once one determines that these things are the

7  law, one thing one can do is just say, the Supreme Court has

8  said no one can own the law.  These things are the law.  They

9  cannot own them, we're done, right?  One does not need to

10 delve deeply into particular analytical frameworks for

11 getting there.  As we said though, there are a number of

12 possible analytical frameworks you can use to get there.

13 They all lead to the same place.

14        The ICC case goes down every single one of those

15 roads roughly and finds that they all go to the same place,

16 that they all find that this is not infringement.  The guide

17 here is the ICC case as to sort of how you get there on all

18 of the roads, the Fifth Circuit in Veeck and the Fifth

19 Circuit in Canadian Standards Association.

20        I want to note that the Fifth Circuit decision in

21 Canadian Standards Association came out after Georgia, and so

22 did a number of the other cases finding, including the ICC

23 case, finding that the Georgia case does not change -- it

24 doesn't make it more likely that someone can own the law,

25 right, because what it is saying is no one can own the law.

1          One of the arguments that ASTM makes in their reply

2    brief that we didn't have an opportunity to discuss in our

3    opposition brief relates to how you can square the Veeck case

4    and the Canadian Standards Association case and some of the

5    portions of the D.C. Circuit case with other cases like the

6    Ninth Circuit's case, the Practice Management case.

7          And the first thing I have to say about that is you

8    don't have to square those cases.  That is the District Court

9    in California had to follow the Practice Management case, had

10   a particular view of the Practice Management case, and was

11   bound by it.  You are not bound by the Practice Management

12   case.  So even if you think that the Practice Management case

13   would lead to a different conclusion than the Veeck case, the

14   CSA case, the ICC case or the ASTM case, you don't have to

15   follow it.

16         But, also, we are of the view and we share the view

17   that's expressed in the Solicitor General's brief that there

18   isn't any inconsistency or split among the Circuits on this

19   question.  And the framework for this, the sort of steps that

20   the Solicitor General's brief goes through in talking about

21   how they square the result in Practice Management in the

22   Ninth Circuit with the result in Veeck in the Fifth Circuit,

23   I think, is at least a little bit helpful if you feel like

24   you need to square those things.

25         And the factors that the court discusses are listed

1  in ASTM's reply brief.  But I want to go through them briefly

2  here and talk about why contrary to ASTM's reply brief, we

3  actually think they line up fine for us here.  The first one,

4  the factor one is that whether these codes were developed to

5  be used as legislation and to be used to become the law or

6  whether they were developed for other private reasons.

7        The code in the Practice Management case had nothing

8  to do with the law.  It was not developed for use in law.  It

9  was just a medical coding standard developed for medical

10 offices and then was later incorporated (indiscernible).

11       Here --

12       THE COURT:  Finish that statement.  It was --

13       MR. GRATZ:  It was later identified as a coding

14 standard that one needed to use in order to submit claims,

15 medical insurance claims to the government in Practice

16 Management.

17       And the Solicitor General's brief where -- when the

18 question was, is there a Circuit split here between Veeck in

19 the Fifth Circuit and Practice Management in the Ninth

20 Circuit -- said, well, look, one of the reasons you could

21 reach a conclusion in one case versus the other and a reason

22 these two could be consistent is that the material in

23 Practice Management was not developed to become law and the

24 material in Veeck was developed to become law.

25       Again, I want to note, we don't think that matters

1  but, to the extent you need to square these, the Solicitor

2  General's brief suggests that is a way you can square them.

3  And that lines up here.  We line up aligned with Veeck.  And

4  the reason for that is, as I said, the text I have on the

5  screen here, that the works in suit according to the style

6  guide, if they contain this particular text, they were

7  developed for reference in model building codes.  And that

8  lines us up with Veeck, not with Practice Management.

9      The second factor is that the codes in Veeck were

10  said to govern a broad range of conduct.  And it's definitely

11  right that any individual ASTM standard doesn't govern a very

12  broad range of conduct.  It governs how you have to make one

13  particular kind of steel for one particular kind of building.

14  But the ASTM standards together do govern a broad range of

15  conduct.  That is, all of the conduct of choosing what

16  materials to use and using materials in building buildings.

17  That's just as broad or almost as broad as the range of

18  conduct covered by the building codes themselves.  You can't

19  sort of escape this just by dividing it up into lots of

20  different documents.  You'd have to look at sort of what all

21  of what ASTM is doing together.

22      The third factor that the Solicitor General's brief

23  identifies for squaring Veeck with Practice Management is

24  that the work contains rules that regulate conduct, not just

25  reference information.  The medical coding standard in

1  Practice Management didn't provide any rules for you to use.

2  It just provided a table of things that you needed to refer

3  to on how to code things.

4       Here, these standards are just as much rules as the

5  building codes.  For example, Section 7.1 of ASTM A252, which

6  is Exhibit 15 to Ms. Wise's declaration, says, "The steel

7  shall contain no more than 0.050 percent phosphorus."  Now,

8  that's a rule.  If you build a building in Philadelphia and

9  the steel does not follow that rule, your conduct violates

10  the law in Philadelphia.

11       Similarly, Section 6.1 of ASTM A36, which is Exhibit

12  14 to Ms. Wise's declaration, says, The steel shall be

13  killed, the steel has to be deoxidized.  And that is a rule.

14  If you follow that rule, you are following the law in

15  Philadelphia.  And if you don't follow that rule, you are not

16  following the law in Philadelphia.

17       And that is why these things are, as the documents I

18  said before, part of the requirements, right.  That is one of

19  the ways we know that they regulate conduct, is that the

20  government says they are part of the requirements.  This is

21  the text we were looking at earlier.

