**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>UPCODES, INC.; GARRETT REYNOLDS; and SCOTT REYNOLDS,<br><br>Defendants. | Civil Action No.: 2:24-cv-01895-CFK<br><br>**JURY TRIAL REQUESTED**<br><br>REDACTED PUBLIC VERSION |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1
II. STATEMENT OF UNDISPUTED MATERIAL FACTS ..... 3
A. ASTM is a Nonprofit SDO that is Funded by Its Sale and Licensing of Its Copyrighted Standards. ..... 3
B. UpCodes is a For-Profit Company Funded by Silicon Valley Venture Capital Firms. ..... 5
C. UpCodes Copied ASTM Standards at the Request of Its Customers. ..... 7
D. UpCodes' Copies of the Works Are Nearly Perfect Substitutes, and Its Copies Adversely Impact the Market for Authorized Copies and Subscription Services. ..... 7
III. ARGUMENT ..... 9
A. ASTM Owns Valid Copyrights in the Works, and UpCodes' Copying Is Undisputed. ..... 9
1. ASTM Indisputably Owns the Copyrights. ..... 9
2. UpCodes Cannot Rebut the Presumption of Validity. ..... 10
3. Copying Is Not Contested. ..... 13
B. UpCodes Cannot Meet Its Burden to Show Its Use of the Works Was Fair. ..... 14
1. Factor 1: Purpose and Character of the Use ..... 14
2. Factor 2: Nature of the Copyrighted Work ..... 22
3. Factor 3: Amount and Substantiality of the Portion Used ..... 23
4. Factor 4: Effect on the Market for the Original ..... 23
5. In Totality, the Fair Use Factors Weigh Against Fair Use. ..... 28
C. UpCodes is Liable for Removing Copyright Management Information. ..... 28
1. ASTM's Works contained copyright management information. ..... 29
2. UpCodes knowingly and intentionally removed and altered ASTM CMI. ..... 29
3. UpCodes knew the removal would facilitate infringement. ..... 29
D. Garrett Reynolds and Scott Reynolds Are Personally Liable for UpCodes' Infringement and CMI Removal. ..... 30
IV. CONCLUSION ..... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bd. of Internal Med. v. Rushford*,
2026 WL 125193 (3d Cir. Jan. 16, 2026) .......... 9, 13

*Am. Soc'y of Cinematographers v. Schatz*,
2021 WL 4352302 (C.D. Cal. May 25, 2021) .......... 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 9

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... *passim*

*Apple Comput., Inc. v. Franklin Comput. Corp.*,
714 F.2d 1240 (3d Cir. 1983) .......... 12

*ASTM v. Public.Resource.org, Inc.*,
2017 WL 473822 (D.D.C. Feb. 2, 2017) .......... 4, 11

*ASTM v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) .......... 26

*ASTM v. Public.Resource.org, Inc.*,
597 F. Supp. 3d 213 (D.D.C. 2022) .......... 11

*ASTM v. Public.Resource.Org, Inc.*,
82 F.4th 1262 (D.C. Cir. 2023) .......... 27

*ASTM v. UpCodes, Inc.*,
172 F.4th 253 (3d Cir. 2026) .......... *passim*

*August Image, LLC v. AllWrite Commc'ns Inc.*,
2024 WL 4505000 (N.D. Ga. Sept. 10, 2024) .......... 17

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .......... 22

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*,
297 F. Supp. 3d 339 (S.D.N.Y. 2017) .......... 17

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.*,
44 F.3d 61 (2d Cir. 1994) .......... 22

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
749 F.2d 154 (3d Cir. 1984) .......... 30

*Facility Guidelines Inst., Inc. v. UpCodes, Inc.*,
677 F. Supp. 3d 955 (E.D. Mo. 2023) .......... 11, 24

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
499 U.S. 340 (1991)....................22

*Georgia v. Public.Resource.Org*,
590 U.S. 255 (2020)....................10, 11

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....................24

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024)....................20, 24, 28

*Harper & Row Publishers, Inc. v. Nation Enterps.*,
471 U.S. 539 (1985)....................14, 15, 16, 24

*International Code Council, Inc. v. UpCodes, Inc.*,
2020 WL 2750636 (S.D.N.Y. May 27, 2020)....................11, 20, 24

*Mango v. BuzzFeed, Inc.*,
970 F.3d 167 (2d Cir. 2020)....................29

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007)....................28

*Murphy v. Millennium Radio Grp. LLC*,
2013 WL 2961669 (D.N.J. June 14, 2013)....................29

*Murphy v. Millennium Radio Grp. LLC*,
650 F.3d 295 (3d Cir. 2011)....................28, 29

*Nat'l Fire Prot. Assn. v. UpCodes, Inc.*,
753 F. Supp. 3d 933 (C.D. Cal. 2024).................... *passim*

*Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*,
931 F.3d 215 (3d Cir. 2019)....................9, 10, 12

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................23

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*,
No. 25-2153, 2026 WL 2932557 (3d Cir. Sept. 29, 2026).................... *passim*

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
293 F.3d 791 (5th Cir. 2002) (*en banc*)....................11

**Statutes**

17 U.S.C. § 102(b)....................11

17 U.S.C. § 106.................... 13

17 U.S.C. § 410(c)....................9

17 U.S.C. § 501....................3, 30

17 U.S.C. § 1202....................3, 28, 29, 30

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................................................9

## I. INTRODUCTION

In a precedential decision addressing similar circumstances, the Third Circuit recently affirmed a summary judgment for a copyright plaintiff because "[t]he undisputed evidence reflects that [the copyright owner's] materials possess a creative spark, and [the copier] aspired to be a direct competitor by using them for a highly similar purpose." *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, No. 25-2153, 2026 WL 2932557 at *1 (3d Cir. Sept. 29, 2026). The same is true here: UpCodes has used ASTM's original works for a highly similar purpose to directly compete with ASTM. Thus, like the Third Circuit in *ROSS*, the Court should rule as a matter of law that "[ASTM's] materials are copyrightable and that [UpCodes] use was not fair." *Id.*

There is no *bona fide* dispute about whether ASTM owns valid copyrights in the standards at issue or that UpCodes copied ASTM's standards without consent. Even on a preliminary record, Judge Brody concluded that "ASTM establishe[d] both elements of a copyright infringement claim." Dkt. 104 at 15 ("Op."). As a result, this case boils down to whether UpCodes can meet its burden of proving that its copying is protected by fair use even though it is a for-profit company that reproduces the entirety of ASTM's standards without any commentary or criticism and in direct competition with ASTM. It cannot.

In furtherance of its fair use defense, UpCodes argues that its copying is not for a commercial purpose and does not undermine the market for ASTM standards because UpCodes only copied ASTM's standards for the altruistic purpose of bringing "the law" to the public. Not surprisingly, that claim failed to withstand scrutiny during discovery. Discovery revealed that UpCodes set out to [redacted] to bring what it called the [redacted] Statement of Stipulated Facts ("SMF") ¶ 25. To advance that goal, UpCodes admittedly lures architecture, engineering, and construction ("AEC") firms to its website by giving away content it stole from standards developments organizations ("SDOs") for free, thereby giving

its users "a taste" to entice them to "go on to being a paid user." Statement of Additional Facts ("SAF") ¶ 78. The evidence here is consistent with the United States District Court for the Central District of California's finding in a similar case against UpCodes: "UpCodes' unlicensed use of [the copied] standards on both its 'free' and 'paid' tier has one objective purpose: making money." *Nat'l Fire Prot. Assn. v. UpCodes, Inc.*, 753 F. Supp. 3d 933, 961 (C.D. Cal. 2024) ("*NFPA*").

