**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>UPCODES, INC.; GARRETT REYNOLDS; and SCOTT REYNOLDS,<br><br>Defendants. | Civil Action No. 2:24-cv-01895-CFK<br><br>**Redacted Public Version** |

**MEMORANDUM OF LAW IN SUPPORT OF UPCODES' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO ASTM'S MOTION**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. UpCodes and Its Mission of Posting the Law ..... 2

B. UpCodes Posts Laws That Adopt ASTM Standards ..... 3

C. UpCodes Has Not Harmed ASTM ..... 3

D. Procedural History ..... 3

III. LEGAL STANDARD ..... 4

IV. ARGUMENT ..... 4

A. UpCodes Publishes the Law ..... 4

1. A Second Layer of Incorporation Does Not Change That the Works in Suit Are the Law ..... 5

a. Philadelphia Made A36, A615, and B209 the Law Through the 2018 IBC ..... 6

b. California Made All Ten Works, Including the Remaining Seven Works, Part of California Law ..... 7

c. Annexes, Appendices, and Supplemental Requirements Are Also the Law ..... 8

B. ASTM's Copyright Infringement Claims Fail Because UpCodes' Posting of the Law is Fair Use ..... 10

1. Factor One: "the purpose and character of the use" ..... 11

a. UpCodes' use is transformative ..... 11

b. UpCodes' use is largely noncommercial ..... 13

2. Factor Two: "the nature of the copyrighted work" ..... 15

3. Factor Three: "the amount and substantiality of the portion used" ..... 15

4. Factor Four: "the effect of the use upon the potential market for or value of the copyrighted work" ..... 16

a. The record does not show that UpCodes' use harms the market for technical standards ..... 16

i. UpCodes' use of the Works has not harmed ASTM's sales ..... 17

ii. ASTM's evidence that an alleged market exists does not show that UpCodes has harmed it ..... 18

iii. ASTM's speculation about the future does not establish a likelihood of significant market harm ..... 19

b. Public access to laws weighs in favor of fair use ..... 21

5. On balance, UpCodes' use is fair ..... 21

C. Independent From Fair Use, ASTM's Copyright Claims Fail for Additional Reasons ..... 22

**TABLE OF CONTENTS**
(continued)

**Page**


1. No One Can Own the Law ........ 22
2. Because there is only one way to express a legal rule, copyright's merger doctrine bars ASTM's claim ........ 24

D. ASTM's § 1202(b) Claim Fails as a Matter of Law ........ 26

E. ASTM's Trademark Claims Cannot Succeed Because UpCodes' References Constitute Nominative Fair Use ........ 27

1. The Modified Likelihood-of-Confusion Test Applies ........ 28
2. The Consumer Sophistication Lapp Factor Weighs Against Confusion ........ 28
3. The Intent Lapp Factor Weighs Against Confusion ........ 28
4. The Actual Confusion Lapp Factor Weighs Against Confusion ........ 29
5. On balance, ASTM Cannot Establish a Likelihood of Confusion, and Therefore Fails at Step One of the Third Circuit's Nominative Fair Use Test ........ 29

V. CONCLUSION ........ 29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
896 F.3d 437, 450 (D.C. Cir. 2018) ........ 11

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*,
172 F.4th 253 (3d Cir. 2026) ........ *passim*

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*,
752 F. Supp. 3d 480 (E.D. Pa. 2024) ........ *passim*

*Bldg. Offs. & Code Adm. v. Code Tech., Inc.*,
628 F.2d 730 (1st Cir. 1980) ........ 22, 24

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884) ........ 24

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........ 14, 15, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 4

*Educ. Testing Servs. v. Katzman*,
793 F.2d 533 (3d Cir. 1986) ........ 25

*Facility Guidelines Inst., Inc. v. UpCodes, Inc.*,
677 F. Supp. 3d 955 (E.D. Mo. 2023) ........ 10, 14, 27

*Georgia v. Public.Resource.Org, Inc.*,
590 U.S. 255 (2020) ........ 22, 23

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ........ 10, 13, 15

*Howell v. Miller*,
91 F. 129 (6th Cir. 1898) (Harlan, J.) ........ 22

*Int'l Code Council, Inc. v. UpCodes, Inc.*,
No. 17 Civ. 6261, 2020 WL 2750636 (S.D.N.Y. May 27, 2020) ........ *passim*

*Interpace Corp. v. Lapp, Inc.*,
721 F.2d 460 (3d Cir. 1983) ........ 28, 29

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005) ........ 24

*Kadrey v. Meta Platforms, Inc.*,
No. 23-cv-03417, 2025 WL 1786418 (N.D. Cal. June 27, 2025) ........ 27

*Thomson Reuters v. ROSS*
No. 25-2153, 2026 WL 2932557, at *5–6 (3d Cir. Sept. 29, 2026)....................................1, 13, 15, 26

*United States v. Myers*,
553 F.3d 328 (4th Cir. 2009) .........................................................................................................5

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
293 F.3d 791 (5th Cir. 2002) (en banc)...........................................................................22, 25, 26

*Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*,
50 F.3d 189 (3d Cir. 1995)...........................................................................................................28

*Wheaton v. Peters*,
33 U.S. (8 Pet.) 591 (1834) ..........................................................................................................22

**Statutes**

17 U.S.C. § 107 ...........................................................................................................................*passim*

17 U.S.C. § 1202(b)...........................................................................................................2, 26, 27

Phila. Code ch. 4-200 ......................................................................................................................6

Phila. Code ch. 4-200 § A-102.3 .....................................................................................................6

Phila. Code ch. 4-200 §§ A-501.1, A-601.1, A-601.4......................................................................7

Phila. Code ch. 4-200 §§ B-1.1, B-1.2 (2018)..................................................................................6

**Other Authorities**

First Amendment..........................................................................................................................24

Fed. R. Civ. P. 56(a) ........................................................................................................................4

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13D.29[D] (Matthew Bender,
Rev. Ed. 2026) .............................................................................................................................25

## I. INTRODUCTION

ASTM's reliance on *Thomson Reuters v. ROSS* is a red herring meant to distract the Court from the most relevant authority: the Third Circuit's preliminary injunction decision in this very case. *ROSS* involved editorial headnotes that "are not law," copied by a competitor that shared Westlaw's "same ultimate purpose"—to "create and optimize a legal-research platform that helps users find responsive legal material." No. 25-2153, 2026 WL 2932557, at *5–6 (3d Cir. Sept. 29, 2026). Here, by contrast, the Third Circuit has already held that UpCodes is likely to prevail on fair use because it serves a fundamentally different purpose than ASTM. *Am. Soc'y for Testing & Materials v. UpCodes, Inc.* ("*UpCodes II*"), 172 F.4th 253, 263 (3d Cir. 2026). Unlike ASTM, which publishes standards to advance industry best practices, UpCodes "publishes the Works as law, not as technical standards," offering only the versions incorporated into law—even after they have been superseded by newer ASTM publications. *Id.*

On that basis, the Third Circuit held that the first three fair use factors favor UpCodes. *Id.* at 271. The factual record does not alter that conclusion. ASTM devotes much of its brief to establishing that UpCodes is a commercial enterprise. Mem. of Law in support of Pl.'s Mot. for Partial Summ. J. ("ASTM Mot.") at 1, ECF 181. That is not disputed. Indeed, the Third Circuit acknowledged UpCodes' for-profit nature but found the facts concerning UpCodes' use of the Works more significant: UpCodes "publishes ASTM's works to convey only what the law is, not to inform industry professionals of current best practices. This fundamental distinction renders UpCodes' use transformative." *UpCodes II,* 172 F.4th at 263 (citation modified).