22       The fourth factor in squaring Practice Management

23  and Veeck that the Solicitor General identifies is whether

24  there are criminal penalties for violation of the rules,

25  something to take into account.  And here there are.  As we

1  identify in our brief, for example, in Philadelphia, there's

2  a fine of $300 for each offense.  And that's in Exhibit 3 to

3  my declaration.

4      And the final factor is whether the defendant

5  identifies what they are publishing as a model code or as the

6  law.  Now, in Practice Management, the defendant published

7  the coding standard as the coding standard, not as the law or

8  as incorporated into a government publication or anything

9  like that.  They just said, this is the privately written

10 coding standard labeled as such.  In Veeck, the material --

11 the codes were presented as the law, as the building codes of

12 Anna and Savoy, Texas.  And so that's something else that the

13 Solicitor General said squared those cases.

14     And here we say it is the law of Pennsylvania.  In

15 fact, we identify it in the bigger text as the Pennsylvania

16 Structural Carbon Steel Code, because that's what we think it

17 is.  It's the code for structural carbon steel in

18 Pennsylvania.  And underneath that, in smaller text, we say

19 it's adopting ASTM B252 because it is.  This is -- by the

20 way, the screenshot on this is at ECF 60-73.  I realized we

21 hadn't pointed out that screenshot in our materials.

22     And what's really telling here on the question

23 whether we are identifying this or using this as the model or

24 as the industry standard versus using it as the law is that

25 we don't post the most current version of the standard when a

1  prior version is the one incorporated into law.

2        Most of the ten works at issue here are actually old

3  versions of these things that ASTM has updated.  And we don't

4  post the updated versions, the better versions that someone

5  in industry might want to use.  Instead, we post the ones

6  that are incorporated into the law because we want to support

7  people following the law.  And we don't particularly care

8  about supporting people's desire to use a better industry

9  standard because people come to us to follow the law.

10       Notably, this was also true in the ASTM case in the

11  D.C. Circuit.  And the court noted this, that many of the

12  codes, many of the ASTM publications at issue in that case as

13  well were older versions.  And that is telling of why we are

14  using them.  We're using them because those versions are the

15  law.  And that's why people come to us because we have the

16  versions that are the law, not because we have the latest

17  best practices.

18       So that is what I wanted to talk about with respect

19  to the Solicitor General's brief and how sort of that

20  framework for being able to square what the Ninth Circuit did

21  with what the Fifth Circuit did to the extent Your Honor

22  feels like you need to square them.

23       Let me move on now, having talked about that these

24  things are the law and that that is, we think, dispositive of

25  the question under Veeck, Canadian Standards Association and

1    ICC from the Southern District of New York to talk about

2    copyright fair use.  As we said in our brief, this provides a

3    completely independent alternative basis to find that there

4    is not a likelihood of success on the merits here.

5            The first -- Mr. Fee went through the four factors

6    and I will discuss each one briefly and provide our response

7    with respect to it.  The first factor is the purpose and

8    character of the use, including both whether the use is

9    transformative or otherwise justified or favored in its

10   purpose and to what extent the use is commercial.

11           With respect to whether the use is favored or

12   justified or transformative, the best guide here, as with the

13   whole fair-use analysis, is the D.C. Circuit opinion in ASTM.

14   And the reason that's the best guide is because it's the only

15   appellate decision on this issue after the Warhol case,

16   right.

17           We have a decision for the Supreme Court in the area

18   of fair use, which we do not get all that often here as

19   copyright lawyers, and we only have one Court of Appeals

20   decision after Warhol that tells us how these issues interact

21   with the issues in Warhol.  And it applies Warhol and finds

22   fair use.  Specifically, with respect to the purpose and

23   character of the use, it finds that it is a transformative

24   purpose applying Warhol to take a document and post it as the

25   law.  That is, because we post it as the law rather than for

1  some other purpose, that is a favored and justified purpose

2  under the first factor.

3          With respect to commerciality, we make the law

4  available without charge.  We agree that there are ways in

5  which what we are doing is more commercial than the facts in

6  the D.C. Circuit case.  Since the defendant in that case is a

7  non-profit organization that was operating without any

8  revenue at all.  And it is right that we have revenue, but

9  none of our revenue comes from providing access to the law.

10  Our revenue instead comes from building value-added services

11  where the value comes from us, not from the law.

12          The second factor is the nature of the copyrighted

13  work.  The DC Circuit there again, sort of provides the

14  guide.  The nature of the work is the law.  And in this case,

15  it was developed to be the law.  That was not necessarily

16  true of every work in the D.C. Circuit case.  And the D.C.

17  Circuit says, we actually don't care if it was developed to

18  be the law.  It is the law.  And that is relevant to the

19  nature of the copyrighted work, the second fair-use factor.

20          As to the third fair-use factor, the amount and

21  substantiality of the portion used, it is right that we use

22  most of the text of these ten works but that is because most

23  of the text of these ten works are the law.  And we don't

24  include portions that are not the law.  We don't have any

25  desire to include portions that are not the law.  There's --

1 for example, an appendix to one of these that says, these

2 aren't rules that apply unless in this particular situation.

3 And we don't include that appendix because it's not the law

4 because it says those rules don't apply.

5       And obviously, to the extent this Court thinks we're

6 wrong and thinks that some of the things that we have posted

7 are not the law, if we get any court or any enforcer of the

8 law telling us that particular text isn't the law, we would

9 take it down.  It's like this footnote, you actually don't

10 need that to understand the law.  We don't want it on our

11 website because the purpose of our website is to provide the

12 law and only the law.  So that's -- as to the third factor,

13 the amount used, we use the portion that is the law and we

14 omit portions that are not the law.