UpCodes' scheme is working. It generates millions in revenue "by attracting users to its website, offering some content for free to funnel prospective customers to its platform, and monetizing a portion of its free-tier users by converting them to paying customers." *NFPA*, 753 F. Supp. 3d at 961. As a result, the threat UpCodes' use poses to ASTM is clear. As the Third Circuit recognized even on a preliminary record, "if the [Works] can be obtained for free from UpCodes, consumers will be less incentivized to purchase the Works from ASTM for a fee." *ASTM v. UpCodes, Inc.*, 172 F.4th 253, 269 (3d Cir. 2026) ("*ASTM I*").

Previously, UpCodes "call[ed] into question the robustness of the market for standards incorporated into law," *id.* at 270, but it cannot continue to do so now. Discovery revealed that UpCodes is now an active participant in that market. UpCodes recently agreed [redacted] to license one SDO's [redacted] ASTM has entered into similar licenses with numerous parties. SMF ¶¶ 10-12. Thus, the record unambiguously confirms the viability of that market.

In short, discovery revealed that UpCodes commercially exploits ASTM's standards by selling access to them in its paid subscription tier and by giving away access to them as part of its lead generation process. In addition, discovery confirmed Judge Brody's conclusion that UpCodes' copies of the entirety of ASTM's standards are "an effective substitute" for ASTM's standards, Op. at 35, and therefore cannot be transformative. And the full record confirms that

UpCodes' copies of ASTM's standards will make consumers "less incentivized to purchase the Works from ASTM for a fee." *ASTM I*, 172 F.4th at 269. Under these circumstances, UpCodes' copying is not fair as a matter of law.

Therefore, ASTM respectfully moves the Court for summary judgment of copyright infringement under 17 U.S.C. §§ 106 and 501. ASTM also moves for summary judgment of removal or alteration of copyright management information ("CMI") pursuant to 17 U.S.C. § 1202.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. ASTM is a Nonprofit SDO that is Funded by Its Sale and Licensing of Its Copyrighted Standards.

ASTM is a nonprofit voluntary consensus standards development organization that has developed approximately 13,000 standards through a consensus-based development process. SMF ¶¶ 1-4. Standards are publications that contain product specifications, installation methods, methods for manufacturing or testing materials, recommended practices to promote safety or efficiency. SAF ¶ 2. More than 2,400 ASTM standards are referenced in model building codes. SAF ¶ 10. This case involves ten of the ASTM standards that are referenced by the 2021 *International Building Code* ("*IBC*"), a copyrighted model code developed by International Code Council, Inc. ("ICC") (the "Works"). Many states have IBR'd the *IBC*. For example, the 2021 Pennsylvania Uniform Construction Code incorporates by reference the 2021 *IBC*. The 2021 *IBC*, in turn, refers to 276 ASTM standards by stating, for example, that "Steel pipe piles shall conform to the material requirements in [ASTM standard] A252," one of the Works at issue in this case. SAF ¶¶ 29-30.

ASTM owns valid, enforceable copyright registrations in the Works. SMF ¶¶ 4, 14-16. Each standard reflects substantial creative choices in the expression of technical specifications—choices that could have been made differently at the time of creation. SAF ¶ 5. *See ASTM v.*

*Public.Resource.org, Inc.*, 2017 WL 473822, at *14 (D.D.C. Feb. 2, 2017) ("*PRO I*") ("At the time they were authored, there were certainly myriad ways to write and organize the text of the standards"), *rev'd in part on other grounds*, 896 F.3d 437 (D.C. Cir. 2018).

ASTM publishes and distributes its standards through multiple channels, including through purchases of PDF files via its website, ASTM's own subscription service, and through authorized resellers. SMF ¶¶ 5-12; SAF ¶ 22. ASTM sells its standards to AEC professionals, among others. SMF ¶ 13. ASTM's standards, including the Works, are widely available—a fact that UpCodes' own expert acknowledges. SMF ¶¶ 5-12. In fact, UpCodes has never identified a single user who was unable to access an ASTM standard. SAF ¶ 8.

Consumers can purchase individual standards from ASTM and its resellers. SMF ¶ 10-13; SAF ¶ 8. In addition, ASTM makes its standards available through its own subscription service called ASTM Compass. SMF ¶ 9. ASTM also licenses third parties, such as ICC, MADCAD, and Accuris, to include its standards, including IBR'd standards, in their own online subscription services. SMF ¶¶ 10-12; SAF ¶ 14.

ASTM Compass offers a subscription product called "*Standards in Building Codes*" ("*SIBC*"), which provides access to every version of more than 2,400 ASTM standards that are referenced in building codes like the *IBC*. SMF ¶ 8; SAF ¶ 10. The *SIBC* includes the 10 Works, including past versions and updated versions as they are published. SMF ¶ 8. ASTM also offers a subscription that provides customers with access to all of ASTM's standards, including the 2,400 standards in *SIBC*, and this offering has generated over [redacted] in revenue since 2018. SAF ¶ 10. ASTM's licensees also offer similar subscriptions that include the Works. Both ASTM's and its licensees' subscriptions permit users to use tools in connection with ASTM's standards, including searching, annotating, and bookmarking. SMF ¶¶ 10-12; SAF ¶ 26.

ASTM generates its revenue primarily through the sale and licensing of its copyrighted standards. SAF ¶¶ 8, 15. ASTM depends on its ability to generate revenue from its "core business" so that it can reinvest that money into standards development and related trainings. SAF ¶ 8. ASTM incurred approximately [redacted] in operating expenses on standards creation, publication, and related services in 2024. SAF ¶ 7. "[A]ny significant loss of revenue would require ASTM to change the way in which it conducts its business." SAF ¶ 124. Without copyright revenue, "critically important but unprofitable standards will no longer be developed, which will come at a high cost to public health and safety." SAF ¶ 124.

**B. UpCodes is a For-Profit Company Funded by Silicon Valley Venture Capital Firms.**

UpCodes, Inc. is a for-profit startup founded in 2016 by brothers Garrett Reynolds and Scott Reynolds and is funded by prominent venture capital firms, such as YCombinator, Building Ventures, and G Ventures (f/k/a Google Ventures). SMF ¶¶ 23, 30. From the start, UpCodes identified its competitors as "standards development organizations" that sell "hard copy books." SAF ¶ 45. Specifically, it disclosed that "[t]he competitor we fear most is MADCAD," an ASTM licensee. SAF ¶ 46. Its goal has been clear from the outset. It told YCombinator, "We truly believe we're coming in right at the right time, the code publishers' multibillion dollar racket is coming to an end, and we're going to be the ones." SMF ¶ 25. In furtherance of that goal, UpCodes engaged in a massive copyright infringement campaign, ultimately building a business worth [redacted] on the backs of countless non-profit standards development organizations. SMF ¶ 31.

UpCodes uses the non-profit organizations' copyrighted works in at least three ways. First, UpCodes gives away the SDO's copyrighted content for free to divert traffic from the SDOs and their licensees so that it can sell subscriptions to those users. SMF ¶¶ 29, 35; SAF ¶¶ 79-84. This is called a "freemium" business model and is common approach among Silicon Valley technology companies. SAF ¶ 99. UpCodes boasts that its "freemium B2B SaaS model" is "hyper capital

efficient" because it "utilize[s] [its] user base" to drive subscription revenue. SAF ¶¶ 88, 99. UpCodes leverages the content it copies to provide free users with a "taste" of its services that will encourage them to purchase a paid subscription. SAF ¶ 78. This strategy is working. UpCodes' user base has grown as it added more and more copyrighted materials to its free site, and it now has approximately 900,000 monthly active users ("MAU"). SAF ¶ 95. In fact, [redacted] of UpCodes' new revenue generation comes from free users that opt-in to paid subscriptions. SAF ¶ 99. Since it posted ASTM's Works, UpCodes has generated [redacted] in revenue. SAF ¶ 70. UpCodes also secured investments totaling more than [redacted] from venture capital firms by leveraging this strategy. SAF ¶ 99.