The Third Circuit found the fourth factor equivocal only because the preliminary record did not provide "sufficient information to assess the likelihood of significant market harm to ASTM." *Id.* at 271. The full summary judgment record demonstrates that the likelihood of market harm is slim to none. ASTM's standards business continues to thrive. Indeed, even now ASTM is unable to identify ***any*** effect on ASTM's sales or licensing revenues from UpCodes posting the laws based on its Works. Nor could ASTM identify

any customers it has lost to UpCodes. The market harm ASTM predicted has not occurred, and there is no reliable evidence in the record that suggests it ever will.

These facts confirm what the Third Circuit already observed: UpCodes provides the public with standards as incorporated into law, even where ASTM has since replaced them with newer versions. *UpCodes II,* 172 F.4th at 263. All four fair use factors favor UpCodes, and summary judgment should be entered in its favor.

ASTM's remaining claims fare no better. Because UpCodes' use is fair, there is no predicate infringement for ASTM to assert a copyright management information claim under § 1202(b). And this Court has already found that ASTM's trademark claims fail because "UpCodes' references to ASTM's mark constitute nominative fair use." *Am. Soc'y for Testing & Materials v. UpCodes, Inc.* ("*UpCodes I*"), 752 F. Supp. 3d 480, 508 (E.D. Pa. 2024).

## II. BACKGROUND

### A. UpCodes and Its Mission of Posting the Law

Brothers Scott and Garrett Reynolds founded UpCodes in 2016 to make it easier for both industry professionals and laypeople to understand how to comply with federal, state, and local building codes. UpCodes' Statement of Additional Facts ("SAF") ¶ 2; *UpCodes II*, 172 F.4th at 263 ("UpCodes' stated mission . . . is to 'help members of the public access and comply with the laws that govern their built environment.'"). UpCodes' policy and practice is to only publish the law on its website and provide free access to the law. SAF ¶ 3. If a user wants features beyond full access to the law, such as advanced search and collaboration tools, UpCodes offers those for a subscription fee. SAF ¶¶ 8–9.

"UpCodes only publishes versions of [ASTM] standards that have been incorporated into law, even if those versions have been superseded by newer versions. It displays standards under the headings of the building codes in which they are incorporated, asking users to choose a jurisdiction to view a standard and integrating jurisdiction-specific amendments when applicable." *UpCodes II*, 172 F.4th at

263. As the Third Circuit concluded, those practices establish that UpCodes "publishes the Works as law, not as technical standards." *Id.* at 263–66. The ten ASTM Works at issue follow those practices.

### B. UpCodes Posts Laws That Adopt ASTM Standards

UpCodes first made laws adopting ASTM standards available in April 2024. SAF ¶ 17. To post a law on its website, UpCodes first acquires and processes the model standard. SAF ¶ 5. For any codes or standards that the adopting jurisdiction has amended, UpCodes manually collects, ingests, and processes any amendments made by individual jurisdictions to make sure UpCodes posts only the law for each jurisdiction as adopted. *Id.* UpCodes expends significant effort to track code amendments in over seventy jurisdictions across the country to offer what is available nowhere else: an extensive library of codes and standards ***as enacted into law***. *Id.* ¶¶ 6, 12. Once a code is live, UpCodes monitors legislative and regulatory action across the United States and takes steps to incorporate any further amendments or errata. *Id.* ¶ 13. Even where standards are adopted without amendment, UpCodes provides new, added value: confirmation that the posted text is the jurisdiction's law and incorporates any subsequent changes or amendments. *Id.* ¶ 7.

### C. UpCodes Has Not Harmed ASTM

ASTM's revenues have increased since UpCodes began posting laws adopting ASTM standards. SAF ¶ 79. ASTM's General Counsel testified that he is "not [] aware of" any concrete way in which UpCodes has harmed ASTM. *Id.* ¶ 66. And ASTM's damages expert could not identify any discernible impact on ASTM's revenues from UpCodes' posting of laws incorporating ASTM standards. *Id.* ¶ 77.

### D. Procedural History

On May 3, 2024, ASTM filed this lawsuit against UpCodes and its co-founders Scott and Garrett Reynolds. SAF ¶ 1. This Court denied ASTM's motion for preliminary injunction, finding that "ASTM cannot show a likelihood of success on the merits of its copyright and trademark claims." *UpCodes I*, 752 F. Supp. 3d at 512, *aff'd,* 172 F.4th 253 (3d Cir. 2026). ASTM appealed this decision with respect to

copyright infringement and fair use (ASTM Notice of Appeal, ECF 109), and the Third Circuit affirmed this Court's denial of ASTM's motion for preliminary injunction. *UpCodes II*, 172 F.4th at 258.

## III. LEGAL STANDARD

A court must grant summary judgment if it determines that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant has the burden to make an initial showing of the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the movant is entitled to a judgment as a matter of law if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmoving party may not rely solely upon the allegations raised in the pleadings, but must set forth specific facts demonstrating the existence of a genuine issue of material fact for trial. *See id.* at 324.

## IV. ARGUMENT

### A. UpCodes Publishes the Law

As the Third Circuit held, UpCodes "achieves the distinct objective of making the law freely accessible and educating the public on the contents of binding laws." *UpCodes II*, 172 F.4th at 262. Those binding laws are building codes and standards that have been adopted or incorporated by reference, whether directly or indirectly. SAF ¶ 4.

Indeed, ASTM does not appear seriously to dispute that UpCodes posts ASTM standards only where they are the binding law of a jurisdiction. Instead, ASTM argues half-heartedly that its standards do not have the force of law because building codes incorporated by reference into legislation *in turn incorporate by reference the ASTM standards*, rather than legislation directly incorporating by reference those standards. ASTM Mot. at 13. ASTM then points out that portions of some of its standards are labeled as "supplementary" or "non-mandatory." *Id.* As both this Court and the Third Circuit have recognized, the first suggestion is flatly wrong, and the second is irrelevant to the inquiry.

### 1. A Second Layer of Incorporation Does Not Change That the Works in Suit Are the Law

Incorporation by reference is a drafting mechanism. It allows a government to give legal effect to requirements contained in an external document without reproducing every word of that document in the body of its code. Material incorporated by reference carries the same force of law as the incorporating regulation. *See United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) ("Where one statute adopts the particular provisions of another by a specific and descriptive reference to the statute or provisions adopted, the effect is the same as though the statute or provisions adopted had been incorporated bodily into the adopting statute." (italics omitted)). "Indirect incorporation by reference . . . occurs when a law incorporates or adopts another publication, such as a model building code, that in turn incorporates a standard by reference." *UpCodes II*, 172 F.4th at 259 (internal quotation marks omitted).

The Third Circuit has resolved the precise direct-versus-indirect issue in this case. The Court recognized that "ASTM standards are frequently incorporated by reference into federal, state, and local law," and it expressly defined "incorporated" to cover both direct and indirect incorporation. *Id.* at 259 & n.1. The Court then rejected ASTM's effort to treat indirect incorporation differently. It explained that "once the Works were incorporated by reference into law—which occurred before UpCodes' copying—they moved even further to the periphery of copyright's core protection," and it found no reason why indirect incorporation, "as opposed to direct[], should change this outcome." *Id.* at 267. Applying this rule to ASTM A252, the Court held that Philadelphia's adoption of the IBC "thereby giv[es] legal effect—via indirect incorporation by reference—to the entirety of A252." *Id*. The Court went on to say that "[t]o the extent a similar analysis applies to the rest of the Works (which ASTM makes little effort to dispute), UpCodes reasonably copied the entirety of the Works." *Id*.

The Third Circuit made clear that the legally relevant question is whether the code referencing the standard makes compliance with the Work mandatory. As explained below, the 2018 and 2021 IBC require compliance with the ten Works at issue in various jurisdictions. Thus, those standards are the law.