15       The fourth factor is the effect on the market for or

16 value of the copyrighted work.  And here, this would

17 ordinarily be very difficult to assess at this point in the

18 proceeding, right?  Because we haven't had the stuff up there

19 for that long.  And so, what can anyone tell about what the

20 effect on the market would be?  But here, we actually have a

21 great benefit, which is the ASTM D.C. Circuit case and the

22 situation in that case.  The situation in that case was, sort

23 of early on in the case, ASTM said, well, who could compete

24 with free?  It's only common sense that this is going to harm

25 our market.  And that's the only common-sense conclusion, so

1    you should credit that common sense conclusion.  That's

2    exactly what you heard from Mr. Fee here today.

3          And the court did credit that conclusion and ruled

4    in favor of ASTM initially.  And then on remand, several

5    years later, the court looked at the question again and said,

6    well, actually, wait a minute, that seemed to make sense, but

7    now it's been more than a decade since this stuff went up and

8    ASTM still can't show any harm.

9          And so, that seemed like a common-sense inference

10   that if someone else was posting this on the internet, they

11   would experience some harm, but that turned out to be wrong.

12   And so, we are going to find that this factor does not

13   disfavor fair use and, in fact, find that there is not

14   evidence of an effect on the market for or value of the

15   copyrighted work.  And the same is true here.

16         They haven't presented any reason why when there

17   wasn't an effect on the market with respect to a couple of

18   dozen of their other standards, when someone else posted them

19   on the internet, why there would be an effect on the market

20   for us, or why there's such a reason to think that there

21   would be such an effect on the market, that you can assume

22   that for us, where the court who assumed that in the D.C.

23   Circuit case, looked at it later and said, you know, I should

24   have asked for evidence of that. I shouldn't have followed

25   that, what seemed like a common-sense assumption.

1        The last thing I have to say about the fourth

2   factor, the effect on the market for or value of the work, is

3   that Mr. Fee says, well, look, a lot of the people who are

4   accessing your website would access our website too, if your

5   website wasn't there.  And the answer is, probably right,

6   because many people want to access the law as the law.  And

7   if you had to pay ASTM to access the law, and now you can

8   access the law without paying ASTM, like if what you are

9   looking for is the law, if the demand is for the law,

10  previously ASTM got to charge a toll for anyone who wanted to

11  access the law.

12       But that is not a toll they are entitled to.  They

13  are not entitled to have a monopoly on access to the law.

14  They are not entitled to have a monopoly on the ability to

15  speak the law.  And to the extent they are losing out on

16  dollars because they no longer have a monopoly on the ability

17  to speak the law, those are not dollars to which they were

18  ever entitled, because the customary price to be able to

19  access and speak the law is zero.  No one is entitled to

20  charge a toll to access the law.  And so that is the end of

21  the fourth factor.

22       And with that, we near the close of the fair-use

23  analysis.  But one thing I want to emphasize with respect to

24  the fourth factor, and this is something that the D.C.

25  Circuit also talked about, is that we are balancing here the

1  private harm to ASTM against the public gain of wide access
2  to the law.  And this is a place where the amicus brief filed
3  by the Electronic Frontier Foundation at ECF 71-1, I think,
4  is particularly helpful -- the Electronic Frontier
5  Foundation, along with a number of other groups, including
6  Public Knowledge -- filed a brief talking about how it is
7  important to the public interest that there is wide
8  availability of these materials.

9          And that both, I think, feeds into the public
10  interest with respect to whether the public interest would be
11  disserved by granting an injunction, but it also feeds into
12  the fourth factor here because what we are balancing is
13  private harm against public benefit, because that's what the
14  D.C. Circuit says to do.  And, indeed, that's what the
15  Supreme Court says to do in the <u>Oracle</u> decision.

16          I here come to a close on copyright, and I want to
17  move on to trademark, unless there's anything Your Honor has
18  burning on Your Honor's mind with respect to trademark.

19          THE COURT:  I understand your argument.

20          MR. GRATZ:  So let me then turn to the trademark
21  claim.

22          THE COURT:  It doesn't mean I endorse it, it's just
23  I understand it.

24          MR. GRATZ:  I understand, and I remember you saying
25  the same thing to Mr. Fee.

1           With respect to the trademark claim, Mr. Fee and I,

2    I think, agree that the key issue here is nominative use, and

3    how that test is applied in the Third Circuit.  That is,

4    whether that, when the use is in order to talk about someone

5    else's good using their trademark, in order to describe one's

6    own good.

7           We have a number of differences about how that test

8    is applied.  The first thing I want to say about this is, the

9    Third Circuit Lending Tree opinion is actually quite clear

10   about how to do the analysis and provides sort of a

11   step-by-step roadmap for going through it.  And what it says

12   is the first thing -- and the analysis it provides is

13   actually quite different from the analysis in other circuits.

14          So, the first thing it says is, the plaintiff first,

15   before the defendant has any burden, has to prove a

16   likelihood of confusion.  And it says, this is a precondition

17   to a defendant's even having to assert and demonstrate its

18   entitlement to a nominative fair-use defense.  So they carry

19   that initial burden.  And actually, let me pull up my slide

20   that has this text on it.

21          And the reason for that is that the Third Circuit

22   holds that some likelihood of confusion is compatible with

23   nominative fair use.  That is, even if there's a likelihood

24   of confusion, that doesn't resolve the question in the

25   plaintiff's favor in a case involving nominative use.  It

1  just means you go on to ask some questions of the defendant

2  on which the defendant has the burden.

3        The next thing the Third Circuit says is, and I

4  think this is importantly very different from something that

5  we heard in ASTM's brief and that we heard from Mr. Fee, is

6  that in a case where nominative use is asserted, you use a

7  modified version of the normal trademark "likelihood of

8  confusion" factors, the Lapp factors, tailored to situations

9  where nominative use is asserted.  And you do not, the Third

10 Circuit says, analyze or pay any attention to the similarity

11 of the marks, right.