UpCodes also monetizes its free users through its product listings service. SAF ¶ 94. For a fee, UpCodes offers building product manufacturers the opportunity to promote their products (*e.g.*, windows, plumbing, and masonry) to UpCodes' 900,000 monthly users. SAF ¶ 95. UpCodes currently hosts over 750,000 building products that architects and engineers can use in their commercial construction projects. SAF ¶ 94. Product manufacturers like [redacted] have paid as much as [redacted] for the opportunity to market its products to UpCodes' monthly active users, [redacted] of which are free users. SAF ¶ 97.

Second, UpCodes uses ASTM's and other SDOs' codes and standards in connection with a paid subscription service. SMF ¶ 29. UpCodes offers three paid tiers: "Essentials," "Professional," and "Enterprise" that each provide users with access to UpCodes' code library. SMF ¶ 29. Paid users can use tools like searching, bookmarking, and annotation on the codes and standards that UpCodes has copied. SMF ¶ 29. UpCodes admits these tools would be useless without the codes and standards. SAF ¶ 78.

Third, UpCodes uses SDO's codes and standards to train its AI tool, called "Copilot." SAF

¶ 71. UpCodes' Copilot accesses UpCodes' code library to answer user questions about "code compliance." SAF ¶ 72. UpCodes claims that "[u]nlike generic AI tools, Copilot is designed for compliance workflows, tying codes, documents, projects, and your institutional knowledge together in one place." SAF ¶ 73. UpCodes Copilot may also recommend products from UpCodes' product library. SAF ¶ 75.

**C. UpCodes Copied ASTM Standards at the Request of Its Customers.**

Beginning in approximately September 2023, UpCodes began adding ASTM's copyrighted standards into its library of codes and standards at the request of paying subscribers. SAF ¶¶ 120-122. For example, [redacted] which was paying UpCodes more than [redacted] in licensing fees, asked UpCodes to add ASTM standards to its library, and UpCodes confirmed it would "prioritize the important ones asap." SAF ¶ 120.

UpCodes purchased unauthorized copies of the Works and reproduced the full text of each of the Works and published it on the UpCodes website with some limited exceptions. SMF ¶¶ 27-28; SAF ¶ 57. Before publishing the Works on its website, UpCodes intentionally and systematically removed ASTM's copyright management information, including ASTM's name, address, copyright notices and proprietary legends, and its terms and conditions of use. SMF ¶¶ 17-22, 36-39; SAF ¶¶ 140, 145, 146. Then, although UpCodes purports to be focused on increasing public access, UpCodes placed ASTM's standards behind a password-protected portion of its website to combat competition from artificial intelligence large language models from "stealing" UpCodes' copies of ASTM's content. SMF ¶ 32.

**D. UpCodes' Copies of the Works Are Nearly Perfect Substitutes, and Its Copies Adversely Impact the Market for Authorized Copies and Subscription Services.**

UpCodes earned at least [redacted] in revenue during the period of infringement. SAF ¶ 70. All paid users and registered users during the relevant time frame had access to the Works.

*Id.* Since reproducing ASTM's standards, users have accessed the ASTM standards available on UpCodes' website more than [redacted] times. SAF ¶ 131. While the harm associated with the loss of [redacted] of views is substantial, the threat will grow exponentially if UpCodes and others are permitted to freely copy any of the thousands of ASTM standards that are referenced in model building codes for free. SAF ¶ 123-126.

The limited customer information produced by UpCodes revealed that [redacted] of individuals who accessed the Works on UpCodes' website worked at companies subscribing to ASTM's services. SMF ¶ 33; SAF ¶ 86. In the short time UpCodes has offered the Works, UpCodes' traffic for those standards has already surpassed ASTM's. SAF ¶ 131. Moreover, ASTM's licensees' customers have reached out to UpCodes to inquire about ASTM standards availability and to compare UpCodes' offering with their current ASTM licenses. SAF ¶ 120-122. One UpCodes prospect (who currently is an ASTM licensee customer) testified that it would be "significantly less likely to want to pay for access to an ASTM licensee" if UpCodes had more ASTM standards available on its website. SAF ¶ 121. Ray Shipman, UpCodes' purported expert witness and the Building Official and Code Enforcement Officer for the City of DuPont, WA, testified that he preferred using UpCodes' copies of the Works over ASTM books and conceded that he would have no reason to access the same standard from both UpCodes and ASTM. SMF ¶ 34.

ASTM's economic expert, Dr. Jeffery A. Stec, explained, "UpCodes' reproduction of substantively identical copies of the Copyrighted Works function as a direct market or near-perfect substitute[s]" for ASTM's Works. SAF ¶ 125. UpCodes offers the identical content as the Works at zero cost, creating a classic "zero-price effect." SAF ¶ 125. Meaning, "[w]hen one supplier offers an identical product at a price of zero, consumer choice theory would indicate demand for the free product increases dramatically while demand for the direct market substitute, which is not

free, will go to zero." SAF ¶ 124; *ASTM v. UpCodes, Inc.*, 172 F.4th 253, 268 (3d Cir. 2026) ("*ASTM I*") (it is "'plain to see' how UpCodes' copying will affect the market for the Works").

The scale of potential harm extends well beyond the ten Works. Over 2,400 ASTM standards are referenced in model building codes adopted by jurisdictions across the United States. SAF ¶ 10. UpCodes reproduced two additional standards since the lawsuit started and has stated it may add additional standards to its website following this litigation. SMF ¶ 28; SAF ¶ 58. As ASTM's Vice President and General Counsel described that if any ASTM standard referenced in a building code can be freely reproduced and displayed, including as part of a paid subscription service, it will have "devastating effect" on ASTM. SAF ¶ 132.

## III. ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### A. ASTM Owns Valid Copyrights in the Works, and UpCodes' Copying Is Undisputed.

To establish copyright infringement, a plaintiff must demonstrate: (1) ownership (2) of a valid copyright; and (3) unauthorized copying of original elements of the protected work. *See Am. Bd. of Internal Med. v. Rushford*, 2026 WL 125193, at *4 (3d Cir. Jan. 16, 2026).

#### 1. ASTM Indisputably Owns the Copyrights.

ASTM's ownership of the copyrights in the ten Works is beyond dispute. Each Work is registered with the United States Copyright Office, and the registrations were made within five years of first publication. SMF ¶¶ 14-17; SAF ¶¶ 16-17. Pursuant to 17 U.S.C. § 410(c), these certificates of registration constitute "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." *See also Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d

215, 219 n.3 (3d Cir. 2019). Therefore, ASTM is presumed to be the owner of the copyrights in each of the Works, and UpCodes cannot rebut that presumption. SMF ¶¶ 14-17.

**2. UpCodes Cannot Rebut the Presumption of Validity.**

"Registering a work's copyright within five years of the work's first publication entitles the holder to a presumption of validity." *Silvertop*, 931 F.3d at 219 n.3. Therefore, the Works are presumed copyrightable. UpCodes' primary invalidity defenses are that the Works have lost copyright protection because they have been IBR'd into building codes and therefore are (1) unenforceable government edicts that "carry the force of law" or (2) invalid under the merger doctrine. As explained below, each of these arguments each fail, so UpCodes cannot rebut ASTM's presumption of validity.