**a. Philadelphia[1] Made A36, A615, and B209 the Law Through the 2018 IBC**

Three of the Works in suit—A36/A36M-14, A615/A615M-15ae1[2], and B209-14—are the law in Philadelphia through their incorporation by reference into the 2018 IBC. Philadelphia's adoption of the Works as law occurred in two steps. First, on October 1, 2018, Philadelphia expressly adopted the 2018 IBC as the "Philadelphia Building Code" and incorporated it into the Philadelphia Code (the set of ordinances passed by the City Council) "as if fully set forth [t]herein." Phila. Code ch. 4-200 § B-1.1; City of Philadelphia Ordinance No. 180176, §§ B-1.1, B-1.2 (2018); SAF ¶ 22. The Third Circuit recognized that in so doing Philadelphia adopted the 2018 IBC as governing law. *UpCodes II*, 172 F.4th at 259–60.

Second, the Philadelphia Code makes standards referenced in the IBC legally binding. It provides that standards referenced in Philadelphia's technical codes "shall be considered part of the requirements" of those codes "to the prescribed extent of each such reference." Phila. Code ch. 4-200 § A-102.3; SAF ¶ 23. Those referenced standards include the standards identified in the adopted IBC's "Referenced Standards" chapter. Phila. Code ch. 4-200 § A-102.3.2; SAF ¶ 22.

The 2018 IBC identifies ASTM A36/A36M-14, A615/A615M-15ae1, and B209-14 as "standard[s] referenced in this code." *See* Novikov Decl., Ex. 1 at Ch. 35; SAF ¶ 25. It also states that "[t]hese standards, in essence, are part of this code to the extent of the reference to the standard." *Id.* As detailed in Eugene Novikov's declaration, the 2018 IBC's provisions require compliance with each standard. *Id.* For example, § 1810.3.2.3 of the 2018 IBC requires "[f]ully welded steel piles [to] be fabricated from plates that conform to the material requirements in ASTM A36." *Id.* ¶ 30.

These provisions impose binding requirements, not optional technical guidance. As ASTM itself

[1] Although the Works have been incorporated into the building codes of many jurisdictions, two suffice to establish that every Work in suit is the law: Philadelphia, which the Third Circuit already examined in this case, and California.

[2] ASTM's Exhibit A to the Complaint identifies A615/A615M-15a as the copyrighted work at issue, but UpCodes only posts A615/A615M-15ae1. *See* ECF No. 178-12 (Wise Decl., Ex. 107).

recognized, "[w]hen the ICC code references an ASTM document, depending upon which document, they are saying that you have to meet this standard or you should meet this standard in order to meet our code requirement." SAF ¶ 26. The effect of these references is exactly the same as if Philadelphia had copied the text of the IBC and the relevant ASTM Works and pasted it into its ordinances. Anyone building in Philadelphia must comply with ASTM A36 when using fully welded steel piles, A615 when using reinforcement, and B209 when using aluminum roof coverings. Failure to do so violates the Philadelphia Code and can result in a $300 fine for each offense, with each day of a continuing violation treated as a separate offense. SAF ¶ 24; Phila. Code ch. 4-200 §§ A-501.1, A-601.1, A-601.4.

By the time UpCodes started publishing A36/A36M-14, A615/A615M-15ae1, and B209 in April 2024 for Philadelphia, those standards had already been made the law in Philadelphia. SAF ¶¶ 33–35.

**b. California Made All Ten Works, Including the Remaining Seven Works, Part of California Law**

All ten ASTM Works at issue, including the remaining seven Works at issue—A252-10, A653/A653M-17, A722/A722M-18, A706/A706M-16, A875/A875M-13, A924/A924M-17a, and A690/A690M-13a—are likewise the law in California based on the 2022 California Building Code (Novikov Decl., Ex. 3 ("2022 CBC")). First, the 2022 CBC became effective on January 1, 2023, and "incorporates by adoption the 2021 International Building Code of the International Code Council with necessary California amendments." *Id.* at § 1.1.1; SAF ¶ 27.

Second, the 2022 CBC makes standards referenced in the code legally binding. It expressly provides that "[t]he codes and standards referenced in this code shall be considered to be part of the requirements of this code to the prescribed extent of each such reference." SAF ¶ 28. Thus, the CBC itself makes clear that its referenced standards are requirements of California law, not merely sources of technical guidance.

The 2022 CBC identifies each of the following as a standard referenced in the code and identifies the substantive provisions and tables that reference it: A252-10 (Reapproved 2018), A653/A653M-17,

A722/A722M-18, A706/A706M-16, A875/A875M-13, A924/A924M-17a, and A690/A690M-13a. *See* Novikov Decl., Ex. 3 at Ch. 35; SAF ¶ 29. Chapter 35 further explains that the referenced standards supply requirements for materials and methods of construction and "are part of this code to the extent of the reference to the standard." *Id.* As detailed in Eugene Novikov's declaration, the 2022 CBC's provisions require compliance with each standard. SAF ¶ 32. For example, § 1810.3.2.3 of the 2022 CBC requires that "[s]teel pipe piles shall conform to the material requirements in ASTM A252." *Id*. The fact that some provisions offer alternatives for compliance does not make the incorporated standards advisory. For example, the 2022 CBC requires micropile reinforcement to conform to either A615 or A722. Novikov Decl., Ex. 3 at § 1810.3.10.2; SAF ¶ 32. Just as a statute whose subsections set forth two different ways to achieve compliance is the law in its entirety, the fact that builders must choose one of the two standards does not make either any less a part of the law.

By the time UpCodes started publishing A252-10 (Reapproved 2018), A722/A722M-18, A653/A653M-17, A706/A706M-16, A875/A875M-13, A924/A924M-17a, and A690/A690M-13a in April 2024 for California, those standards had already been incorporated into law through the 2022 CBC. SAF ¶¶ 36–42.

**c. Annexes, Appendices, and Supplemental Requirements Are Also the Law**

ASTM cannot avoid the fact that its standards are the law by arguing that certain sections within those texts—annexes, appendices, and supplemental requirements—are labeled "nonmandatory." As UpCodes' building codes expert stated in testimony that stands unrebutted, "[f]rom a code administration perspective, the important question is not where material appears in an ASTM standard or what label the standard assigns to it." SAF ¶ 93. "The important question is whether the material helps the relevant participant understand, apply, measure, test, or verify compliance with the adopted standard." *Id.*

The Third Circuit has already rejected ASTM's argument. The Court recognized that each of the "Works contains 'mandatory' text that outlines technical requirements and 'non-mandatory' or

supplemental text, such as explanatory notes, supplemental materials, appendices, and annexes." *UpCodes II*, 172 F.4th at 259. But it nevertheless held that "[i]t makes no difference that UpCodes copied 'non-mandatory' portions of incorporated Works." *Id.* at 268. In reaching that conclusion, the Third Circuit embraced the D.C. Circuit's finding that "the most important question is what material counts as 'law,' and because law is interpreted contextually, even explanatory and background material in an incorporated standard will aid in understanding and interpreting legal duties." *Id.* (cleaned up). This reasoning applies to all of the different materials on which ASTM relies as purportedly "non-mandatory." ASTM Mot. at 13. First, "annexes" are mandatory even according to ASTM. SAF ¶¶ 90–91. ASTM requires an annex to be labeled "Mandatory Information" and directs that an annex should contain detailed information that "is a mandatory part of the specification but too lengthy for inclusion in the main text." *Id.* Second, "appendices" remain "integral to understanding the standard's material requirements," regardless of their "nonmandatory" designation. *UpCodes II*, 172 F.4th at 268. As the Third Circuit aptly stated, using A252 as an example:

> The mandatory portion of the [A252] standard provides that "wall thickness shall not be more than 12.5% under the specified nominal wall thickness." JA477. But to actually determine the minimum permissible wall thickness based on various nominal wall thicknesses, one consults a "non-mandatory" table in the standard's appendix. JA501. It is reasonable for UpCodes to copy non-mandatory portions of a standard incorporated in full, as such portions still have legal effect and may prove integral to understanding the standard's material requirements. A contrary ruling would be blind to the realities of how people interpret and use law.