12        What we heard from Mr. Fee is, well, there's a case

13 saying if the marks are identical and the goods are similar,

14 you're pretty much done.  And that is not true of nominative

15 use cases for the reasons the Third Circuit talks about,

16 which is the whole reason that we're here, the whole reason

17 the defendant was using the mark is because it's the same as

18 the plaintiff's mark because they were referring to the

19 plaintiff's good in describing their own good, right?

20        That's what we're talking about with nominative use,

21 using the plaintiff's trademark to refer to the plaintiff's

22 good in describing the defendant's good, that obviously they

23 have to be describing the defendant's good, too.  So you

24 don't analyze the similarity of the marks, and you don't

25 analyze the strength of the mark because that doesn't -- you

1  know, if having a strong mark might be a reason you might

2  need to use the word "ASTM" to describe ASTM B252.

3        But you do look at the other four Lapp factors and

4  we discussed these in our brief and ASTM discusses them, too.

5  You look at the price of the goods and other factors

6  indicative of care and attention expected of consumers making

7  a purchase.  And here, we think that factor sort of weighs in

8  our favor or suggests no likelihood of confusion because the

9  people we're talking about here are largely sort of

10  sophisticated actors who are looking to follow fairly

11  specific laws and they are going to use care in selecting the

12  source of their laws in a way that someone might or might not

13  use the same care in selecting sort of which bubblegum to buy

14  at the grocery store.

15        That's why this trademark law takes this into

16  account.  How much are people going to be paying attention to

17  which one they grab?  And here, where they're building a

18  building and the safety of that building is in question,

19  they're going to pay a lot of attention to it.

20        Second, the length of time the defendant has used

21  the mark without evidence of actual confusion.  There's no

22  evidence of actual confusion here.  And if we had been doing

23  this for a really long time and that remained true, this

24  factor would weigh heavily in our favor.  We have been doing

25  this only for a relatively short time.  So it weighs in our

1    favor, but we recognize we only have a relatively short

2    record of no actual confusion.  And so it still weighs in our

3    favor.

4              Third, the intent of the defendant in selecting the

5    mark.  All of the evidence is we use the term "ASTM" to

6    describe the source of a particular law and where the law is

7    adopted from because that is what the law, the building code

8    or other adopting law, how it refers to it.  We have to use

9    that word.  That's why we use it.  We don't use it to

10   associate ourselves with ASTM but because that's what the law

11   says.  That's the way the law refers to it.

12             And finally, evidence of actual confusion of which

13   there is none. And so when you look at the factors the Third

14   Circuit says to look at when nominative use is asserted, we

15   don't think that the plaintiff has met their burden, which is

16   a precondition to us having any burden to show a likelihood

17   of confusion.

18             But just in case, the Third Circuit says if they had

19   shown that, we could overcome that by responding and showing

20   -- making a showing of our own.  The showing that the

21   defendant would need to make if the plaintiff had met their

22   burden of showing a likelihood of confusion, that would be

23   overcome by us showing three things: first, that the use of

24   the plaintiff's mark is necessary to describe both the

25   plaintiff's product or service and the defendant's product or

1   service.

2          Well, it's necessary to describe their product or

3   service because that is what it's called.  It's called ASTM

4   B252.  If we just referred to it as B252, people might or

5   might not know what we are talking about.  And it is

6   necessary to describe our product or service because we have

7   to say why it is that this is a legal requirement.  And this

8   text is a legal requirement because it is made part of the

9   building code.  It says you must follow ASTM B252.  And so

10  because that's what the building code says, we have to

11  somehow label it as ASTM B252, which was adopted by the

12  building code.

13         The second factor is that the defendant uses only so

14  much of the plaintiff's mark as is necessary to describe the

15  plaintiff's product, right, or necessary to identify the

16  plaintiff's product.  And that is true here.  We just use the

17  word "ASTM" to refer to ASTM as a publisher of particular

18  documents and in the name of a particular document where it's

19  necessary to identify the document as ASTM B252.

20         And this is notably different from the facts, at

21  least before the District Court in the D.C. case where the

22  logo was used.  And the court found, you know what, you

23  didn't need to use the logo.  But the court found you did

24  need to use the letters "ASTM" to identify what it was that

25  you were saying is the law because that's what the law uses

1    to identify those documents as the law.

2         And finally, that the defendant's conduct or

3    language would reflect the true and accurate relationship

4    between the plaintiff and defendant's products or services.

5    And here, they do because our website where it identifies,

6    for example, the Pennsylvania Structural Steel Code, it says

7    underneath that "adopting ASTM B252."  That word "adopting"

8    is what is identifying the relationship between what the user

9    is looking at and that document ASTM B252.  That is, this is

10   a law which is adopting a particular document published by

11   ASTM.

12        We are not claiming that we have the entire document

13   published by ASTM.  We don't.  We don't have the logo on the

14   front.  We omit things that are not the law, like their logo.

15   But we accurately identify the relationship by using that

16   word adopting and by indicating where we are listing

17   publishers that these are -- is an index of adoptions by

18   publisher.

19        Mr. Fee identifies as one of the differences between

20   this and the D.C. Circuit case that there was a disclaimer in

21   that case.  We would be happy to talk to them about putting a

22   disclaimer on if it would resolve this, but they've never

23   asked us to do that.  And that, Your Honor, is the conclusion

24   of my remarks with respect to the trademark claim.

25        Finally, we do not think that there is a likelihood

1    of success on the merits here, and so we do not think that

2    any analysis of the propriety of a preliminary injunction is

3    necessary.  But just to respond very briefly to Mr. Fee, who

4    said that we could not pay a judgment, as we discuss in our

5    papers, there are ten works at issue here.  We have money in

6    the bank.  We could pay a judgment.