***a. ASTM's Privately-Authored Works Are Not Government Edicts.***

The Supreme Court's decision in *Georgia v. Public.Resource.Org*, 590 U.S. 255 (2020), makes clear that the government edicts doctrine is an author-identity rule that "'bars the officials responsible for creating the law' from being considered the 'author[s]' of '*whatever work* they perform in their capacity' as lawmakers." *Id.* at 265-66 (emphasis original and citation omitted). The doctrine "does not apply . . . to works created by . . . private parties[] who lack the authority to make or interpret the law." *Id.* at 265; *see also ROSS*, 2026 WL 2932557 at *4 (quoting *Georgia*, 59 U.S. at 265) (explaining that a court reporter's explanatory materials were copyrightable "so long as 'they came from an author who had no authority to speak with the force of law'").

ASTM is indisputably a private entity that lacks the authority to make or interpret the law. SMF ¶ 1. It develops original technical standards that are unquestionably copyrightable upon creation. SMF ¶¶ 2-8, 14-17; SAF ¶ 32. When the standards are created and copyright protection vests "instant[ly] and automatic[ally.]" *Georgia*, 590 U.S. at 275. They may be referenced by third parties or even lawmakers, but that does not make lawmakers the authors of the standards.

*See ASTM v. Public.Resource.org, Inc.*, 597 F. Supp. 3d 213, 231 (D.D.C. 2022) (a "government body that merely incorporates a standard by reference does not independently create any content, and therefore does not become an 'author' of the standard").

Multiple courts have correctly rejected UpCodes' application of the government edicts doctrine to works authored by private parties. In *NFPA. v. UpCodes, Inc.*, the court explained: "UpCodes argues that anything carrying the 'force of law' cannot be copyrighted. However, that same argument was rejected by the Supreme Court in *Georgia*." 753 F. Supp. 3d at 949-50.[1] The *NFPA* court explained that Georgia raised the "same argument as UpCodes that the government edicts precedents should be construed 'to focus exclusively on whether a particular work has 'the force of law.''" *Id.* at 950 (quoting *Georgia*, at 272). The Supreme Court "held that, '[i]nstead of examining whether given material carries 'the force of law,' we ask only whether the author of the work is a judge or legislator.'" *Id.* (quoting *Georgia*, at 276). The court in *International Code Council, Inc. v. UpCodes, Inc.* likewise ruled that "[b]ecause ICC is a private party that lacks the authority to make or interpret the law, the Government Edicts doctrine is clearly not dispositive of this case." 2020 WL 2750636, at *8 (S.D.N.Y. May 27, 2020); *Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, 677 F. Supp. 3d 955, 964 (E.D. Mo. 2023) (same); *PRO I*, 2017 WL 473822, at *9-11 (holding IBR'd ASTM standards are not government edicts).

***b. The Merger Doctrine is Inapplicable.***

Merger is a copyrightability doctrine based on the principles in 17 U.S.C. § 102(b) that exclude from copyright protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b); *ROSS*, 2026 WL 2932557 at *5 (assessing

[1] In the *NFPA* litigation, UpCodes "relie[d] heavily on the Fifth Circuit's decision in *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 796 (5th Cir. 2002) (*en banc*)" to argue that "'the law' cannot be copyrighted" and therefore IBR'd standards do not retain their copyright. *NFPA*, 753 F. Supp. 3d at 951 n.15. As the *NFPA* court found, that reading is rejected by *Georgia*, *id.*, and is therefore no longer good law. *Id.* at 950.

merger as a question of copyrightability). In the "rare occurrence" in which "a work's underlying idea can effectively be expressed in only one way" the idea is said to "merge" with its expression. *Silvertop*, 931 F.3d at 222; *ROSS*, 2026 WL 2932557 at 5. "[I]f copyright does not foreclose 'other methods of expressing [an] idea ... as a practical matter, then there is no merger.'" *Id.* (quoting *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1253 (3d Cir. 1983)).

The Third Circuit follows the weight of authority that merger is assessed at the time that a work is created, examining the choices available to the author at that time. *Apple*, 714 F.2d at 1253 ("The idea which may merge with the expression, thus making the copyright unavailable, is the idea which is the *subject of the expression*.") (emphasis added); *see also ROSS*, 2026 WL 2932557 at *5 ("the merger doctrine does not apply when there 'are many other ways' to convey *a work's underlying idea*") (quoting *Silvertop*, 931 F.3d at 223). The proper analysis requires examination of whether the author's "idea" is capable of being expressed in multiple ways—not the number of ways the infringer could use to achieve its objective. *Apple*, 714 F.2d at 1253.

UpCodes' argument that merger should apply in this case because, after creation, the Works were referenced in building codes improperly focuses on the choices available to the infringer at the time of infringement, not the *author* at the time of creation. *NFPA*, 753 F. Supp. 3d at 952 (rejecting UpCodes' argument that the IBR'd NFPA standard "merged with the law to become facts"). UpCodes admits that there were multiple ways that the Works could have been written at the time of creation. SAF ¶ 19, Dkt. 68 at 17 (stating "[t]rue enough" that "nothing ... would preclude UpCodes or another standards development organization from writing publications expressing the same ideas set forth in the Works"). This admission is fatal to its merger defense.

***c. UpCodes' "Force of Law" Premise Fails on the Full Record.***

UpCodes' copyrightability defenses also rest on a factual premise that the full record does not support. No legislation or regulation has incorporated by reference any of the Works. SAF ¶ 27. UpCodes instead relies on the fact that the 2021 *IBC*—itself a copyrighted work owned by ICC, lists ASTM standards among its referenced standards in Chapter 35, and that the 2021 *IBC* is IBR'd by many jurisdictions. SAF ¶ 28. On that attenuated theory, UpCodes reproduces each Work in its entirety, including the explanatory notes, supplementary materials, appendices, and annexes that ASTM expressly designates as non-mandatory and that impose no obligation on anyone in any jurisdiction. SAF ¶¶ 33-44. Whatever force UpCodes ascribes to a standard's mandatory requirements, that rationale cannot reach material that is not, and has never been, part of any jurisdiction's law even under UpCodes' theory.

**3. Copying Is Not Contested.**

Plaintiffs may prove copying (*i.e.*, exercising the author's exclusive rights under 17 U.S.C. § 106) in three ways: "(1) direct evidence of copying; (2) proof of access to the copyrighted work and probative similarity between the works; and (3) proof that the works are strikingly similar." *Am. Bd. of Internal Med. v. Rushford*, 2026 WL 125193, at *4 (3d Cir. Jan. 16, 2026).

UpCodes admits that it copied the Works. 17 U.S.C. § 106; SAF ¶ 138-139. UpCodes purchased pirated copies of the ASTM Works and manually reproduced the full text of each of the Works to publish on its website in violation of 17 U.S.C. § 106(1). SMF ¶ 18; SAF ¶¶ 51-58. UpCodes created derivative works by collecting a selection of ASTM Works, bundling them as part of the UpCodes' "code library" and publicly displaying the Works for all UpCodes' users in violation of 17 U.S.C. § 106(2); SAF ¶ 54-59. UpCodes also distributes and publicly displays the Works for free and for sale as part of a subscription in violation of 17 U.S.C. § 106(3), (5); SAF ¶ 132. UpCodes did not obtain authorization to exercise ASTM's exclusive rights to reproduce,

publicly display, distribute, or prepare derivative versions of the Works. SMF ¶ 18; SAF ¶ 51. Thus, as Judge Brody recognized, "ASTM has demonstrated a *prima facie* case of copyright infringement." Op. at 14.