*Id.; see also* SAF ¶ 94 (similar). Finally, ASTM's drafting rules make clear that "supplementary requirements" become mandatory when specified for a particular project, SAF ¶ 92, whereupon they are required for compliance with the building code in the same way as the base standard. For example, Mr. Shipman explains that with respect to A653, supplementary requirements S1 and S2, when specified for a project, are used in "measuring thickness, specifying coating mass, and evaluating whether the steel sheet satisfies the applicable requirements." SAF ¶ 95. Thus, although supplementary requirements are not mandatory for every project, when a project specifies them, they are the law.

Accordingly, ASTM's own labels marking portions of its standards as mandatory or nonmandatory cannot override the IBC's incorporation of the Work. As the Third Circuit held, "[i]t is reasonable for UpCodes to copy non-mandatory portions of a standard incorporated in full, as such portions still have legal effect and may prove integral to understanding the standard's material requirements. A contrary ruling would be blind to the realities of how people interpret and use law." *UpCodes II*, 172 F.4th at 268.

### B. ASTM's Copyright Infringement Claims Fail Because UpCodes' Posting of the Law is Fair Use

The fair use analysis turns on four non-exclusive factors: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Fair use exists to "provid[e] a context-based check that can help to keep a copyright monopoly within its lawful bounds." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22 (2021). That check carries particular force where, as here, a copyright holder seeks to restrict public access to the law. Consistent with that principle, courts across the country have likewise reached the same conclusion, holding that UpCodes' posting of model codes adopted into law is fair use. *See Facility Guidelines Inst., Inc. v. UpCodes, Inc.* ("*FGI*"), 677 F. Supp. 3d 955, 969–73 (E.D. Mo. 2023) (denying preliminary injunction where "UpCodes' posting of [model codes] that have been adopted into law likely constitutes fair use"); *Int'l Code Council, Inc. v. UpCodes, Inc.* ("*ICC*"), No. 17 Civ. 6261, 2020 WL 2750636, at *24, *28–29 (S.D.N.Y. May 27, 2020) (on summary judgment, holding UpCodes' accurate posting of adopted codes fair use as matter of law).

This Court has already applied those factors here, concluding at the preliminary injunction stage that UpCodes' use of ASTM's Works "satisfies the affirmative defense of fair use." *UpCodes I*, 752 F. Supp. 3d at 508. The Third Circuit affirmed. On the narrower preliminary injunction record, the Third Circuit concluded that the first three factors favor fair use. *UpCodes II*, 172 F.4th at 262–68. It found the fourth factor equivocal at that stage because "many important questions remain unanswered." *Id. at* 271. Discovery has answered those questions, and the answers favor UpCodes. The full record confirms the

Third Circuit's analysis of the first three factors and tips the fourth squarely toward fair use. Accordingly, the Court should grant summary judgment in UpCodes' favor.

#### 1. Factor One: "the purpose and character of the use"

The first factor weighs in favor of fair use because UpCodes' use is transformative and largely noncommercial. The first factor pertains to "whether the new work merely 'supersedes the objects' of the original creation . . . or instead adds something new, with a further purpose or different character." *UpCodes II*, 172 F.4th at 262 (citations omitted). In assessing this factor, courts consider whether the copier's use is transformative and whether it is commercial in nature. The Third Circuit held that the first factor favors fair use because any "commercial elements of UpCodes' use do not outweigh its transformative nature." *Id.* at 266.

##### a. UpCodes' use is transformative

The Third Circuit held that "UpCodes' use is transformative because it achieves the distinct objective of making the law freely accessible and educating the public on the contents of binding laws." *UpCodes II*, 172 F.4th at 262 (internal quotation marks omitted). Guided by the D.C. Circuit in *ASTM v. Public.Resource.Org*, the Third Circuit explained that UpCodes' use is distinct from ASTM's because while ASTM "publishes technical standards to positively impact public health and safety, consumer confidence, and overall quality of life," "UpCodes only publishes versions of standards that have been incorporated into law, even if those versions have been superseded by newer versions." *Id.* at 263 (internal quotation marks omitted). UpCodes, though not a non-profit, "mirrors Public Resource in this key respect: it publishes ASTM's works to convey 'only what the law is,' not to inform industry professionals of 'current best practices.'" *Id.* Moreover, "UpCodes makes the standards available for free." *Id.* "This 'fundamental' distinction renders UpCodes' use transformative." *Id.* The exact basis on which ASTM urges the Court to reach a different conclusion in this regard is unclear. ASTM first notes that UpCodes "adds nothing new to the expression of ASTM's Works" when it posts them as enacted law. ASTM Mot.

at 19. This Court has already rejected this argument, writing that "as multiple courts have recognized, posting enacted laws for the purpose of educating members of the public as to their legal obligations may be transformative, even if the enacted laws are identical to other copyrighted works." *UpCodes I*, 752 F. Supp. 3d at 501 (internal quotation marks omitted) (citing *ICC*, 2020 WL 2750636, at *24 (holding the same); *see also FGI*, 677 F. Supp. 3d at 970 (same); *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 450 (D.C. Cir. 2018) (same)). That is because informing the public about the content of the law is itself additive. A user who wishes to know the law of California cannot get that information from ASTM—including from its *Standards in Building Codes* ("SIBC") publication, which contains no information about what standards are adopted in what jurisdictions. SAF ¶ 16. But it *can* get that information from UpCodes. SAF ¶ 15.

ASTM next seeks to contradict the Third Circuit's—and this Court's—conclusion that UpCodes' activity is directed to a different purpose than ASTM's. Its argument rests entirely on the already-rejected premise that because the text of the law is the same as the text of the copyrighted works (in the case of the specific works at issue here), ASTM and UpCodes must be disseminating them for the same fundamental purpose. That premise is as wrong today as it was at the preliminary injunction stage. As the Third Circuit explained, UpCodes' purpose is to make the *law* available to the public. *See UpCodes II*, 172 F.4th at 263. The Third Circuit explained that UpCodes "displays standards under the headings of the building codes in which they are incorporated, asking users to choose a jurisdiction to view a standard and integrating jurisdiction-specific amendments when applicable." *Id.* And as this Court observed, "[o]ne objective indication that UpCodes' use serves a distinct purpose is that ASTM subsequently published updated versions of nine of the ten Copyrighted Standards, and UpCodes does not post updated versions of those standards." *UpCodes I*, 752 F. Supp. 3d at 500 (internal quotation marks omitted).

ASTM claims that facts learned in discovery change the result. But its only reference to the discovery record is that "UpCodes has not identified a single instance in which any person or company

was unable to access an ASTM work or any other copyrighted standard." ASTM Mot. at 20. This is a red herring; whether anyone has been "unable to access an ASTM work" has nothing to do with the transformative use inquiry. In fact, the factual record supports the Third Circuit's characterization of UpCodes' purpose. To provide the public with access to the law, UpCodes' content team constantly researches jurisdictional adoptions and monitors, analyzes, and publishes amendments jurisdictions may make to the adopted standards. SAF ¶ 5. ASTM's SIBC, meanwhile, does not indicate where ASTM's standards have been adopted or reflect jurisdictional amendments. SAF ¶ 16. A reader therefore cannot use SIBC to determine what the law is in any given jurisdiction. Nor is the SIBC free. ASTM sells standards; UpCodes provides access to the law. And for that reason, UpCodes' use is transformative.[3]

UpCodes provides anyone who visits its website, whether or not they are paid subscribers, access to the law. This use is transformative. Even beyond mere access, however, UpCodes includes features for free and paying users that "add[] something new and important" (*Google*, 593 U.S. at 29 (citation omitted))—including search, integrated amendments, Code Compare, Code Calculator, diagrams, and Plan Review. SAF ¶¶ 8–9. One way that a use can be transformative is when the use "seeks to create new products," to "expand the use and usefulness" of preexisting materials. *Google*, 593 U.S. at 30. This use is transformative because it is "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Id.*

**b. UpCodes' use is largely noncommercial.**

Under the first factor, courts also consider whether the "use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). But "[c]ommerciality is only one consideration under the first factor and does not alone determine whether a use is fair." *UpCodes II*, 172 F.4th at 265.