7         We do not think that it is likely that any result in

8    this case, even if we lost, would be $150,000 a work because

9    that would require a jury finding of willfulness, that is, we

10   knew we were infringing.  And a jury finding of willfulness

11   is virtually impossible in light of the fact -- in light of

12   the ICC case, right?  I mean, we have a number of District

13   Judges identifying what we are doing as lawful, and so the

14   idea that there would be a finding of willfulness leading to

15   a large damage award being allowed is, we think, unlikely.

16        Finally, with respect to an injunction, I want to

17   return to the public interest because one of the findings

18   that a court must make before entering a preliminary

19   injunction is that the injunction would not disturb the

20   public interest.  And, again, we think, particularly for the

21   reasons discussed in the Electronic Frontier

22   Foundation/Public Knowledge Brief, an injunction here would

23   limit access to the law, and that would not be in the public

24   interest because everyone has the right to see the law,

25   everyone has the right to speak the law, and that is because

1  no one can own the law.

2          So I will conclude there unless Your Honor has any

3  questions.

4          THE COURT:  No.

5          MR. GRATZ:  Thank you.

6          THE COURT:  I understand your argument.

7          Okay.  Would you like to have a short rebuttal?

8          MR. FEE:  Yes, Your Honor.  I just want to make a

9  couple of quick responses there, Your Honor.

10          The first point that Mr. Gratz spent a lot of time

11  discussing was trying to demonstrate that the ASTM standards

12  are "the law" according to him.  And I think it's really

13  important to focus on what the Supreme Court told us in

14  Georgia with respect to whether or not something was entitled

15  to copyright protection in a circumstance like this.  Georgia

16  argued that the question was whether or not text had the

17  effect of being the law.  And if it did have an effect of

18  being the law, no copyright protection was warranted.

19          As I mentioned before, the dissent bought that

20  argument, but you know who didn't buy that argument?  The

21  majority.  The majority said that is not the test for

22  assessing copyrightability.  The test for assessing

23  copyrightability focuses on the identity of the author.

24  There's no dispute here that ASTM is the author of these

25  works.

1          They're entitled to a presumption of authorship as a

2     result of their timely registrations of the copyrights.  And

3     under the Supreme Court precedent, the government-edicts

4     doctrine asks who is the author.  If the answer is a private

5     party, that's the end of the analysis.  There's no basis for

6     canceling copyright protection because it is "the law."

7          We also heard a lot about how Your Honor could go

8     about trying to square the Practice Management case with

9     Veeck.  And a lot of discussion about the Solicitor General's

10    brief on that front.  The Solicitor General's brief and a lot

11    of the cases since Veeck have been pretty clear about how you

12    could square those things.  If it's a model code that's

13    written solely for the purpose of becoming the law, those

14    courts pre-Georgia -- and I guess the ICC, post-Georgia --

15    found that there's no copyright protection.

16          But even Veeck, even CSA, both concluded that when

17    you're talking about a standard as opposed to a model code,

18    standards are entitled to copyright protection even if they

19    are incorporated by reference.  And you don't need to spend a

20    lot of time trying to figure out whether or not an ASTM work

21    is a standard or a code.  You know, one of the things

22    Mr. Gratz alluded to is the Solicitor General said, you know,

23    if it governs a comprehensive field, then maybe it's a model

24    code and not a standard.

25          Well here, Exhibit 14 is ASTM A36.  It's three

1    pages.  This is what a model code looks like.  This is CSA's

2    model code.  It's 953 pages.  You know, they cite the

3    Facility Guidelines case.  This is the Facility Guidelines

4    publication.  Here's the NFPA publication.  These are model

5    codes, arguably.  A three-page description of testing methods

6    for carbon structural steel are not model codes.

7          You've seen model codes before too, Your Honor, I'm

8    sure.  You've seen like the UCC is a model code.  That's not

9    three pages.  Uniform Penal Code, you've probably seen a

10   model penal code before, again, it's nothing like the works

11   we're talking about here.  So even under the cases that

12   Upcodes advocates are applicable here, they expressly

13   recognize that standards maintain copyright protection.  And

14   that is dispositive even if Georgia was not the standard

15   applied here.

16         I want to talk a little bit about what we heard with

17   respect to fair use as well.  You know, we heard a lot about

18   the ASTM court's decision that what Public.Resource did when

19   it reproduced model codes and standards online was

20   transformative.  And, you know, basically the notion that

21   anything that becomes the law when it's posted on another

22   party's website is a transformation.

23         But, you know, that same argument Upcodes made with

24   the NFPA court, and I think the NFPA court got it right.  I

25   mean, it indicated that at least when we're talking about a

1  for-profit organization, the reason that Upcodes is posting

2  these things online is to make money.  And it's to make money

3  by providing access to ASTM's works.  You know, it's a

4  different question, you know, if there's a non-profit

5  organization who's not making any revenue associated with

6  this stuff is posting things online, whether or not they're

7  posting it for a different purpose.

8         You know, the Public.Resource organization posted

9  things online and they've done it for, they put the SEC

10 filings online long before the SEC had them online.  They're

11 putting things online just for public access purposes.  And

12 maybe in that case, the court could have concluded that that

13 was a transformative reproduction.  But here, Upcodes is a

14 non-for-profit organization.  It's out to become a

15 billion-dollar company, like it said.  And the reason it's

16 putting these works online is exactly the same reason that

17 ASTM puts them online.  It's to make these things available

18 to the AEC community.