### B. UpCodes Cannot Meet Its Burden to Show Its Use of the Works Was Fair.

Fair use is a mixed question of law and fact. Where the material facts are undisputed, fair use may properly be resolved on summary judgment. *Harper & Row Publishers, Inc. v. Nation Enterps.*, 471 U.S. 539, 560 (1985); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527-28 (2023). The proponent of the fair use defense "bears the burden of demonstrating its copying was justified." *ROSS*, 2026 WL 2932557 at *6. "[F]air use has always precluded a use that 'supersede[s] the use of the original.'" *Harper & Row*, 471 U.S. at 550.

#### 1. Factor 1: Purpose and Character of the Use

The first fair use factor analysis considers: (i) whether the secondary use is commercial in nature and (ii) the extent to which the secondary use is transformative. *ASTM I*, 172 F.4th at 262. The Supreme Court held in *Warhol* that the central question under Factor 1 is whether the allegedly infringing use "has a further purpose or different character" from the original, and the "degree of difference must be weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 529. Critically, "if the original work and the secondary use share the same or highly similar purposes," and the secondary work is "of a commercial nature, the first factor is likely to weigh against fair use." *Id.* at 534; *ASTM I*, 172 F.4th at 265 ("If a new work is used commercially rather than for a nonprofit purpose, its use will less likely qualify as fair."). The *Warhol* Court also recognized that an author may have several purposes or uses for his or her work which should be considered in the analysis. *Warhol*, 598 U.S. at 533-45.

##### *a. UpCodes Makes Commercial Use of ASTM's Works.*

"The crux of the profit/nonprofit distinction is not whether the sole motive of the use is

monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. There is no question that UpCodes "stands to profit" from its exploitation of the Works without paying the customary price.

### ***1. UpCodes' Paid Tier Is Commercial.***

UpCodes built its platform to compete with standards developers like ASTM and to put them out of business by offering a competing product. SMF ¶ 25; SAF ¶ 127. As the Third Circuit explained recently, when a copier "aimed to create a … platform … to compete with [the copyright owner] for customers," the use is commercial. *ROSS*, 2026 WL 2932557 at *6. Using copyrighted works in a paid-tier subscription offering is a prototypical commercial use. As UpCodes' website explains, for $39 per month, a subscriber to its "Essentials" subscription gets "Access to Codes." SMF ¶ 29. Its "Professional" and "Enterprise" subscribers get the same code access. *Id.* There is no mistaking that access to UpCodes' library, including ASTM's Works, is the heart of UpCodes' paid-tier offerings. *Id.* These subscription offerings undeniably compete with ASTM's Compass subscription offering and the subscription offerings of many of ASTM's licensees. SMF ¶¶ 8-13; SAF ¶ 113-114. Thus, UpCodes directly profits from its copies of standards, including ASTM standards.

UpCodes generated at least [redacted] in revenue from its paying customers who have access to the Works. SAF ¶ 70. Moreover, UpCodes added ASTM standards in response to paying customer demands—supplying in-demand content to its existing user base. SAF ¶¶ 118-122. In sum, by using ASTM's Works in its paid tier subscription offerings and adding them at the request of paying customers, UpCodes directly profits "from exploitation of [ASTM's] copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

UpCodes previously argued that there was no such market or that, to the extent it exists, it

was not cognizable. SAF ¶ 27. However, after the preliminary injunction record closed, UpCodes entered into a licensing agreement for [redacted]—directly refuting its argument that there is no continuing commercial value for superseded editions of IBR'd standards. SMF ¶¶ 40-42; SAF ¶ 150. UpCodes agreed to [redacted] SMF ¶¶ 40-43; Wise Ex. 152. Although only a handful of NFPA copyrighted works were at issue in the *NFPA* lawsuit, UpCodes took a license [redacted] SMF ¶ 40; SAF ¶ 150. UpCodes now identifies NFPA as the copyright owner, admits that it displays the text under license, and links to NFPA's website. SMF ¶ 44.

The UpCodes/NFPA license agreement [redacted] is not an anomaly. Numerous other entities license superseded ASTM standards referenced in building codes or IBR'd, including for use in their subscription services, including MADCAD, Accuris, and ICC. SMF ¶ 8-13. Thus, there can be no doubt on this record that there is a *bona fide* market for standards that are IBR'd or referenced in building codes, and UpCodes failure to pay the customary licensing fee when it "stands to profit from exploitation of the copyrighted material" makes its use commercial. *Harper & Row*, 471 U.S. at 562.

***2. UpCodes' Free Tier is Commercial.***

UpCodes relies on its free tier to [redacted] its revenue growth within each user account. SAF ¶ 99. Even UpCodes admits that it uses its free tier so that "users can get a taste [and] hopefully sign up or go on to being a paid user." SAF ¶ 78. This is particularly true with respect to free users accessing ASTM standards. Unlike many other codes and standards, UpCodes places ASTM's standards behind a password-protected login wall restricting public access. It then uses email addresses for registered users to market its services and encourage free users to purchase

paid subscriptions. SAF ¶¶ 78, 80, 81, 83. For example, UpCodes leveraged user data for one of its free users, [redacted], as a sales lead, and sold an Enterprise subscription. SAF ¶ 81. The evidence clearly establishes that UpCodes' free tier is a commercial offering—it is UpCodes' primary customer acquisition engine. SMF ¶ 32; SAF ¶¶ 76-100; *Am. Soc'y of Cinematographers v. Schatz*, 2021 WL 4352302, at *3 (C.D. Cal. May 25, 2021) (finding use of copyrighted work "to promote and garner subscriptions ... is commercial."); *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 353 (S.D.N.Y. 2017) (using copyrighted photographs to "lure traffic" to the defendant's website is commercial use); *August Image, LLC v. AllWrite Commc'ns Inc.*, 2024 WL 4505000, at *6 (N.D. Ga. Sept. 10, 2024) (finding use commercial because use of the work attracted website traffic). The *NFPA* court correctly concluded that "[g]rowing the number of free users helps attract financial investment and provides UpCodes' sales team with leads for account expansion."[2] *NFPA*, 753 F. Supp. 3d at 961 ("Posting NFPA's standards on its free tier to grow the funnel for its paid tier is indisputably commercial" and "redounds to its commercial benefit.").

At the Third Circuit, UpCodes also argued that its use was not commercial because UpCodes does not "sell advertising space on its free webpages." SAF ¶ 128. Discovery revealed that this is a dubious claim, at best. While UpCodes may not characterize the "product listings" that it sells to manufacturers and displays to free users as advertising, one would be hard pressed to distinguish the two. SAF ¶ 129, (featuring Zurn Water products in the body of the building code).

[2] The Third Circuit noted that it lacked "insight into the evidentiary basis" for the *NFPA* court's finding that UpCodes generates revenue by converting its free users to paying customers, *ASTM I*,172 F.4th at 266 n.8, but discovery has filled that gap, as demonstrated by the evidence cited herein.




Putting aside semantic gymnastics, UpCodes directly profits from providing free copies of standards to its users. SAF ¶ 97 (identifying marketing agreements with building product manufacturers as high as [redacted].

In sum, UpCodes is a venture-capital backed, for-profit startup that uses free distribution of ASTM's Works as part of the "engine" of a multimillion-dollar subscription business and to sell advertising. SAF ¶¶ 70, 83, 97, 99, 129. These are classic commercial uses of copyrighted materials.