[3] ASTM's reliance on *ROSS* is misplaced. There, *ROSS* copied editorial summaries—not the law—to develop a directly competitive legal research platform. 2026 WL 2932557, at *5–6. By contrast, as the Third Circuit has recognized, UpCodes reproduces the text of standards that have become binding law through incorporation by reference. *UpCodes II*, 172 F.4th at 263–265.

While noncommercial use "tips the scales in favor of fair use," "the inverse is not necessarily true," as "many common fair uses are indisputably commercial." *Id. (citing Google,* 593 U.S. at 32). And "[t]he more transformative the new work"—if it doesn't "merely supersede[] the objects of the original creation"—"the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).

UpCodes makes the text of building codes freely available on its website. SAF ¶¶ 8, 11. While UpCodes has advanced paid features (*see supra* § IV.B.1.a), none of these features are required for a user to access, view, or print the laws that UpCodes makes available for free. SAF ¶¶ 8–9.

ASTM argues that UpCodes' free access to the law is still commercial in nature because it attracts users who may be marketed to and may later purchase a premium subscription. But so too does a biographer's use of quotations from her subject's work help her book's sales. The fact that some indirect economic benefit is derived from a use does not make it commercial. Moreover, any commercial benefit matters less where, as here, the use produces a value that benefits the broader public interest—full and free access to the integrated text of federal, state, and local ***laws***. UpCodes' posting of the enacted law does not "supersede[] the objects of the original," which is to provide ***model standards*** for use and adoption. *Campbell*, 510 U.S. at 579; *see also UpCodes I*, 752 F. Supp. 3d at 499 ("UpCodes' transformative use outweighs the significance of the fact that it is a for-profit company—especially given that UpCodes' does not directly profit from its use of the Copyrighted Standards."); *FGI*, 677 F. Supp. 3d at 971 (similar).

Indeed, this Court and others have already found that UpCodes' use is "largely noncommercial." *UpCodes I*, 752 F. Supp. 3d at 501; *see also FGI*, 677 F. Supp. 3d at 971 (similar); *ICC*, 2020 WL 2750636, at *25 ("[a] commercial actor's dissemination of information to the public may be a transformative use." (citing *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84–85 (2d Cir. 2014))). While "UpCodes may receive tangential benefits from its [use], it derives no direct monetary profit from

publishing" the text of building codes that incorporate model standards. *UpCodes I*, 752 F. Supp. 3d at 499.

ASTM's reliance on *ROSS* with respect to commerciality is misplaced. ASTM Mot. at 15. In *ROSS*, the Third Circuit explained a use is commercial when a copier aims to create a platform that competes with the copyright owner for customers. *ROSS*, 2026 WL 2932557, at *6. As discussed above, here, the Third Circuit already observed that UpCodes' platform provides access to law, whereas ASTM publishes technical standards. *UpCodes II*, 172 F.4th at 258, 263. Moreover, UpCodes does not generate any profit from posting laws on its platform because accessing the law on UpCodes is free. SAF ¶ 8. Users who visit UpCodes do so to access the law, not to obtain technical standards. SAF ¶¶ 3, 57, 61.

**2. Factor Two: "the nature of the copyrighted work"**

The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. The Third Circuit has already concluded that technical standards "fall at the factual end of the fact-fiction spectrum, which counsels in favor of finding fair use." *UpCodes II*, 172 F.4th at 267 (citation omitted). And UpCodes posts only standards that are adopted into law, at which point they "move[] even further to the periphery of copyright's core protection." *Id.* ASTM offers nothing to alter this conclusion, instead conflating the factor-two inquiry with the separate question of when a work is original enough to be copyrightable to begin with. ASTM Mot. at 22. The laws UpCodes posts sit far from copyright's core. The second factor favors fair use.

**3. Factor Three: "the amount and substantiality of the portion used"**

The third factor asks whether the portion copied is "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. This factor relates back to the first: it will "generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative, purpose." *Google*,

593 U.S. at 34. UpCodes' copying is tethered to just such a purpose. As the Third Circuit discussed, UpCodes "disseminate[s] the law" to further its mission of providing the public access to the law. *UpCodes II*, 172 F.4th at 264. And as explained above, UpCodes only disseminates portions of the works in suit that constitute the law and nothing more. Because UpCodes "cannot fulfill its purpose of disseminating the law without copying standards that have been incorporated in full into the law," the third factor favors fair use. *Id.* at 267.

#### 4. Factor Four: "the effect of the use upon the potential market for or value of the copyrighted work"

The fourth factor examines "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Courts consider both "the extent of market harm caused by the particular actions of the alleged infringer," as well as the potential market ramifications of "unrestricted and widespread conduct of the sort engaged in by the defendant." *UpCodes II*, 172 F.4th at 268 (quoting *Campbell*, 510 U.S. at 590). In this case, the analysis must also account for "the likely public benefits of UpCodes' copying." *Id.* at 270 (citing *Google*, 593 U.S. at 35–36).

At the preliminary injunction stage, the Third Circuit observed that "the likely market harm from UpCodes' copying appears limited," but found the factor equivocal because "many important questions remain[ed] unanswered." *Id.* at 269, 271. Discovery has answered them. The record shows no evidence of harm to the market for technical standards, and it confirms the substantial public benefit of free access to the law. The fourth factor favors fair use.

##### a. The record does not show that UpCodes' use harms the market for technical standards.

The Third Circuit identified the relevant market as "the market for technical standards" and observed that "the potential harm to the broader market for technical standards appears limited." *UpCodes II*, 172 F.4th at 269. The factual record shows that UpCodes' use of the Works has not harmed ASTM's sales. In addition, ASTM's evidence that an alleged market exists does not show that UpCodes has harmed

it. And ASTM's predictions do not establish a likelihood of significant market harm.

**i. UpCodes' use of the Works has not harmed ASTM's sales.**

The factual record establishes that UpCodes' use of the Works has not harmed ASTM's sales, and the most telling evidence comes from ASTM itself. Nearly two years after UpCodes began publishing the adopted Works as law, ASTM's general counsel, Thomas O'Brien, could not identify "any concrete way" in which UpCodes' alleged harm to ASTM's revenues "has been felt." SAF ¶ 66. Nor could he identify a single standards-development process ASTM has forgone because of UpCodes, any other project ASTM has been unable to undertake because of "financial pressure or future uncertainty" attributable to UpCodes, any out-of-pocket cost, or any additional investment ASTM has had to make due to UpCodes' conduct. SAF ¶¶ 68–70.

ASTM admits that whatever alleged harm it attributes to UpCodes "has not yet led to a dramatic decrease in overall revenue." ASTM Mot. at 26. In fact, it has not led to any decrease. ASTM's revenue has ***grown***, and ASTM cannot identify a single customer it lost to UpCodes. SAF ¶¶ 78–82. UpCodes' expert, Douglas Kidder, concluded that the addition of laws based on ASTM standards to UpCodes had no discernible effect on ASTM's revenues. SAF ¶ 75. Mr. Kidder also assessed trends in ASTM customer behavior and found "that ASTM customers are continuing to use and purchase the Works-in-Suit at similar rates as they did prior to UpCodes posting of the laws based on the Works-in-Suit." SAF ¶ 76. ASTM's expert did not contradict that conclusion, nor could he. From 2018 through 2025, ASTM's yearly revenue rose from [redacted]. SAF ¶ 78.

The sales data that ASTM offers does not show harm caused by UpCodes. ASTM points to low annual PDF sales of individual Works, ASTM Mot. at 26, but it offers no analysis connecting those figures to UpCodes. ASTM does not acknowledge that some of these Works' PDF sales were already declining well before UpCodes' publication, or that the sales of six of the others ***increased*** after UpCodes' publication. SAF ¶¶ 17, 83–86. Nor does it address the most obvious explanation for declining sales:

ASTM superseded nine of the ten Works with newer editions. *UpCodes I*, 752 F. Supp. 3d at 500; SAF ¶ 65. As the Third Circuit noted, "PDF sales of the individual Works decreased significantly after the relevant standards were updated." *UpCodes II*, 172 F.4th at 270.