19        I also want to just touch briefly on some of the

20 other distinctions that I think were particularly relevant to

21 the ASTM court's analysis of the market harm factor.  You

22 know, we heard Mr. Gratz ask sort of why, if this was so

23 problematic, why were some of the standards that were up in

24 the ASTM case, there was no evidence of actual calculable

25 damages in that case.

1       And, you know, first of all, you know, I want to

2   make sure we're clear that there was expert testimony in that

3   case about harm to ASTM.  But putting that issue aside,

4   there's, I think, two other really important differences

5   between the standards that were being posted in that case and

6   what's happening here.  One is the standards at issue in the

7   ASTM D.C. Circuit case were very old.  Most of them were from

8   the 1960s to 1990s.  So those things have been posted -- have

9   been out there for decades and decades and decades.  Here,

10  all these works are much newer.

11      But perhaps even more importantly, in the ASTM case,

12  all of the works at issue were available online for free

13  already from ASTM.  So there were already an option to get

14  works available for free.  So that isn't going to -- the fact

15  that Upcodes also made them available for free, it was less

16  likely to have an impact than it is in this circumstance.

17  Where here, the available option prior to Upcodes becoming

18  involved was you could buy the standards if you wanted to

19  have your own copy as opposed to going to a library to find

20  out what they said for a small fee.  And Upcodes gives it

21  away for free.  So that's a pretty big difference.

22      You know, it's one thing to say there isn't going to

23  be market harm when you reproduce an ASTM standard from the

24  '60s that's also available for free online from ASTM.  It's

25  quite another thing to say the fact that you're posting

1  things online for free, that are relatively new and only

2  available otherwise for purchase from ASTM if you want to

3  have your own copy is an entirely different ball of wax.

4       The other thing I want to make sure we're clear

5  about is in the ASTM D.C. circuit decision, the court found

6  there was no fair use when the works weren't incorporated by

7  reference.  There were 32 works that ASTM -- ASTM works that

8  were posted online by Public.Resource.Org that were not

9  incorporated by reference.  And in that circumstance, there

10 was no finding of fair use.

11      I want to just touch real briefly on the trademark

12 issue. Mr. Gratz spent a fair amount of time walking through

13 the Lending Tree decision and explaining how that court made

14 clear that the analysis would be different for a likelihood

15 of confusion in the case of nominative use.  But that glosses

16 over the entire dispute here.  The question is whether or not

17 they're making a nominative use.

18      And the Lending Tree case made clear that you make a

19 nominative use when you're using a trademark to refer to the

20 trademark owner's products or services.  So if I'm Honda and

21 I want to say our car is better than a Ford car, I say our

22 car has 25 miles per gallon and they have 19 miles per gallon

23 with Ford, that's a nominative fair use because I'm referring

24 to Ford's product when I say it has 19 miles per gallon.

25 That's not what's happening here.

1          Like I showed you earlier, this is the ASTM

2    standard.  Upcodes does not make this available to its

3    customers.  It makes a copy of this that is not ASTM's

4    product and puts it online and says it's ASTM's product and

5    it's published by ASTM.  Those copies are not our product.

6    Those copies, because they're not our product, are not

7    subjected to a nominative fair-use defense.

8          And as a result, you would go through the normal

9    analysis in the lab factors where you could refer to the A&H

10   Sportswear v. Victoria's Secret case I mentioned, which made

11   clear that when there's a virtually identical mark and

12   virtually identical services, that's really the end of the

13   inquiry.  I will say, if for whatever reason you believe that

14   that's a nominative fair use still, we do go through in our

15   brief all the other factors that he laid out in the Lapp

16   analysis and explain why the likelihood of confusion is still

17   very high.

18          THE COURT:  Thank you.

19          MR. FEE:  The last thing I just want to say, Your

20   Honor, is on the public-interest issue here.  ASTM develops

21   these standards to help public interest.  That's what their

22   mission is.  They only can do that if they have funds to

23   enable the standards development process.  I've talked to you

24   already about how they go about doing that and why that is

25   the best way to develop standards.

1         Upcodes would have you believe that they're doing

2    some great public interest here by making these available

3    online for free.  But they haven't identified a single

4    person, I don't believe, in any of their cases -- certainly

5    not in this case or in the ICC case, which I'm also involved

6    in -- where any individual ever had any problems getting

7    access to these standards or codes.

8         There is not an access problem.  I just want to say

9    it again, there is not an access problem.  There's evidence

10   in the record that if there's persons who need access to ASTM

11   standards for whatever reason are unable to pay that small

12   fee and they need a copy of it, ASTM will make the standards

13   available for free to those persons. So there's no public

14   interest that's being saved by Upcodes' conduct here.

15        Their conduct is for their own personal benefit to

16   be a billion-dollar company and it's to the harm of the

17   public interest of having standards development organizations

18   like ASTM use small fees associated with making their

19   standards available to licensees in order to fund a

20   non-industry captured standards development process.

21        Unless you have any other questions?

22        THE COURT:  Thank you.

23        MR. FEE:  Thank you.

24        MR. GRATZ:  May I respond briefly?

25        THE COURT:  Yes, of course.

1          MR. GRATZ:  So first, with respect to the copyright

2    issues and with respect to Georgia, Mr. Fee pointed out that

3    it was the position of Georgia and the dissent, that is the

4    people who were arguing in favor of greater rather than

5    lesser copyright protection, that whether it had the force of

6    law mattered.  That is, it would be very strange if -- and

7    Mr. Fee is saying, well, the force of law doesn't matter at

8    all even to expand the scope of the government-edicts

9    doctrine.

10          In other words, force of law is -- everyone agrees,

11    the dissent and the majority agree that if it has the force

12    of law, if it is the law, that no one can own the law.  And

13    Georgia was about something else.  It was about a dispute

14    about things where they do not have the force of law.  And

15    they said as to that, well, we're not going to look at

16    whether it has the force of law because these things -- they

17    don't obviously have the force of law.  We're going to use a

18    different test.