### *3. UpCodes Exploits the Works to Monetize Artificial Intelligence Products.*

UpCodes' commercial exploitation of the Works is not limited to displaying them to its paid subscribers and as part of its free lead-generation engine. UpCodes ingests its code library—including the Works—into "Copilot," an AI-powered code research assistant that generates responses to users about the substance of the standards. SAF ¶¶ 71-72. UpCodes markets that capability to investors as a separate revenue line that has [redacted] and it attributes its [redacted] to having [redacted] i.e., SDOs' standards, and [redacted] SAF ¶ 74. UpCodes plainly understands that this use requires permission: [redacted]

[redacted] SMF ¶ 46. UpCodes did not seek or obtain comparable rights from ASTM. Using ASTM's expression as training and retrieval material for a competing commercial product is not a "further purpose or different character;" it is the appropriation of the derivative-work right that copyright reserves to ASTM. *Warhol*, 598 U.S. at 529, 541.

***b. UpCodes' Use is Not Transformative.***

The "central" question of the transformation analysis is "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Warhol*, 598 U.S. at 528.Indeed, "the problem of substitution [is] copyright's bête noire." *Id.* The "use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or 'supplan[t],' the work" and not be transformative. *Id.*

**1. *UpCodes' Copies Serve the Same Purpose as, and Act as a Substitute for, ASTM's Standards.***

At the preliminary injunction stage, the court focused on one of ASTM's purposes in creating standards—to positively impact public health and safety, consumer confidence and overall quality of life—and concluded that UpCodes did not share this purpose. *ASTM I*, 172 F.4th, at 263. But the Supreme Court's decision in *Warhol* makes clear that an author such as ASTM often has multiple purposes in creating a work. 598 U.S. at 533-45 (recognizing that the copyright owner licensed her photos to illustrate stories in magazines and licensed her photos to serve as a reference or to create stylized derivatives of her works). Like the works of many authors, ASTM's standards serve many purposes, and UpCodes' uses shares several of them.

UpCodes acknowledges that it adds nothing new to the expression of ASTM's Works and that it merely repackages and republishes the original. SAF ¶ 55. Likewise, UpCodes admits that it does not offer any criticism or commentary on ASTM's Works. SAF ¶ 55. UpCodes simply

recreates the entirety of each ASTM standard and adds nothing new.

Under these circumstances, it is hardly surprising that Judge Brody concluded that "'it is fair to say' that UpCodes' copies are 'an effective substitute for the Copyrighted Standards." Op. at 334 (quoting *ICC*, 2020 WL 2750636, at *28). As the *Form and Style for ASTM Standards* makes clear, one purpose of many ASTM standards is to be used "for reference in model codes," SAF ¶ 10, and ASTM makes those standards available in full to be read by the AEC market. Discovery proves that UpCodes' purpose overlaps with these purposes. Like ASTM, UpCodes make the body of each Work that is referenced in building codes available in full to the AEC market. SMF ¶¶ 8-13; SAF ¶ 113; *see also supra* § III(B)(1)(a). The *NFPA* court observed in similar circumstances that "UpCodes' use shares the same overriding purpose as NFPA's—namely, to provide access to the text of NFPA' standards for AEC companies and professionals who use those standards for various reasons." *NFPA*, 753 F. Supp. 3d at 959.

Regardless, UpCodes' self-serving claim of an altruistic motive rather than a financial motive could not withstand the scrutiny of full fact discovery. In its decade of operation, UpCodes has not identified a single instance in which any person or company was unable to access an ASTM Work or any other copyrighted standard that it copied. Rather than make ASTM standards available to those who previously could not access them, UpCodes merely provides access comparable to ASTM at a lower cost. SMF ¶¶ 8-13. But simply making a copyright owner's works available for a lower cost or for free is not a transformative use. *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 181 (2d Cir. 2024) (rejecting defendant's argument that making "digital copies of the Works and distributes those copies to its users in full, for free … [for the] same exact purpose as the originals: making authors' works available to read" was transformative). The evidence confirms that UpCodes is attempting to replace ASTM, and the Third Circuit

recently confirmed that is not a transformative purpose. *ROSS*, 2026 WL 2932557 at *7 (finding "no transformative purpose" where defendant's use "does not lead a user to Westlaw … it aims to replace Westlaw").

Even if UpCodes' purpose was to make standards referenced in building codes available to the public, it shares that purpose with ASTM. SMF ¶¶ 8-13. As discussed above, ASTM and its licensees offer subscriptions to the public that focus on standards referenced in building codes. SMF ¶¶ 8-13; SAF ¶¶ 10-11. UpCodes' paid offering is virtually identical to these offerings: both UpCodes and ASTM and its licensees make the same Works available to the same audience with the same or highly similar tools. SAF ¶ 12, 113. Because UpCodes' use of the Works "shares the same ultimate purpose as [ASTM's] use," it is "minimally transformative at best." *ROSS*, 2026 WL 2932557 at *6.

***2. UpCodes' Copies Serve an Identical Purpose to ASTM's Derivative Work–the SIBC.***

In *Warhol*, the Supreme Court also recognized that "the [copyright owner] has a right to derivative transformations of her work." *Id.* at 529. It therefore cautioned that "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works. To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.* at 529.

Here, ASTM has created a derivative work of the Works entitled *Standards in Building Codes*. *SIBC* is a subscription that includes past, current, and newly published versions of standards that are referenced in many building codes (including the Works).[3]SAF ¶ 10-11.

[3] At the preliminary injunction stage, the Third Circuit stated that "[a]s for the *SIBC* publication, we lack information on this record to determine whether UpCodes' use shares the same purpose as the publication and is likely to 'substitute for, or supplan[t]' it" because it did not know whether *SIBC* contained the versions of the ASTM standards incorporated into building codes, even if outdated," and "is formatted to situate the standards within the context of

UpCodes' copies of ASTM standards referenced in building codes serve the exact same purpose as ASTM's aptly named *Standards in Building Codes*. As a result, UpCodes' copying of ASTM standards referenced in building codes cannot be transformative. *See Warhol*, 598 U.S. at 529.

In sum, UpCodes failed "to show any innovation beyond copying and repackaging [the] copyrighted standards," *NFPA*, 753 F. Supp. 3d at 960, and UpCodes' copies are not transformative because they serve the same purpose as, and act as a substitute for, ASTM's standards and its derivative works.

**2. Factor 2: Nature of the Copyrighted Work**

The "nature of the copyrighted work" factor "'rarely play[s] a significant role in the' fair use determination," *ROSS*, 2026 WL 2932557 at *8 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015) ("*Google Books*"), and should not do so here. At the preliminary injunction stage, the Third Circuit found this factor supported fair use given the factual and technical nature of the Works. *ASTM I*, 172 F.4th at 266. ASTM's technical standards involve substantial creative expression in the selection, organization, and arrangement of technical specifications—choices protected by copyright even in factual or functional works. *See CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reps., Inc.* 44 F.3d 61, 70-72 (2d Cir. 1994); *Feist Pubs., Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345 (1991) (originality requires only a minimal degree of creativity, "no matter how crude, humble or obvious" it might be). Moreover, the Works are not mere compilations of raw data; they reflect the considered judgment of expert technical committees who made innumerable creative decisions about what to include, how to organize it,

---

building codes in which they are incorporated." *ASTM I*, 172 F.4th, at 264 n.7. The record now is clear that *SIBC* contains the versions of ASTM standards referenced in building codes even if they are outdated. While it is not entirely clear what the Third Circuit meant by formatted to situate the standards within the context of building codes in which they are incorporated," to the extent UpCodes does that by offering both the ASTM standards and the relevant building code provision, ICC, ASTM's licensee, has licensed the ASTM standards referenced in its building codes and makes both of them available to users. SMF ¶¶ 8-13.

and how to express it. SMF ¶¶ 14-16. Even assuming factor two favors fair use, it cannot outweigh the first, third, and fourth factors here. *See ROSS*, 2026 WL 2932557 at *10 (affirming summary judgment of no fair use when factors one, three, and four weighed against fair use).