**ii. ASTM's evidence that an alleged market exists does not show that UpCodes has harmed it.**

ASTM's argument that UpCodes' laws are a substitute for the Works does not establish harm. ASTM relies on this Court's preliminary finding that UpCodes' copies are "effective substitutes," and on the Third Circuit's statement that it is "plain to see how UpCodes' copying will affect the market for the Works." ASTM Mot. at 24 (quoting *UpCodes II*, 172 F.4th at 269). But the Third Circuit accepted both premises and still concluded that "the potential harm to the broader market for technical standards appears limited." *UpCodes II*, 172 F.4th at 269. It explained why: "because the technical standard industry outpaces legislators," this case may present "an atypical scenario where copies may be effective substitutes for the Works . . . without necessarily usurping the relevant market." *Id.* at 270.

ASTM points to a settlement agreement between UpCodes and NFPA, ASTM's other licenses, ASTM's usage figures, and customer testimony, but none of this evidence establishes harm to the market for technical standards. For example, ASTM argues that UpCodes' agreement with NFPA proves a "vibrant market" for standards incorporated into the law. ASTM Mot. at 25. But [redacted]

ASTM also has not shown that UpCodes has harmed its licensing practices or subscription sales.

ASTM Mot. at 4. ASTM has not identified any licensee that renegotiated its terms, reduced its payments, or stopped paying royalties because of UpCodes. *Id.* at 25; SAF ¶ 87. ASTM also does not show that sales of its *SIBC* subscriptions went down, much less that UpCodes has diverted any of that subscription revenue. ASTM Mot. at 25–28.

ASTM also notes that the Works have been viewed on UpCodes [redacted]; that UpCodes' traffic for the Works has surpassed ASTM's; and that [redacted] of the people who viewed the Works on UpCodes worked at companies that subscribe to ASTM. *Id.* at 8. But that shows overlap, not substitution, and ASTM does not claim that any of those companies have since canceled, let alone as a result of UpCodes. *Id.* at 27–28; SAF ¶ 82; *see also* SAF ¶ 81 (roughly [redacted] of ASTM Compass subscribers renew their subscription). The Third Circuit has already explained that such data "says nothing about the number of subscribers who have subsequently canceled their ASTM subscriptions." *UpCodes II*, 172 F.4th at 269. And the evidence of actual purchases shows that ASTM customers continue to buy the Works at the same rates. *See supra* § IV.B.4.a.i. For example, ASTM relies on the 30(b)(6) testimony from [redacted], an ASTM and UpCodes customer, to argue that, if UpCodes offered more ASTM standards, there would be a "strong possibility" that [redacted] could consider transitioning away from Techstreet. ASTM Mot. at 28. But [redacted] explained that it subscribed to UpCodes because UpCodes has "every building code in every municipality, including the local amendments," and the firm has continued to buy ASTM standards through Techstreet, which remains [redacted] first stop for technical standards. SAF ¶¶ 58–60. [redacted] actual conduct establishes that UpCodes' platform complements ASTM's Works and does not replace them.

**iii. ASTM's speculation about the future does not establish a likelihood of significant market harm.**

Unable to show harm that has occurred in the years since UpCodes first posted laws adopting the Works, ASTM speculates that harm might still arise in the future: ASTM worries that ASTM's licensees "may be encouraged" to stop paying royalties, ASTM Mot. at 25; it claims that UpCodes' use threatens

ASTM's revenues "[s]hould UpCodes' substitutional use become widespread," *id.*; and its expert, Dr. Stec, opines that consumer choice theory "would indicate" that demand for ASTM's paid offerings "will go to zero." ECF 181-2 ("ASTM SAF") ¶ 124.

ASTM's predictions, however, are contradicted by the record. ASTM's revenue has grown, ASTM customers continue to buy the Works at the same rates, and ASTM offers no analysis connecting any decline in sales or downloads of the Works to UpCodes. *See supra* § IV.B.4.a.ii. Indeed, the Third Circuit already considered ASTM's theory. It acknowledged that consumers may be "less incentivized" to pay for works available for free, *UpCodes II*, 172 F.4th at 269, but nevertheless found factor four equivocal because the record did not show how likely and how significant the harm actually is. *Id.* at 271.

Dr. Stec's opinion on future harm does not answer that question either. His only contribution is to opine that if the thing ASTM is selling were made available for free then ASTM's customers would no longer be incentivized to pay ASTM. ASTM SAF ¶ 124. Dr. Stec does not use any method to reach this generalized conclusion. He does not project lost sales or customers, assign a probability to any event he forecasts, or estimate the size of any resulting harm. His "Quantification" section counts the ASTM standards UpCodes might someday post, not harm he projects. SAF ¶ 73. And he ignores the record developed over more than two years of litigating this case. He forecasts that lost revenue would force ASTM to "reduce the number of ASTM standards it develops" or "increase the time between updated individual standards or eliminate updates." SAF ¶ 74. But ASTM's general counsel, Thomas O'Brien, denied that any of this had occurred. Asked how UpCodes had harmed ASTM, he responded that giving standards away "for free" harms ASTM's "ability to collect revenue"; asked whether there was "any concrete way in which that has been felt," he answered, "Not that I'm aware of." SAF ¶ 66. He could not identify a single standards-development process ASTM has forgone because of UpCodes, any other project ASTM has been unable to undertake because of "financial pressure or future uncertainty" attributable to UpCodes, any out-of-pocket cost, or any additional investment ASTM has had to make.

SAF ¶¶ 67–70.

In short, the discovery record offers no basis to conclude that UpCodes' use harms the market for ASTM's products, now or in the future.

**b. Public access to laws weighs in favor of fair use**

"[I]t is necessary to consider the likely public benefits of UpCodes' copying as part of the fourth factor analysis in this case." *UpCodes II*, 172 F.4th at 270 (citing *Google*, 593 U.S. at 35–36). The D.C. Circuit held that there are "substantial public benefits of free and easy access to the law." *Id.* (citing *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1271 (D.C. Cir. 2023)). The Third Circuit followed suit, writing that "[e]nhanced public access to the law is a clear and significant public benefit." *Id*. That the record does not reflect anyone who was "unable to access" the standards for a fee (ASTM Mot. at 27 n.4) does not vitiate the public benefit of making the law freely available.

ASTM argues in a footnote that UpCodes' use causes public harm by impeding motivation to develop new technical standards. *Id*. But as discussed above, ASTM has not suffered any discernible harm resulting from UpCodes' use.

**5. On balance, UpCodes' use is fair.**

On balance, the fair use analysis weighs strongly in favor of UpCodes. The Supreme Court warned against treating the four statutory factors "in isolation": "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. Weighed together here, the factors favor UpCodes: UpCodes' use is transformative because it disseminates the law, *UpCodes II*, 172 F.4th at 263–66; the incorporated Works sit at the factual end of the fact-fiction spectrum, *id.* at 267; UpCodes reasonably copied laws adopting the Works in full because it "cannot fulfill its purpose of disseminating the law without copying standards that have been incorporated in full into the law," *id.*; and there is no evidence that UpCodes' use has harmed any cognizable market. Moreover, even if the fourth factor is ambiguous, "[g]iven the clear weight of the first three factors . . . it is clear that the potential

harms to [ASTM's] markets for its works cannot outweigh the benefits and necessity of enabling unfettered access to enacted laws." *ICC*, 2020 WL 2750636, at *28.