19          The second thing Mr. Fee talked about was that we

20    can tell something about this because these documents are

21    short and these documents are long.  These books are thicker

22    than the document that Mr. Fee was holding up.  And the

23    thickness of the document does not affect the analysis.

24    There is not a reason the thickness of the document should

25    affect the legal outcome.

1          And in fact, just because ASTM chose to break up its

2    documents into separate standards that are in a loose-leaf

3    fashion rather than sections of one larger book like these

4    others do, is of no legal significance.  And if we are going

5    to be measuring the size of the objects, one relevant fact

6    there is ASTM, when it publishes -- here are all the

7    standards you need to comply with the building codes, that

8    book is 8,700 pages long and comes in multiple volumes, at

9    least back when they published it on paper before it got too

10   big to publish even in a multi-volume set.  So if we are

11   measuring the size of the document, even if that is relevant,

12   ASTM's documents are the size of a law.  That is not,

13   however, wrong.

14          One thing I want to just clarify moving to the

15   fair-use analysis, Mr. Fee said, well, the D.C. Circuit found

16   that this was transformative, but that was in a case

17   involving a non-commercial use.  And importantly, the

18   question of whether something is transformative is separate

19   from the question of whether it is commercial.  And they are

20   completely separate because we know from the -- for example,

21   the Campbell case in the Supreme Court, that when something

22   is transformative, it doesn't matter as much whether it's

23   commercial.

24          So obviously, one can't be an input into the other

25   and they can't be the same analysis where we first determine

1   whether and to what extent it's transformative.  And that

2   tells us how much we care to what extent it's commercial.

3   And here, the D.C. Circuit found using works in order to say

4   what the law is, is transformative. And that is what's

5   happening here.

6           With respect to market harm, I guess all I have to

7   say is, Mr. Fee is saying today all of the same things that

8   Mr. Fee said to the District Court in the District of D.C.

9   and what Mr. Fee's expert said in that case, and the court

10  did not credit them.  And we should certainly not, I think at

11  the preliminary injunction stage, now credit them.

12          Perhaps down the line, Mr. Fee will be able to show

13  harm here where he was not able to show harm in the other

14  case.  But for today, I do not think that we should credit

15  the assertion that there is harm without evidence of that

16  harm.  That is what I have to say with respect to responding

17  to the points on copyright.

18          With respect to the points on trademark, I actually

19  do think in this case, there are many things that, Mr. Fee

20  and I actually disagree about what the Third Circuit says.

21  So I would encourage Your Honor to just look at what the

22  Third Circuit says.  Mr. Fee says you only do the

23  nominative-use analysis once the defendant has proven or

24  shown that what they're making is a nominative use.

25          But that is the opposite of what the Third Circuit

1   says.  The Third Circuit says where nominative use is

2   asserted, we're going to look second at whether the defendant

3   can show that they're right and we're going to look first at

4   whether the plaintiff can prove under the modified lot

5   factors that there's a likelihood of confusion.  You cannot

6   put the defendant's burden at the beginning where the Third

7   Circuit has said the defendant's burden is at the end and

8   comes only after.

9           One thing on the sort of definitional point that I

10  want to point out, and this is a small item, but I think it

11  may be helpful in sort of untwisting the parties' positions

12  on this.  Lending Tree, the Third Circuit opinion, in

13  defining nominative use, quotes a Ninth Circuit opinion in KP

14  Permanent Make-Up.  But there's a typo in the Lending Tree

15  case, and it omits some words from the quote, which I don't

16  think ultimately changed the meaning, but just make it much

17  more confusing and I think may lead to some of the confusion

18  here.

19          The quote from the Ninth Circuit is that,

20  "Nominative fair use occurs when the alleged infringer uses

21  the trademark holder's mark to describe the trademark

22  holder's product, even if the alleged infringer's ultimate

23  goal is to describe their own product."  Right?  They're

24  referring to the trademark holder's product using the

25  trademark holder's mark, but they are ultimately describing

1  something about their own product.

2      For example, if I say, I fix Volkswagens, right?

3  And I am a Volkswagen, I am not a Volkswagen mechanic.  But

4  if I say, I fix Volkswagen's, I don't have to have any

5  affiliation with Volkswagen to say that because I am talking

6  about my own service, I fix Volkswagens, using that trademark

7  to refer to the thing that I fix.  Similarly, this is the

8  Pennsylvania Structural Steel Code adopting ASTM B252.  It's

9  saying what this is and how it relates to that other thing.

10  I fix Volkswagens, this legal text adopts that publication.

11      Just to return to Lending Tree, the Lending Tree

12  opinion uses as its quote, "Nominative fair use is said to

13  occur when the alleged infringer uses the trademark holder's

14  product, even if the alleged infringer's ultimate goal is to

15  describe his own product."  But that omits the words "the

16  trademark holder's mark" to describe the trademark holder's

17  product and makes the whole thing a little more confusing.

18      So I just wanted to draw Your Honor's attention to

19  the Ninth Circuit opinion there, just because it can help

20  sort of tease apart some of the confusion about what is a

21  nominative use.  That is, it's using the trademark holder's

22  mark to refer to the trademark holder's product to say

23  something about the defendant's product.

24      And the thing that's being said here is, Mr. Fee

25  said, like, it's a copy.  Like, that's what we're saying,

1  right?  Because we copied the part that's the law.  This is a

2  part of the copy.  This is a copy of the part of ASTM B252

3  that was adopted into law.  That's what we're saying.  And to

4  say that, we have to say the word -- the letters "ASTM."  We

5  don't have to use their logo, and so we don't.