**3. Factor 3: Amount and Substantiality of the Portion Used**

UpCodes' wholesale reproduction of the Works must be examined in light of its non-transformative and commercial use. *Campbell*, 510 U.S. at 586-87 ("[T]he extent of permissible copying varies with the purpose and character of the use."). UpCodes copied every word, figure, table, and appendix (including non-mandatory appendices) from ASTM's Works aside from the copyright management information. As such, "UpCodes posts online a significant portion—or the "heart"—of each of the [ASTM] standards it has copied." *NFPA*, 753 F. Supp. 3d at 964.

At the preliminary injunction stage, the Third Circuit stated that Factor 3 "favors fair use" because "the entirety of the standards is needed to convey the standard." 172 F.4th at 267. But this reasoning was based on the preliminary conclusion that UpCodes use was transformative, *id.* at 264-65—a premise that cannot survive scrutiny on the full record, as explained above. *See ROSS*, 2026 WL 2932557 at *8.

UpCodes' non-transformative copying of the entirety of the Works "militat[es] against a finding of fair use," particularly considering its commercial and substitutional purpose. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984); *see also ROSS*, 2026 WL 2932557 at *8 ("ROSS thus lacked a transformative purpose and character that would make extensive copying reasonable"). Thus, Factor 3 militates against finding fair use. *NFPA*, 753 F. Supp. 3d at 964 ("UpCodes posts to its site a significant portion of each of the NFPA standards it has copied. [citation omitted]. As such, this factor tends not to weigh in favor of fair use.")

**4. Factor 4: Effect on the Market for the Original**

Factor 4 is the most important fair use factor and overwhelmingly favors ASTM. *See*

*Harper & Row*, 471 U.S. at 566 (Factor 4 is "undoubtedly the single most important element"). "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Harper & Row*, at 568; *Campbell,* 510 U.S. at 590 ("whether unrestricted and widespread conduct . . . would result in a substantially adverse impact on the potential market' for the original."). Factors one and four are "closely related, as the more copying is done to achieve a purpose that is the same as or substantially similar to the original, the more likely it is that the copy will serve as a 'satisfactory substitute for the original.'" *Hachette*, 115 F.4th at 189. "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without *favorable* evidence about relevant markets." *Campbell,* 510 U.S. at 590 (emphasis added).

As Judge Brody previously acknowledged, UpCodes' copies of the Works are "effective substitutes" for ASTM's Works. Op. at 35; *accord ICC*, 2020 WL 2750636, at *28; *Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, 677 F. Supp. 3d 955, 973 (E.D. Mo. 2023). UpCodes' self-proclaimed intent to run standards publishers out of business, SMF ¶ 25, renders its "wholesale copying aimed at creating a market substitute … presumptively unfair." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021).

The Third Circuit likewise acknowledged that "it is plain to see how UpCodes' copying will affect the market for the Works," *ASTM I*, 172 F.4th, at 268, even though it did not have the benefit of key evidence regarding the impact on the marketplace at that time. At that time, UpCodes argued that there was not a viable market for standards that were IBR'd, especially when those standards were not the latest versions. *See* SAF ¶ 27. But discovery revealed that there is a market for IBR'd standards, including those that have been superseded, and UpCodes actively participates in that market. In particular, UpCodes now licenses standards referenced in building

codes (including superseded standards) from NFPA. SMF ¶¶ 40-43. Considering this new evidence, UpCodes cannot meet its "burden of proving that the secondary use does not compete in the relevant market[s]." *Warhol I*, 11 F.4th at 49. The evidence shows that there is a vibrant market for licensing these standards and UpCodes and many of its competitors, including MADCAD, Accuris, and ICC participate in that market. SMF ¶ 10. "[T]hese third-party licensees may be encouraged by UpCodes' practices of publishing ASTM's standards for free and decide to stop paying royalties on the standards and/or offer these standards for free to their customers." SAF ¶ 124. Should UpCodes' substitutional use become widespread, it threatens nearly half of ASTM's publication revenues. SAF ¶¶ 130-134; *ROSS*, 2026 WL 2932557 at *9 ("'[U]nrestricted and widespread' copying of Thomson Reuters's headnotes to develop substitute legal-research tools, like ROSS did, would harm Westlaw's position in that original market.").

UpCodes' exploitation of the Works also interferes with both ASTM's individual sale of standards and its subscription sales, including subscriptions that provide access to all ASTM standards and/or access to *SIBC*, and the magnitude of that threat will increase if this type of copying becomes widespread. In the *SIBC* subscription, ASTM customers can access past, current, and newly published versions of standards (including all of the Works) that are referenced in many building codes. SMF ¶ 8; SAF ¶ 11. ASTM's economic expert, Dr. Jeffery Stec, explained that UpCodes' use "exemplifies the classic free-rider problem: when a producer bears the full cost of creating a good but cannot exclude others from distributing identical copies, competitors who incur no development costs will enter the market and drive the price toward marginal cost, which for digital reproduction is effectively zero. The result would be the destruction of ASTM's market for its standards used in building codes that currently generate revenue which ASTM reinvests into standards development." SAF ¶ 8.

Although UpCodes' paid subscriptions provide users with the ability to access additional features beyond simply reading or printing from UpCodes' library, such as searching, annotating, and bookmarking text, UpCodes admits those features would be useless without the text of the codes and standards. SAF ¶ 78. Regardless, "[w]hether an UpCodes subscriber is nominally paying for 'tools' rather than for the Copyrighted Works does not change the fact that a user who obtains an ASTM standard on UpCodes at no charge has no reason to obtain that same standard from ASTM or an ASTM licensee." SAF ¶ 125.

ASTM's individual standard sales for the Works have already seen this drop. SAF ¶ 136 ([redacted]). This has not yet led to a dramatic decrease in overall revenue because UpCodes temporarily chose to limit its copying to 12 ASTM standards. But Supreme Court precedent requires consideration of the market if UpCodes and others engage in widespread copying of the same nature. *See, e.g.*, *Campbell*, 510 U.S. at 590. If UpCodes and others copied all 2,400 ASTM standards referenced in building codes without ASTM's consent, it would have dramatical impact on the market for those standards. SAF ¶ 124. Under these circumstances, UpCodes cannot meet its burden of proving that widespread copying of standards referenced in building codes UpCodes will not impact the market for those standards.

UpCodes likens itself to the non-profit Public.Resource.Org ("PRO"), against whom ASTM previously brought copyright claims. But this case is very different. First, the D.C. Circuit found "little, if anything, in the record indicates that PRO stands to profit from its reproduction." *ASTM v. Public.Resource.Org, Inc.*, 896 F.3d 437, 449 (D.C. Cir. 2018). UpCodes, by contrast, is a venture-backed for-profit company that has generated at least [redacted] in revenue to date from its infringement. SAF ¶ 70. Second, the standards in the *Public.Resource.Org* case were

decades old. Here, UpCodes claims it can copy ASTM standards referenced in model building codes as soon as any jurisdiction in the United States adopts that model code, and adopted model codes reference countless current standards. For one example, New Jersey adopted the 2024 *IBC*, which references the current version of ASTM A36. SAF ¶ 31. Finally, the D.C. Circuit discounted the harm to ASTM because the standards at issue there were freely available in ASTM's Reading Room. *ASTM v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1271 (D.C. Cir. 2023) (reasoning that where ASTM already made the standards available for free, that fact "might reduce the amount of harm" posed by defendant's substitutional use). That rationale is absent here. ASTM's Reading Room is limited to standards incorporated into federal regulations, and it does not include any of the Works. SAF ¶ 27. There is no free, ASTM-authorized version whose existence could blunt the harm from UpCodes' reproduction.