### C. Independent From Fair Use, ASTM's Copyright Claims Fail for Additional Reasons.

Fair use alone is enough for UpCodes to prevail as a matter of law on ASTM's copyright infringement claims. But those claims also fail for two additional, independent reasons, each sufficient on its own: (1) ASTM cannot own the law, because no one can own the law; and (2) because the law can be expressed in only one way, the merger doctrine bars ASTM's claims.

#### 1. No One Can Own the Law

While this case can be decided on the doctrine of fair use, the fundamental principle that the law cannot be copyrighted also leads to the same conclusion. *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 668 (1834) (holding that "no reporter has or can have any copyright in the written opinions delivered by this court."); *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.) ("no one can obtain the exclusive right to publish the laws of a state in a book prepared by him."); *Bldg. Offs. & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 736 (1st Cir. 1980) ("*BOCA*") ("[I]t is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder. . . ."); *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 793 (5th Cir. 2002) (en banc) (holding that "*as law*, the model codes enter the public domain and are not subject to the copyright holder's exclusive prerogatives.") (emphasis in original).

In 2020, the Supreme Court ruled that "no one can own the law." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 265 (2020). That principle provides alternative grounds to resolve this case. *Id.*; *see also id.* at 275 ("statutes and opinions" are not copyrightable). To apply the principle that "no one can own the law" to the annotations before it, the Court needed to inquire into the process by which they were prepared. *Id.* at 265–68. While some texts, like statutes and judicial opinions, are clearly "the law," other

texts, like annotations, are in a gray area. *Id.* at 266–67. "Rather than attempting to catalog the materials that constitute 'the law,'" therefore, the Court adopted a bright-line rule excluding from copyright "works that are (1) created by judges and legislators (2) in the course of their judicial and legislative duties," ***even if they are not*** "the law" because they do not have binding force. *Id.* at 259, 265–66.

This is not an "author-identity" rule, as ASTM would have it. ASTM Mot. at 10. The Court instead created a zone of safety around "the law": the principle that "no one can own the law" is so important it places *even some materials that lack the force of law* in the public domain because they are also issued by lawgivers. *Georgia*, 590 U.S. at 259, 265–66. The Court did not create this zone of safety ***around*** the binding law to carve away the public's rights with respect to the binding law itself. Materials created by lawmakers in their lawmaking capacities are in the public domain, without requiring an inquiry into whether they are also binding law. *Id.* But this prophylactic rule supplements, and does not supplant, the principle it serves: binding law is not subject to copyright, no matter who put pen to paper. *See id.* at 259.

Privately written texts become binding law in a variety of situations, and in none of those situations does the writer end up owning the law. When a citizen drafts a ballot initiative that is put before voters and becomes law, that citizen does not own copyright in a portion of their state's statutes. When a lobbyist writes a bill and is successful in having it enacted, the lobbyist does not own copyright in a portion of the United States Code. And likewise, when a private organization like ASTM—which admits that one of the purposes of its standards is for reference in building codes (ASTM SAF ¶ 10)—prepares a standard and is successful in having it adopted as the binding law, that organization does not own copyright in that law.

ASTM argues that the prophylactic rule announced in *Georgia* (even where a text is not binding, it is still in the public domain if it was authored by a lawmaker acting in a lawmaking capacity) supplants the principle that "no one can own the law." ASTM Mot. at 10-11. Even texts that set forth binding rules governing citizens' conduct may be subject to copyright, ASTM's argument goes, if the texts themselves were penned in the first instance by someone other than a legislator.

That argument is wrong because it would violate the principle that "no one can own the law." But even were the Court to hold that the identity of the "author" is always outcome-determinative, the texts at issue here would be in the public domain because they are attributable to legislators speaking in their legislative capacity. When a legislative body adopts a text as the law, that text becomes attributable to the legislative body, not to the person who held the pen. Indeed, the Supreme Court has observed that the term "author" is given a "more enlarged definition" in the copyright context than "in the limited sense of a book and its author." *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884). "An author in that sense is 'he to whom anything owes its orign; originator; maker; one who completes a work of science or literature.'" *Id.* at 57–58 (citation omitted). The lawmakers are the "maker[s]" of the law, and therefore its authors. *Id.* Indeed, the First Circuit decided *BOCA* in part by applying this principle. *BOCA*, 628 F.2d at 734.

The adoption of a private text as law is analogous to the government's adoption of private speech. For example, texts written by a private entity for agricultural-promotion campaigns were government speech, and not private speech, for First Amendment purposes where the government "exercise[d] final approval authority over every word used in every promotional campaign." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561 (2005). Just as the Secretary of Agriculture was the author of those promotional campaigns, so the Philadelphia City Council is the author of the Philadelphia Building Code (including the materials it incorporates by reference), even though much of the text was written by a private party and then adopted by the government.

The Supreme Court's rule that "no one can own the law" does not depend on who held the pen when the law was written. Because lawmakers in their lawmaking capacity make binding law, they are the "authors" of the binding law.

**2. Because there is only one way to express a legal rule, copyright's merger doctrine bars ASTM's claim.**

The merger doctrine provides an additional alternative basis for rejecting ASTM's claim of

copyright infringement. "[A]n expression will be found to be merged into the idea when there are no or few other ways of expressing a particular idea." *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 539 (3d Cir. 1986). "[T]he limited number of ways a concept can be addressed may be relevant to the extent of copying permitted." *Id.*

The adopted standards UpCodes copied are the law, so they are "'facts' under copyright law. They are the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck*, 293 F.3d at 801. The standards "can be expressed in only one way; they are facts. *Id.* at 802. [UpCodes] placed those facts on [its] website in precisely the form in which they were adopted" by state and local jurisdictions. *Id.* at 802. There is no way to state the law other than to use the exact words of the law: "An individual wishing to publish the text of a law cannot develop his own, unique version and still publish an authoritative copy." *Id.* at 801 (quoting with approval dissent to panel opinion). The "idea" or "fact" of the law has thus merged with its expression in the text of the law.

ASTM's arguments to the contrary are unpersuasive. First, ASTM's assertion that UpCodes conceded that the law can be written in multiple ways is misleading. ASTM Mot. at 12. In its opposition to ASTM's motion for preliminary injunction, UpCodes stated that "nothing . . . would preclude UpCodes or another standards development organization from writing publications expressing the same ideas set forth in the Works", but this does not mean that *the law*, which is what UpCodes posts, can be written in multiple ways. A law review article, for example, can express the same ideas found in a statute, but it is not the law.

Second, ASTM's position that "merger is assessed at the time that a work is created" is contrary to cases that address this very issue. The district court in *ICC* held otherwise under Second Circuit law. *ICC*, 2020 WL 2750636, at *19–22 (finding merger due to incorporation into law). So did the Fifth Circuit in *Veeck*, 293 F.3d at 800–02. Per the leading copyright treatise, this is the "better view." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13D.29[D] (Matthew Bender, Rev. Ed. 2026). The

Third Circuit has not directly addressed the question.

*ROSS* is distinguishable because it concerns the copyrightability of *headnotes* summarizing the law, not the law itself. *ROSS*, 2026 WL 2932557 at *5. In *ROSS*, the Third Circuit drew this line explicitly: "headnotes are not law; judicial opinions are." *Id.* This distinction matters here because UpCodes does not publish headnotes; it publishes the law itself. SAF ¶ 3. And while "there are many ways to express points of law from judicial opinions" (*ROSS,* 2026 WL 2932557 at *5), there is only one way to express enacted law: in the words the jurisdiction enacted. *See Veeck*, 293 F.3d at 800-02. A paraphrase of an incorporated standard is not the law; only the enacted text is.

Moreover, granting copyright in the text of enacted standards would do exactly what *ROSS* said copyrighting headnotes would not: "give [ASTM] a monopoly over the law." *ROSS,* 2026 WL 2932557 at *5. While "judicial opinions remain 'free for publication to all,'" the same is not true for laws that adopt ASTM standards. *Id.* (citing *Banks v. Manchester*, 128 U.S. 244, 253 (1888)). ASTM attempts to hide the law behind its paywall. SAF ¶ 100. ASTM's reliance on *ROSS* improperly conflates an editor's summary of judicial opinions with the enacted law that UpCodes publishes.