6        And I think I will conclude there.  We have had

7  plenty of argument today.  Unless Your Honor has any

8  questions, I would urge Your Honor to deny the motion for a

9  preliminary injunction.

10        THE COURT:  Where -- what do you want to -- what

11  kind of follow-up?  Let's start with you, Mr.

12  (indiscernible).  Do you want to submit anything else?

13        Excuse me, I can't see.

14        MR. FEE:  Sorry, Your Honor.  I don't think we need

15  to submit anything else, Your Honor.

16        THE COURT:  You're not going to have any follow-up?

17        MR. FEE:  No, I would like to make two quick points,

18  if that's all right, in response to what he just said.

19        THE COURT:  Yes, two quick.

20        MR. FEE:  I swear to be quick.

21        THE COURT:  I don't know how my definition of quick.

22        MR. FEE:  No, these will be quick.

23        THE COURT:  But you don't want --

24        MR. FEE:  I promise.

25        THE COURT:  -- you don't want, you do not want --

1    when I said, did you want any follow-up, your law clerks

2    looked very happy.  I mean, your associates, I assume.

3              MR. FEE:  Yeah.  The two quick points I wanted to

4    make, Your Honor.  One was, we had heard Mr. Gratz say, don't

5    take ASTM's word for the fact that they're going to be harmed

6    by our conduct.  Maybe someday in the future, there'll be

7    evidence along those lines.

8              The important point I want to make on that front is

9    that completely has the burden of proof backwards on this

10   one.  Upcodes has the burden of proving fair use, even in the

11   preliminary-injunction context.  And we did cite cases in our

12   opening papers, making the point that the burden of proof

13   from the substantive case carries over to the

14   preliminary-injunction analysis.

15             Secondly, I just want to touch real briefly on the

16   nominative fair-use idea, like we fix Volkswagens.  That's

17   not what's happening here.  You know, if they said on their

18   website, we're publishing our OCR and sometimes wrong copies

19   of ASTM's works on our website, that might be a nominative

20   fair use.  But they don't do that.  They put it online and

21   they say, ASTM is the publisher of this thing on our website.

22   That's false.  It's not referring to our product.  It's

23   referring to what's on their webpage as their website.  And

24   that's why this isn't a nominative fair use.

25             THE COURT:  Okay.  Do you want to -- are you going

86

1  to want to say something?

2          MR. GRATZ:  He made two points.  I have one sentence

3  to respond to each of them.  My one sentence with respect to

4  the harm question is that it's hard to prove a negative and

5  he's putting the burden on us to prove a negative.  And we

6  think we have met our burden by pointing to the D.C. Circuit

7  case, where the finding was in the negative.

8          Second, with respect to nominative fair use, he

9  says, we say that they are the publisher of the stuff that's

10 on our website.  We do not say that they are the publisher of

11 the stuff that is on our website.  We say they are the

12 publisher of their publications, which they are.  And we say

13 that they are adopted into law and the portions adopted into

14 law are copied onto our website, which they are.

15         THE COURT:  Okay.

16         MR. GRATZ:  That is it.

17         THE COURT:  Okay.  You don't want to have any

18 follow-up either, is that --

19         MR. GRATZ:  So I don't think so, Your Honor.

20         Obviously, we would be happy to provide anything --

21         THE COURT:  No, but I need a transcript of this.

22 That I would not -- I assume that --

23         MR. GRATZ:  We will be ordering a transcript, Your

24 Honor.

25         THE COURT:  You okay?

1          MR. GRATZ:  Yeah.

2          THE COURT:  All right, okay.  Thank you.

3          It'll take a little while to get it, you know.

4  That's so that I at least have today's argument and I can

5  reflect on it.

6          MR. GRATZ:  Absolutely, Your Honor.

7          And just while we're here, would you like us to file

8  the demonstratives that's the slides?  Mine were a little bit

9  hastily prepared, but I'm happy to submit them.

10          THE COURT:  I think that's a good idea.

11          MR. GRATZ:  Great, we'd be happy to file those.

12          THE COURT:  Yeah, I think so.

13          MR. GRATZ:  I think they'll probably be filed under

14  seal.

15          THE COURT:  I've listened pretty carefully, and I

16  think that would be very helpful.

17          MR. GRATZ:  Great.

18          THE COURT:  Okay, thank you.  Anything else?

19          MR. FEE:  Can I just hand up our copies?  We'll file

20  them, as well.

21          THE COURT:  Oh, sure.

22          MR. FEE:  But so you have a hard copy.

23          THE COURT:  Yeah, that would be good.

24     (Whereupon, counsel confer briefly.)

25          THE COURT:  All right.

1              MR. GRATZ:  Thank you, Your Honor.

2              THE COURT:  Court is adjourned.

3              MR. FEE:  Thank you, Your Honor.

4              UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

5         (Whereupon, at 12:53 p.m. the hearing was adjourned.)

6                          *  *  *  *  *

7

8

9

10

11

12                          CERTIFICATION

13      I, DIPTI PATEL, court-approved transcriber, certify that

14  the foregoing is a correct transcript from the electronic

15  sound recording of the proceedings in the above-entitled

16  matter.

17

18

19  _____          September 3, 2024

20  DIPTI PATEL, AAERT CET-997

21  Expires: December 6, 2026

22  LIBERTY TRANSCRIPTS

23  I certify that the foregoing is a true and correct copy of
    the transcript originally filed with the Clerk of Court,
24  and incorporating redactions and personal identifiers
    requested, in accordance with the Judicial Conference
25  policy.  Redacted characters appear as a black box in the
    transcript.      /s/ Dipti Patel
                      DIPTI PATEL, AAERT CET-997  October 4,2024