ASTM makes the Works available at a reasonable cost—but not for free.[4] SAF ¶ 8. As ASTM's expert explains, UpCodes' free tier incentivizes users to switch from ASTM to UpCodes. Dr. Stec explains that where "[g]oods are perfect or near-perfect substitutes … a rational consumer will choose the lower-priced alternative. When one supplier offers an identical product at a price of zero, consumer choice theory would indicate demand for the free product increases dramatically while demand for the direct market substitute, which is not free, will go to zero." SAF ¶ 124.

Although this litigation has temporarily delayed UpCodes from reproducing additional ASTM copyrighted works, ASTM's customers have already expressed their desire for UpCodes

---

[4] Any purported public benefits from UpCodes' copying does not weigh in favor of fair use. While UpCodes suggests that it is increasing public access to ASTM's standards, there is no evidentiary support for this proposition. UpCodes cannot identify a single individual who was unable to access ASTM's Works (or any other SDO's codes or standards that it copied) before the standards were made available on UpCodes' website. SAF ¶ 8. ASTM's standards are easily accessed for reasonable prices, and when individuals contact ASTM indicating that they cannot afford to purchase an ASTM standard, ASTM will provide the standard at no cost. SAF ¶ 8. Plus, if UpCodes and others can copy ASTM's referenced standards for free, the public ultimately will be harmed by a decrease in the amount of standards or how frequently they can be updated. SAF ¶ 8.

to expand its library to include additional ASTM standards. SAF ¶¶ 119-122. One UpCodes user, [redacted], testified that it would consider it a "strong possibility" that, if UpCodes had more ASTM standards, [redacted] would consider transitioning away an ASTM licensee. SAF ¶ 121. Such free distribution of competing substitutes is not a fair use. *Hachette*, 115 F.4th at 193 ("there would be little reason for consumers or libraries to pay Publishers for content they could access for free on IA's website."). Like the Internet Archive, UpCodes distributes near-perfect copies of copyrighted works for free in direct competition with the copyright holders' paid offerings. The market harm is, if anything, worse here because UpCodes' digital substitutes can be redistributed to additional unlicensed users. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007) ("When digital works are distributed via the internet, ... every downloader who receives one of the copyrighted works ... is in turn capable of also transmitting perfect copies of the works."). Accordingly, Factor 4 weighs overwhelmingly against fair use.

**5. In Totality, the Fair Use Factors Weigh Against Fair Use.**

Weighing the factors, no reasonable jury could find fair use on this record. Factor 1 (non-transformative, commercial use) weighs heavily against fair use. Factor 2 is, at most, neutral or of limited weight. Factor 3 (complete copying) weighs against fair use. And Factor 4 (devastating threat of market harm established by expert economic analysis, customer testimony, and UpCodes' own investor presentations) weighs overwhelmingly against fair use. *Warhol*, 598 U.S. at 528 ("the problem of substitution [is] copyright's bête noire"); *Hachette*, 115 F.4th at 196.

**C. UpCodes is Liable for Removing Copyright Management Information.**

Section 1202 "establishes a cause of action for the removal of … the name of the author of a work when it has been 'conveyed in connection with copies of' the work." *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 302 (3d Cir. 2011). Under Section 1202(b), a plaintiff must prove: (1) the existence of CMI on or in connection with the copyrighted work; (2) the defendant's

removal or alteration of that CMI without authority; and (3) a dual scienter requirement—that the removal was intentional and that the defendant knew, or had reasonable grounds to know, that the removal would induce, enable, facilitate, or conceal an infringement. *See* 17 U.S.C. § 1202(b); *Murphy*, 650 F.3d at 300; *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020).

**1. ASTM's Works contained copyright management information.**

CMI is any information listed in § 1202(c)(1)–(8) "conveyed in connection with copies of a work… including in digital form." *Murphy*, 650 F.3d at 301. Section 1202(c) defines CMI to include: the title of the work, the name of the author, the copyright notice, the name of the copyright owner, terms and conditions for use of the work, and identifying numbers or symbols referring to such information. ASTM's original published versions of the Works contained CMI, including ASTM's name and logo identifying ASTM as the author and copyright owner, copyright notices (*e.g.*, "Copyright © ASTM International"), and terms and conditions. SMF ¶¶ 17-22.

**2. UpCodes knowingly and intentionally removed and altered ASTM CMI.**

The undisputed evidence establishes that UpCodes obtained copies of the Works bearing ASTM CMI that it removed before reproducing the Works on its website. SMF ¶¶ 36-39; SAF ¶ 138-149. UpCodes intentionally removed ASTM's copyright notices, name, authorship attributions, and terms and conditions from every copy of the Works on its platform. SMF ¶¶ 36-39. UpCodes also replaced the title of the Works with a title of its own creation. SAF ¶ 143.

**3. UpCodes knew the removal would facilitate infringement.**

The third element requires evidence defendant knew or had reason to know "that his actions 'will induce, enable, facilitate, or conceal an infringement of any right' granted under United States copyright law." *Murphy v. Millennium Radio Grp. LLC*, 2013 WL 2961669, at *3 (D.N.J. June 14, 2013). UpCodes removed ASTM's identifying information from the Works before publishing them on its platform, knowing that: (a) ASTM is the copyright owner, SMF ¶¶ 14-16 (b) the

removal of CMI would make it difficult for users to identify the source and rights holder of the Works, SAF ¶¶ 138-149; and (c) by encouraging its users to download, print and copy the altered Works on its platform, its users would be more likely to infringe ASTM's copyrights for the Works. *Id.* By removing the CMI, UpCodes makes it less likely that individuals accessing the standard will contact ASTM for additional copies or licensed rights. *Id.*

UpCodes' intent in removing and altering ASTM's CMI stands in stark contrast to its treatment of NFPA's copyrighted works. For each NFPA copyrighted work, UpCodes applies a notification that states: "Text provided under license from the National Fire Protection Association. The National Fire Protection Association has a registered copyright." SMF ¶ 44. The notification includes a live link to NFPA's website. NFPA standards on UpCodes' platform bear their original names—not UpCodes alterations. [redacted]

**D. Garrett Reynolds and Scott Reynolds Are Personally Liable for UpCodes' Infringement and CMI Removal.**

A corporate officer is personally liable for copyright infringement in which he personally participates. *See Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir. 1984). Garrett and Scott Reynolds co-founded UpCodes, serve as its only officers, shareholders, and personally made the decision to reproduce ASTM's standards on UpCodes' website. SMF ¶¶ 36-39. They participated in the decision to remove ASTM's CMI before the Works were published. *Id.* Summary judgment should therefore enter against all three Defendants.

## IV. CONCLUSION

ASTM respectfully requests that this Court grant partial summary judgment against Defendants on Count I for copyright infringement under 17 U.S.C. §§ 106 and 501 and Count III for removal and alteration of copyright management information under 17 U.S.C. § 1202(b).

Date: October 2, 2026

Respectfully submitted,
By: */s/ Jane W. Wise*

**DLA PIPER LLP (US)**
J. Kevin Fee
Jane W. Wise
Olivia Houston
500 Eighth St NW
Washington, DC 20004
(202) 799-4000
kevin.fee@dlapiper.com
jane.wise@dlapiper.com
olivia.houston@us.dlapiper.com

Staci J. Trager
200 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
staci.trager@us.dlapiper.com

Jordan Chisek
555 Mission Street
Suite 2400
San Francisco, CA 94105
jordan.chisek@us.dlapiper.com

Emily Green Radin
1251 Avenue of the Americas, 27th Fl.
New York, NY 10020
emily.radin@us.dlapiper.com

*Attorneys for Plaintiff American Society for Testing and Materials d/b/a ASTM International*