**D. ASTM's § 1202(b) Claim Fails as a Matter of Law.**

Section 1202(b) prohibits the intentional removal or alteration of copyright management information ("CMI"), and the distribution of works from which CMI has been removed, but only when the defendant acts "knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b). The statute thus imposes a double scienter requirement: ASTM must prove not only that UpCodes intentionally removed or altered CMI, but that UpCodes did so knowing—or with reasonable grounds to know—that the removal would facilitate infringement. ASTM cannot carry that burden for two independent reasons.

First, there is no predicate infringement to facilitate. The Copyright Act provides that fair use "is not an infringement of copyright." 17 U.S.C. § 107. It follows that where the underlying use is fair, the

removal of CMI cannot "induce, enable, facilitate, or conceal an infringement," and § 1202(b) liability fails at the threshold. *See Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, 2025 WL 1786418, at *1 (N.D. Cal. June 27, 2025) (granting summary judgment on § 1202(b) claim because the defendant's copying "was not an infringement," so "its removal of CMI could not have furthered an act of infringement"). That reading, the court explained, is the one "consistent with the overall purpose and structure of copyright law." *Id*. Congress would not have exempted fair users from infringement liability "only to open them back up to DMCA liability if they removed some boilerplate in doing so." *Id.* For the reasons set forth above, UpCodes' publication of the standards incorporated into law is fair use. Thus, ASTM's § 1202(b) claim collapses with its infringement claim.

Second, UpCodes lacked the requisite knowledge. Even if this Court were to reject UpCodes' fair use defense, ASTM must still prove that UpCodes and the Reynolds brothers knew, or had reasonable grounds to know, that their conduct would "induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b). It cannot. There cannot have been reasonable grounds to know that UpCodes' dissemination of the law was an infringement, because courts across the country, at the time of the alleged CMI removal, had already held that it was not infringement. *See, e.g., FGI*, 677 F. Supp. 3d at 973 (denying preliminary injunction motion because UpCodes' posting of model codes adopted into law likely constitutes fair use); *ICC*, 2020 WL 2750636, at *23 (holding that UpCodes' posting of model codes to be "protected as a matter of public domain law" and fair use). Thus, summary judgment should be entered for UpCodes on ASTM's § 1202(b) claim.

### E. ASTM's Trademark Claims Cannot Succeed Because UpCodes' References Constitute Nominative Fair Use.

At the preliminary injunction stage, this Court held that "UpCodes' references to ASTM's mark constitute nominative fair use," and ASTM's trademark claims "therefore fail." *UpCodes I*, 752 F. Supp. 3d at 508. ASTM did not challenge that holding on appeal. Nor has the developed record changed the analysis. Summary judgment should be entered for UpCodes on ASTM's trademark claims.

**1. The Modified Likelihood-of-Confusion Test Applies.**

Because UpCodes uses ASTM's mark "in a nominative manner," the Third Circuit's two-step nominative fair use framework applies. *UpCodes I*, 752 F. Supp. 3d at 509. Under that framework, "the court should apply a modified likelihood of confusion standard that is tailored to the nominative use context." *Id.* At step one, ASTM bears the burden of proving that confusion is likely, and the Court "must tailor the likelihood of confusion test and measure only those factors that are meaningful and probative in the context of nominative fair use." *Id.* at 511. Here, this Court found the "most relevant [factors] in assessing likely confusion" to be: (1) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (2) the intent of UpCodes in adopting the mark; and (3) the evidence of actual confusion. *Id.* (citing *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 238–39 (3d Cir. 2005)); *see Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).

**2. The Consumer Sophistication *Lapp* Factor Weighs Against Confusion**

The first probative *Lapp* factor is consumer sophistication and care. Here, the record shows that ASTM's standards are "targeted at technical people [such as] engineers, architects, builders, and suppliers and manufacturers of construction materials." *UpCodes I*, 752 F. Supp. 3d at 511; *see also* ASTM Statement of Additional Facts ("ASTM SAF"), ECF 186 ¶ 1-3, 5. These are "sophisticated actors who are looking to follow fairly specific laws" and "use care in selecting the source of their laws" when a building's safety is at stake. *Id*. The consumer sophistication *Lapp* factor weighs against confusion.

**3. The Intent *Lapp* Factor Weighs Against Confusion**

The second relevant *Lapp* factor is the intent of the accused infringer in referencing the asserted mark. UpCodes does not reference the ASTM mark to "confuse or deceive consumers as to the [UpCodes' website's] source." *Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 205 (3d Cir. 1995). Rather, UpCodes references ASTM's mark because doing so is "the only practical way" to refer to the standards incorporated into law. *UpCodes I*, 752 F. Supp. 3d at 511. Using the ASTM mark allows UpCodes "to

accurately identify which privately authored standard has been incorporated into law." *Id.*; SAF ¶ 19. In this Court's words, "UpCodes uses the mark to clarify, not to confuse." *UpCodes I*, 752 F. Supp. 3d at 511–12. The intent *Lapp* factor weighs against confusion.

#### 4. The Actual Confusion *Lapp* Factor Weighs Against Confusion

The last relevant *Lapp* factor is evidence of actual consumer confusion. At the preliminary injunction stage, ASTM "concede[d] that it [could] show no evidence of actual consumer confusion." *Id.* at 512. That concession has hardened into a failure of proof. ASTM has taken depositions of nine fact witnesses, subpoenaed more than thirty of UpCodes' users, and reviewed nearly 3,000 third-party documents, and it has identified not a single consumer who was confused about the source of the laws on UpCodes' website. SAF ¶ 20. Nor has it offered any survey evidence. Accordingly, the actual-confusion factor weighs in favor of UpCodes.

#### 5. On balance, ASTM Cannot Establish a Likelihood of Confusion, and Therefore Fails at Step One of the Third Circuit's Nominative Fair Use Test.

Every relevant *Lapp* factor weighs against a finding of a likelihood of confusion: consumers are sophisticated, UpCodes' intent is to clarify rather than confuse, and, after full discovery, ASTM has produced no evidence of actual confusion. The summary judgment record thus confirms what this Court concluded at the preliminary injunction stage: "ASTM has not met its burden of showing a likelihood of confusion." *UpCodes I*, 752 F. Supp. 3d at 512. Because likelihood of confusion is an element on which ASTM bears the burden of proof at trial, its failure of proof entitles UpCodes to judgment as a matter of law. ASTM's trademark claims fail for this reason alone.

## V. CONCLUSION

For the foregoing reasons, UpCodes respectfully requests that its Motion for Summary Judgment be granted, and ASTM's Motion for Summary Judgment be denied.

Dated: October 30, 2026

**MORRISON & FOERSTER LLP**

By: */s/ Joseph C. Gratz*

JOSEPH C. GRATZ (*pro hac vice*)
JGratz@mofo.com
HANNAH JIAM (*pro hac vice*)
HJiam@mofo.com
EUGENE NOVIKOV (*pro hac vice*)
GNovikov@mofo.com
UMEET K. SAJJAN (*pro hac vice*)
USajjan@mofo.com
KATE IM (*pro hac vice*)
KIm@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105, USA
Telephone: 415.268.7000
Facsimile: 415.268.7522

SARA A. DOUDAR (*pro hac vice*)
SDoudar@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858.720.5100
Facsimile: 858.720.5125

BONNIE M. HOFFMAN, PA ID 201140
bhoffman@hangley.com
THOMAS N. BROWN PA ID 321008
tbrown@hangley.com
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
1735 Market Street, 26th Floor
Philadelphia, Pennsylvania 19103
Telephone: 215.568.6200
Facsimile: 215.568.0300

*Attorneys for Defendants*
*UPCODES, INC., GARRETT REYNOLDS, and SCOTT REYNOLDS*